ORAL ARGUMENT NOT YET SCHEDULED
No. 13-5192

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

ALEC L., *et al.*,

*Plaintiffs – Appellants*,

v.

GINA McCARTHY, *et al.*,

*Defendants – Appellees*,

THE NATIONAL ASSOCIATION OF MANUFACTURERS, *et al.*,

*Intervenors for Defendants – Appellees*

—————————————

**On Appeal from the Unites States District Court
for the District of Columbia (No. 11-cv-02235 (RLW))**

—————————————

**BRIEF OF NATIONAL CONGRESS OF AMERICAN INDIANS, ET AL.
AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS-APPELLANTS SEEKING REVERSAL**

—————————————

*Counsel of Record*
F. MICHAEL WILLIS
Hobbs Straus Dean & Walker, LLP
2120 L Street NW, Suite 700
Washington, D.C. 20037
(202) 822-8282

Counsel for *Amici Curiae*

*On the Brief*
ELIZABETH ANN KRONK
WARNER
University of Kansas School of Law
1535 W. 15th Street
Lawrence, Kansas 66045
(785) 864-1139

## STATEMENT REGARDING CONSENT TO FILE, SEPARATE BRIEFING, AUTHORSHIP, AND MONETARY CONTRIBUTIONS

Counsel for all parties (Youth Appellants, Government Appellees, and Industry Appellees-Intervenors) consent to the submission of this brief.

Pursuant to D.C. Circuit Rule 29(d), *amici curiae* certify that to their knowledge no other *amicus curiae* brief addresses the issues raised in this brief and that a separate brief is necessary. *Amici* represent 1) organizations working for Native Nations and within Indian country; 2) the Akiak Alaska Native Community; and 3) law professors, who research, teach, and write on environmental and tribal law. *Amici* certify that filing a joint brief with other interests on issues failing to consider the unique impacts Native Nations experience from climate change and the unique legal and cultural status of these communities is not practicable.

Under Federal Rule of Appellate Procedure 29(c), *amici* state that no party's counsel authored this brief in whole or in part, and no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici curiae* or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

i

## CERTIFICATE OF INTERESTED PARTIES, RULINGS, AND RELATED CASES

**A. Parties and *Amici*.** Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Plaintiffs-Appellants:

National Congress of American Indians, Alaska Inter-Tribal Council, Forgotten People, Inc., Indigenous Peoples Climate Change Working Group, National Native American Law Student Association, Akiak Native Community, and Law Professors Randall Abate, Lorie Graham, Diane Kaplan, Sarah Krakoff, Colette Routel, and Elizabeth Kronk Warner are *amici curiae* in this appeal.

**B. Rulings under Review.** References to the rulings at issue appear in the Brief for Plaintiffs-Appellants.

**C. Related Cases.** References to related cases appear in the Brief for Plaintiffs-Appellants.

Respectfully submitted,

*/s/ F. Michael Willis*
F. Michael Willis
*Counsel for Amici Curiae*

Dated: November 12, 2013

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that they are not publicly held corporations, and no corporation or other publicly held entity own more than 10% of the stock of any of the *amici*. *Amici* have no parents, subsidiaries, or affiliates that have issued shares or debt securities to the public.  The general purpose, insofar as relevant to this litigation, of the *amici* as Native Nations supporters and communities is to promote the Court's consideration of the unique impacts of climate change on Native Nations and how the law applicable to Indian country varies from the law applicable elsewhere.

# TABLE OF CONTENTS

STATEMENT REGARDING CONSENT TO FILE, SEPARATE BRIEFING,
AUTHORSHIP, AND MONETARY CONTRIBUTIONS......................................i

CERTIFICATE OF INTERESTED PARTIES, RULINGS, AND
RELATED CASES.........................................................................................ii

CORPORATE DISCLOSURE STATEMENT.........................................................iii

TABLE OF CONTENTS.........................................................................................iv

TABLE OF AUTHORITIES..................................................................................vi

GLOSSARY............................................................................................................xii

IDENTITIES AND INTERESTS OF *AMICI CURIAE*............................................1

SUMMARY OF ARGUMENT.................................................................................5

ARGUMENT............................................................................................................5

    I.  Climate Change Impacts Devastate Native Nations.......................................6

    II.  Unique Legal and Cultural Status of Native Nations Must be Considered
        by the Federal Government in Relation to Climate Change........................18

        A.    Tribal Sovereignty Must be Considered...........................................18

        B.    Federal Trust Responsibility Must Also be Considered....................21

        C.    Unique Relationship with Land and the Environment Must be
             Considered.........................................................................................28

CONCLUSION.......................................................................................................28

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................................30

CERTIFICATE OF SERVICE...............................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                                            **Page**

*Cherokee Nation v. Georgia*, 30 U.S. 1 (1831)........................................................20

*Nanomantube v. Kickapoo Tribe in Kan.*, 631 F.3d 1150 (10th Cir. 2011)............20

*NLRB v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002) (en banc)..............20

*\*Seminole Nation v. United States*, 316 U.S. 286 (1942)...........................21-22, 25

*\*United States v. Mitchell*, 463 U.S. 206 (1983)................................................22-23

*United States v. Wheeler*, 435 U.S. 313 (1978)................................................20, 21

*\*United States v. White Mountain Apache*, 537 U.S. 465 (2003)..........................23

*\*Washington v. Wash. Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979).......24

*\*Winters v. United States*, 207 U.S. 564 (1908)......................................................24

*Worcester v. Georgia*, 31 U.S. 515 (1832)............................................................20

## Statutes

43 U.S.C. § 1603 (2006).........................................................................................11

28 U.S.C. § 1505 (1949).........................................................................................23

Alaska Native Claims Settlement Act of 1971, 43 U.S.C. §§ 1601, *et seq*.............18

## Rules and Regulations

50 C.F.R. Part 679..................................................................................................25

*78 Fed. Reg. 39539 (2013)....................................................................................19

\* Authorities upon which we chiefly rely are marked with asterisks.

## Other Authorities

*Randall S. Abate et al., Climate Change and Indigenous Peoples: The Search for Legal Remedies (Randall S. Abate & Elizabeth Ann Kronk eds., 2013)..................................................................................................6-7

ACIA Overview Report, *Impacts of a Warming Arctic: Arctic Climate Impact Assessment* (2004)...............................................................................10

ACIA Scientific Report, *Arctic Climate Impact Assessment* (2005).......................10

Azadeh Ansari, *'Climate Change' Forces Eskimos to Abandon Village*, CNN.com (April 28, 2009)...........................................................................................9

Reid Peyton Chambers, *Compatibility of the Federal Trust Responsibility with Self-Determination of Indian Tribes: Reflections on Development of the Federal Trust Responsibility in the Twenty-First Century*, 2005 Rocky Mtn. L. Inst. 13A-2.....................................................................................................26

Patricia Cochran et al., *Indigenous Frameworks for Observing and Responding to Climate Change in Alaska*, 120 Climatic Change 557 (2013)........................6-7

Felix S. Cohen, Handbook of Federal Indian Law (U.S. Gov't Printing Office, 1st ed. 1945)...............................................................................................1

Felix Cohen, *The Erosion of Indian Rights, 1950-1953: A Case Study in Bureaucracy*, 62 Yale L.J. 348 (1953).............................................................5-6

*Cohen's Handbook of Federal Indian Law (Nell Jessup Newton, et al. eds. Lexis Nexis 2012 ed.)...............................................................................19-21

Daniel Cordalis & Dean B. Suagee, *The Effects of Climate Change on American Indian and Alaska Native Tribes*, 22 Nat. Resources & Env't 45 (2008)...........................................................................................9, 15-16

K. Cozzetto et al., *Climate change impacts on the water resources of American Indians and Alaska Natives in the U.S.*, 120 Climatic Change 569 (2013)....................................................................6-7

Eleanor Dictaan-Bang-oa, *Perishing Past and Pride: Indigenous Women and Climate Change*, 2 WOMEN IN ACTION 47 (2009)..............................................6-8

Kyle Dittmer, *Changing Streamflow on Columbia Basin Tribal Lands- Climate Change and Salmon. Climatic Change*, 120 CLIMATIC CHANGE 627 (2013)......6-7

John T. Doyle et al., *Exploring effects of climate change on Northern Plains American Indian health*, 120 CLIMATIC CHANGE 643 (2013)............................6-7

Robert M. Figueroa, *Indigenous peoples and cultural losses*, in THE OXFORD HANDBOOK OF CLIMATE CHANGE (J.S. Dryzek et al. eds., 2011).......................6-7

Mahesh R Gautam et al., *Climate Change in Arid Lands and Native American Socioeconomic Vulnerability: The Case of the Pyramid Lake Paiute Tribe*, 120 CLIMATIC CHANGE 585 (2013)...........................................6-7

General Accounting Office, *Alaska Villages: Most Are Affected by Flooding and Erosion, but Few Qualify for Federal Assistance*, GAO-04-142 (Dec. 2003).......9

Zoltan Grossman, *Indigenous Nations' Responses Climate Change*, 32 AM. INDIAN CULT. RES. J. 5 (2008).............................................................6-7

Terri Hansen, *8 Tribes That Are Way Ahead of the Climate-Adaptation Curve*, INDIAN COUNTRY TODAY (Oct. 15, 2013)..............................................11

Preston Hardison & Terry Williams, *Culture, Law, Risk and Governance: The Ecology of Traditional Knowledge in Climate Change Adaptation*, 120 CLIMATIC CHANGE 531 (2013)..........................................................6-7

Larry D. Hinzman et al., *Evidence and Implications of Recent Climate Change in Northern Alaska and Other Arctic Regions*, 72 CLIMATIC CHANGE 252 (2005)............................................................................10

IPCC, *Climate Change 2007: Synthesis Report* (2007) ...........................9

IPCC, 14.2.6 Human settlements (2007), www.ipcc.ch/ipccreports/ar4-wg2.htm..................................................................15-16

Sarah Krakoff, *American Indians, Climate Change, and Ethics for a Warming World*, 85 DENV. U. L. REV. 865 (2008).............................................6-8

Kathy Lynn et al., *The Impacts of Climate Change on Tribal Traditional Foods*,
120 CLIMATIC CHANGE 545 (2013)....................................................................6-7

Julie K. Maldonado et al., *The Impact of Climate Change on Tribal Communities
in the US: Displacement, Relocation, and Human Rights*,
120 CLIMATIC CHANGE 601 (2013)....................................................................6-7

Jeff Mears, presentation, *A Climate Change Focused Organization*, at First
Stewards Symposium: Coastal Peoples Address Climate Change, Washington,
D.C. (2012) ......................................................................................................6-7

Macchi, Mirjam et al., Issues paper, *Indigenous and Traditional Peoples and
Climate Change*, Gland, Switzerland: International Union for Conservation of
Nature (2008) ..................................................................................................6-8

National Congress of American Indians, *Resolution #EWS-06-2004 – Supporting a
National Mandatory Program to Reduce Climate Change Pollution and Promote
Renewable Energy* (2006) ..................................................................................16

*Native Peoples – Native Homelands Climate Change Workshop: Final Report
(Nancy G. Maynard ed., 1998)....................................................................12, 27

Nell Jessup Newton, *Federal Power Over Indians: Its Sources, Scope, and
Limitations* 132 U. PA L. REV. 195 (1984)..................................................25, 27

*National Tribal Air Association, *Impacts of Climate Change on Tribes in the
United States* (2009)...............................................................10, 13, 14-15, 17-18

Hari M. Osofsky, *The Inuit Petition as a Bridge? Beyond Dialectics of Climate
Change and Indigenous Peoples' Rights*, 31 AM. INDIAN L. REV. 675
(2006-2007)........................................................................................................6-8

Alan Parker et al., *Climate Change and Pacific Rim Indigenous Nations*, *Executive
Summary* (Alan Parker et al. eds., 2006).................................................................8

Plaintiff Declaration of Nelson Kanuk in Support of Youth's Motion for
Preliminary Injunction, Sept. 28, 2011, Appellants' Appendix A156-
A159........................................................................................................11-12

Plaintiff Declaration of Jaime Lynn Butler in Support of Youth's Motion for Preliminary Injunction, Sept. 28, 2011, Appellants' Appendix A147-A149......................................................................................................13-14

Frank Pommersheim, *The Reservation as Place: A South Dakota Essay*, 34 S.D. L. REV. 246 (1989)....................................................................16

Patrick Reis, *Obama Admin Strikes $3.4B Deal in Indian Trust Lawsuit*, N.Y. TIMES (Dec. 8, 2009)..................................................................24-25

Bob Roehr, *AAAS Coalition Explores Perspectives of Indigenous Communities on Climate Change*, American Association for the Advancement of Science News Release (Feb. 6, 2012)...........................................................6-8

Margot Roosevelt, *Vanishing Alaska: Global Warming is Flooding Villages Along the Coast. Should They Surrender and Move?* TIME MAGAZINE (Sept. 27, 2004)....................................................................................10

Jan Salick & Anja Byg, *Indigenous Peoples and Climate Change*, Tyndall Centre for Climate Change Research, Oxford (2007)....................................6-8

CHRISTINE SHEARER, KIVALINA: A CLIMATE CHANGE STORY (Haymarket Books 2012).................................................................................6-7

Christine Shearer, *The Social Construction of Alaska Native Vulnerability to Climate Change*, 19 RACE, GENDER, & CLASS 61 (2012)....................6-8

Peggy M. Shepard & Cecil Corbin-Mark, *Climate Justice*, 2 ENVTL. JUST. 163 (2009)...................................................................................17

Special Message to Congress on the Problems of the American Indian: "The Forgotten American," 113 Pub. Papers (March 6, 1968)......................26

Survival International, *The Most Inconvenient Truth of All, Climate Change and Indigenous People* (2009).............................................................9

Victoria Tauli-Corpuz & Aqqaluk Lynge, *Impact of Climate Change Mitigation Measures on Indigenous Peoples and on their Territories and Lands*, New York: UN Permanent Forum on Indigenous Issues (2008)...........................6-8

*Rebecca Tsosie, *Indigenous People and Environmental Justice: The Impact of Climate Change*, 78 U. COLO. L. REV. 1625 (2007)................................10, 17, 27

*Rebecca Tsosie, *Keynote Address: Indigenous Peoples and Global Climate Change: Intercultural Models of Climate Equity*, 25 J. ENVT. L. & LITIG. 7 (2010)....................................................................................................6-8

Union of Concerned Scientists, *Climate Change and Your Health*, http://www.ucsusa.org/global_warming/science_and_impacts/impacts/climate-change-and-your-health.html (last visited Oct. 20, 2013)....................................15

Garrit Voggesser, *The Tribal Path Forward: Confronting Climate Change and Conserving Nature*, THE WILDLIFE PROFESSIONAL, Winter 2010......................6-8

Garrit Voggesser et al., *Cultural Impacts to Tribes from Climate Change Influences on Forests*, 120 CLIMATIC CHANGE 615 (2013)................................6-7

Kyle Powys Whyte, *Justice Forward: Tribes, Climate Adaptation and Responsibility in Indian Country*, 120 CLIMATIC CHANGE 517 (2013)...............6-7

Daniel R. Wildcat, *Introduction: climate change and indigenous peoples of the USA*, 120 CLIMATIC CHANGE 509 (2013)...........................................................6-7

Charles F. Wilkinson & Eric R. Biggs, *The Evolution of the Termination Policy*, 5 AM. INDIAN L. REV. 139 (1977).........................................................................21

*Mary Christina Wood, *The Indian Trust Responsibility:  Protecting Tribal Lands and Resources through Claims of Injunctive Relief Against Federal Agencies*, 39 TULSA L. REV. 355 (2003)...........................................................22, 23-24, 25

Mary Christina Wood & Zachary Welcker, *Tribes as Trustees Again (Part I):  The Emerging Tribal Role in the Conservation Trust Movement*, 32 HARV. ENVTL. L. REV. 373 (2008)..........................................................................................16-17

## GLOSSARY

AITC        Alaska Inter-Tribal Council

NCAI        National Congress of American Indians

FP          Forgotten People, Inc.

## IDENTITIES AND INTERESTS OF *AMICI CURIAE*

*Amici curiae* represent 1) organizations working on behalf of Native Nations and in Indian country; 2) the Akiak Alaska Native Community; and 3) law professors, who research, teach, and write on environmental and tribal law. *Amici* seek to ensure that in deciding this case the Court understands the unique impacts of climate change on Native Nations.  *Amici* also introduce how the law applicable to Indian country varies from the law applicable elsewhere.  *Amici* join to support Youth Appellants Alec L., *et al*. in seeking reversal, and include:

The **National Congress of American Indians** (NCAI) is the oldest and largest American Indian organization, representing more than 250 Indian Tribes and Alaskan Native Villages, and is devoted to protecting the health and welfare of Indian people, the many generations of Native children to come, and tribal government rights under treaties and federal laws, including rights in tribal lands and natural resources.  Among the most climate-sensitive North American communities are those of Indigenous populations that depend on natural resources, are located in coastal and river flood plains, or are prone to extreme weather events.  Nearly all tribes fit into one of those categories, and most Alaska Native communities fit into all three.

The **Alaska Inter-Tribal Council** (AITC) is a statewide, tribally-governed, non-profit organization that advocates on behalf of tribal governments throughout

1

the states.  AITC promotes indigenous self-determination by providing technical
assistance to tribal governments, facilitating inter-government and inter-agency
communication and collaboration, offering public education regarding Alaska
Native cultures and tribal governments, and advocating on behalf of tribal
initiatives and self-governance.

**Forgotten People, Inc.** (FP) (incorporated on the Navajo Nation) is a non-
profit community-based organization dedicated to improving the well-being of the
Dine' people who live on the Navajo Nation in Arizona and experience daily the
impacts of climate change.  The mission of FP is to help achieve environmental
and economic justice, access to safe drinking water, housing, solar electrification
and sustainable agriculture.  The communities served by FP are some of the most
traditional in North America and survive via a subsistence lifestyle, as they have
done for hundreds of years.

**Indigenous Peoples Climate Change Working Group** is a body of
individuals committed to seeing links between tribes, Tribal Colleges and
Universities, federal agencies and non-governmental organizations strengthened.
The Working Group strives to improve our environmental future, and formed this
organization to ensure that tribal peoples are educated about the environment in
order to make good environmental decisions in their communities.

2

**National Native American Law Student Association** is an organization founded to promote the study of Federal Indian Law, Tribal Law, and traditional forms of governance, and to support Native Americans in law school. The Association reaches out to Native communities, encourages Native People to pursue legal education, and educates the legal community about Native issues.

**Akiak Native Community** is a group of Alaskan Natives that live together in Akiak, Alaska. The Akaik primarily rely on subsistence and fishing activities to survive. Due to their location in Alaska, continuing negative environmental effects threaten the Akiak's culture and lifestyle.

**Randall Abate** is a Professor of Law at Florida A&M College of Law. Professor Abate teaches climate change and its impacts on indigenous peoples, environmental law, international and comparative law, and constitutional law. Before teaching at Florida A&M College of Law, Professor Abate handled environmental law matters at two law firms in Manhattan.

**Lorie Graham** is a Professor of Law at Suffolk University Law School. Professor Graham teaches courses on Indigenous Peoples Rights, Federal Indian Law, Property, and Human Rights. Formerly, Professor Graham directed the Harvard University Native American Program and acted as a visiting scholar at Harvard Law School and the University of Massachusetts-Amherst.

3

**Diane Kaplan** is a Professor of Law at The John Marshall Law School. Professor Kaplan teaches Children in the Legal System, Civil Procedure, and Corporations. Her litigation experience includes mental health, juvenile, and tribal law.

**Sarah Krakoff** is a Professor of Law at the University of Colorado School of Law. Professor Sarah Krakoff teaches and writes in the areas of Indian Law and natural resource law. She formerly served as Director of the American Indian Law Clinic at the University of Colorado School of Law.

**Colette Routel** is an Assistant Professor of Law at William Mitchell College of Law. Her interests include researching and writing on federal Indian law and natural resources law. Professor Routel also maintains an active pro bono practice in federal Indian law, wildlife law, wilderness law, and asylum law.

**Elizabeth Kronk Warner** is an Associate Professor of Law and Director of the Tribal Law and Government Center at the University of Kansas School of Law. Her research and teaching interests include federal Indian law, tribal law, environment and natural resources, and property. In addition, Professor Kronk Warner serves as an appellate judge for the Sault Ste. Marie Tribe of Chippewa Indians Court of Appeals in Michigan.

## SUMMARY OF ARGUMENT

This *amicus curiae* brief serves two purposes.  First, the brief discusses some of the tremendous impacts climate change is having on Native Nations[1] across the country.  As a result of climate change, Native Nations' land, livelihood, food security and citizens' health are imperiled.  Although climate change impacts Americans throughout the country, Native Nations are particularly vulnerable given their unique connection to land for subsistence, cultural, religious and legal reasons.  Second, the brief provides an introduction to legal concepts, such as tribal sovereignty and the federal trust responsibility to federally recognized tribes, that inform any discussion involving the legal rights of Native Nations and defendants-appellees' responsibility to Native Nations.

## ARGUMENT

> [T]he Indian plays much the same role in our American society that the Jews played in Germany. Like the miner's canary, the Indian marks the shifts from fresh air to poison gas in our political atmosphere; and our treatment of Indians, even more than our treatment of other minorities, reflects the rise and fall in our democratic faith.
>
> – Felix Cohen[2] (1953)[3]

---

[1] The term "Native Nations" or "Nations" is deliberately selected in order to be inclusive of American Indians, Alaskan Natives and Native Hawaiians.  Where this broad term does not apply, the more legally appropriate term is used.

[2] Felix Cohen is considered by many to be the father of modern Federal Indian Law, as he authored the first federal Indian law treatise.  Felix S. Cohen, HANDBOOK OF FEDERAL INDIAN LAW (U.S. Gov't Printing Office, 1st ed. 1945). Since Cohen's first edition of the *Handbook*, it has been revised several times, most recently in 2012, and remains the premier treatise on the subject.

Felix Cohen's poignant prophecy is true today, as Native Nations are being poisoned by unmitigated greenhouse gas emissions into their atmosphere—poisoned by the impacts of climate change.  Given their location and legal and cultural connections to the land, Native Nations are uniquely vulnerable to the impacts of climate change.  A unique government-to-government relationship exists between the federal government and Native Nations, which informs the federal government's responsibility to these Nations.  Accordingly, this *amicus* brief details the unique impacts of climate change on Native Nations.  The brief also discusses legal and cultural dimensions that must be taken into consideration when evaluating the ramifications of these impacts of climate change.  Ultimately, the brief concludes that climate change ravages Native Nations, and the federal government, which includes the defendants-appellees in this case, has a responsibility to assist these Nations by rapidly reducing greenhouse gas emissions in order to mitigate the worst impacts of climate change.

## I.     Climate Change Impacts Devastate Native Nations

Experts, scientists, and scholars overwhelmingly agree that Native Nations are being profoundly devastated by the impacts of climate change.[4]  Native Nations

---

[3] Felix Cohen, *The Erosion of Indian Rights, 1950-1953: A Case Study in Bureaucracy*, 62 YALE L.J. 348, 390 (1953).

[4] RANDALL S. ABATE ET AL., CLIMATE CHANGE AND INDIGENOUS PEOPLES: THE SEARCH FOR LEGAL REMEDIES (Randall S. Abate & Elizabeth Ann Kronk eds.,

2013); Patricia Cochran et al., *Indigenous Frameworks for Observing and Responding to Climate Change in Alaska*, 120 CLIMATIC CHANGE 557 (2013) (*available at* http://link.springer.com/article/10.1007/s10584-013-0735-2); K. Cozzetto et al., *Climate change impacts on the water resources of American Indians and Alaska Natives in the U.S.*, 120 CLIMATIC CHANGE 569 (2013) (*available at* http://link.springer.com/article/10.1007/s10584-013-0852-y); Kyle Dittmer, *Changing Streamflow on Columbia Basin Tribal Lands- Climate Change and Salmon. Climatic Change*, 120 CLIMATIC CHANGE 627 (2013) (*available at* http://link.springer.com/article/ 10.1007/s10584-013-0745-0); Mahesh R Gautam et al., *Climate Change in Arid Lands and Native American Socioeconomic Vulnerability: The Case of the Pyramid Lake Paiute Tribe*, 120 CLIMATIC CHANGE 585 (2013) (*available at* http://link.springer.com/article/10.1007/s10584-013-0737-0); Julie K. Maldonado et al., *The Impact of Climate Change on Tribal Communities in the US: Displacement, Relocation, and Human Rights*, 120 CLIMATIC CHANGE 601 (2013) (*available at* http://link.springer.com/article/ 10.1007/s10584-013-0746-z); Kathy Lynn et al., *The Impacts of Climate Change on Tribal Traditional Foods*, 120 CLIMATIC CHANGE 545 (2013) (*available at* http://link.springer.com/article/10.1007/s10584-013-0736-1); John T. Doyle et al., *Exploring effects of climate change on Northern Plains American Indian health*, 120 CLIMATIC CHANGE 643 (2013) (*available at* http://link.springer.com/article/ 10.1007%2Fs10584-013-0799-z); Garrit Voggesser et al., *Cultural Impacts to Tribes from Climate Change Influences on Forests*, 120 CLIMATIC CHANGE 615 (2013) (*available at* http://link.springer.com/article/10.1007/s10584-013-0733-4); Kyle Powys Whyte, *Justice Forward: Tribes, Climate Adaptation and Responsibility in Indian Country*, 120 CLIMATIC CHANGE 517 (2013) (*available at* http://link.springer.com/article/10.1007/s10584-013-0743-2); Daniel R. Wildcat, *Introduction: climate change and indigenous peoples of the USA*, 120 CLIMATIC CHANGE 509 (2013) (*available at* http://link.springer.com/article/10.1007/s10584-013-0849-6); Preston Hardison & Terry Williams, *Culture, Law, Risk and Governance: The Ecology of Traditional Knowledge in Climate Change Adaptation*, 120 CLIMATIC CHANGE 531 (2013) (*available at* http://link.springer.com/article/10.1007/s10584-013-0850-0); Robert M. Figueroa, *Indigenous peoples and cultural losses*, in THE OXFORD HANDBOOK OF CLIMATE CHANGE 232-259 (J.S. Dryzek et al. eds., 2011); Zoltan Grossman, *Indigenous Nations' Responses Climate Change*, 32 AM. INDIAN CULT. RES. J. 5-27 (2008); Jeff Mears, presentation, *A Climate Change Focused Organization*, at First Stewards Symposium: Coastal Peoples Address Climate Change, Washington, DC (2012); CHRISTINE SHEARER, KIVALINA: A CLIMATE CHANGE STORY (Haymarket Books 2012); Christine Shearer, *The Social Construction of Alaska Native*

7

face the loss of their land, culture, spiritual connections, health, and economic

viability.  Although climate change threatens the entire United States, Native

Nations are more likely to be impacted by climate change, because of their unique

characteristics.  For example, because Native Nations are often tied to specific

areas of land, such as reservations, it is impossible for Natives to leave these areas

to either escape the effects of climate change or perhaps to follow migratory

species moving to new ranges without abandoning their land and without risk to

their legal rights.[5]

---

*Vulnerability to Climate Change*, 19 RACE, GENDER, & CLASS 61–79 (2012);
Rebecca Tsosie, *Keynote Address: Indigenous Peoples and Global Climate
Change: Intercultural Models of Climate Equity*. 25 J. ENVT. L. & LITIG. 7 (2010);
Garrit Voggesser, *The Tribal Path Forward: Confronting Climate Change and
Conserving Nature*, THE WILDLIFE PROFESSIONAL, Winter 2010, at 24–30; Eleanor
Dictaan-Bang-oa, *Perishing Past and Pride: Indigenous Women and Climate
Change*, 2 WOMEN IN ACTION 47–50 (2009); Sarah Krakoff, *American Indians,
Climate Change, and Ethics for a Warming World*, 85 DENV. U. L. REV. 865
(2008); Macchi, Mirjam et al., Issues paper, *Indigenous and Traditional Peoples
and Climate Change*, Gland, Switzerland: International Union for Conservation of
Nature (2008); Hari M. Osofsky, *The Inuit Petition as a Bridge? Beyond Dialectics
of Climate Change and Indigenous Peoples' Rights*, 31 AM. INDIAN L. REV. 675
(2006-2007); Bob Roehr, *AAAS Coalition Explores Perspectives of Indigenous
Communities on Climate Change*, American Association for the Advancement of
Science News Release (Feb. 6, 2012); Jan Salick & Anja Byg, *Indigenous Peoples
and Climate Change*, Tyndall Centre for Climate Change Research, Oxford
(2007); Victoria Tauli-Corpuz & Aqqaluk Lynge, *Impact of Climate Change
Mitigation Measures on Indigenous Peoples and on their Territories and Lands*,
New York: UN Permanent Forum on Indigenous Issues (2008).
[5] Alan Parker et al., *Climate Change and Pacific Rim Indigenous Nations*,
*Executive Summary* 1-2, 19 (Alan Parker et al. eds., 2006) [hereinafter *Climate
Change*].

In the Arctic, climate change is causing indigenous peoples to lose land and natural resources that are crucial to their subsistence lifestyle. Increasing temperatures related to climate change have caused melting of sea ice and permafrost.[6] Given that Alaska Native communities rely on the permafrost for aspects of their daily lives and, in many instances, cultures are built around the stability of permafrost, this trend is deeply troubling.[7] Climate change is also causing Alaskan Natives to suffer severe local impacts to their daily activities, which may include whaling, sealing, fishing, and reindeer herding.[8] On the whole, climate change has caused hunting, fishing, and travel in the Arctic to become more difficult and often perilous.[9]

---

[6] Daniel Cordalis & Dean B. Suagee, *The Effects of Climate Change on American Indian and Alaska Native Tribes*, 22 NAT. RESOURCES & ENV'T 45, 47 (2008) ("Alaska may be experiencing the impacts of global warming more than any other place on Earth, and Alaska Native tribes are among the first American populations to feel the effects of global climate change. Erosion and flooding affect 86 percent of Alaska Native villages to some extent, with the greatest effects felt along the coast.") (citing General Accounting Office, *Alaska Villages: Most Are Affected by Flooding and Erosion, but Few Qualify for Federal Assistance*, GAO-04-142 (Dec. 2003)).

[7] Survival International, *The Most Inconvenient Truth of All, Climate Change and Indigenous People*, 1 (2009) [hereinafter Survival International]. ("Satellite data since 1978 show that annual average Arctic sea ice extent has shrunk by 2.7 (2.1-3.3)% per decade, with larger decreases in summer of 7.4 (5.0-9.8)% per decade.") (Citing IPCC, *Climate Change 2007: Synthesis Report*, 30 (2007)).

[8] *Id.*

[9] *Id.;* Azadeh Ansari, *'Climate Change' Forces Eskimos to Abandon Village*, CNN.com (April 28, 2009), http://www.cnn.com/2009/TECH/science/04/24/climate.change.eskimos/.

Climate change also affects species that Native Nations rely on in their subsistence lifestyle and cannot be replaced. Some Arctic species are perishing as a result of climate change.[10] Several Alaskan Native communities have observed changes in the health and behavior of caribou, a key subsistence species.[11] Also, "[s]almon and other fish that go up river to spawn make up 60 percent of Alaska Natives' subsistence resources. Recent declines in these fish populations have thus directly affected the dietary and economic well-being of these people [Natives]."[12] Furthermore, because of climate change, "[t]here is stark evidence that iconic species such as the beluga whales and polar bears are in extreme danger of extinction."[13] As a specific example, in the Pribilof Islands, villagers blame climate change along with industrial contaminants for the decline of 20 species, ranging from kelp to sea lions.[14] Because many Native Nations are legally tied to

---

[10] *See* Rebecca Tsosie, *Indigenous People and Environmental Justice: The Impact of Climate Change*, 78 U. COLO. L. REV. 1625, 1640 (2007).

[11] Larry D. Hinzman et al., *Evidence and Implications of Recent Climate Change in Northern Alaska and Other Arctic Regions*, 72 CLIMATIC CHANGE 252, 286 (2005).

[12] ACIA Overview Report, *Impacts of a Warming Arctic: Arctic Climate Impact Assessment*, 119 (2004).

[13] National Tribal Air Association, *Impacts of Climate Change on Tribes in the United States*, 11 (2009) (*available at* http://epa.gov/air/tribal/pdfs/Impacts of Climate Change on Tribes in the United States.pdf).

[14] Margot Roosevelt, *Vanishing Alaska: Global Warming is Flooding Villages Along the Coast. Should They Surrender and Move?* TIME MAGAZINE (Sept. 27, 2004). Generally, scientific research has corroborated observations of Alaskan Natives. ACIA Scientific Report, *Arctic Climate Impact Assessment*, Chapter 1 (2005).

10

specific areas of land, following animal migrations that diverge from traditional paths is often extremely difficult if not impossible.[15]

Overall, climate change has devastated Alaskan Natives, and, in some instances, the very existence of Alaskan Native communities is threatened. In the Inuit village of Shishmaref, Alaska, which has been inhabited for over 4,000 years, homes are falling into the sea, as the shoreline has dramatically eroded because of melting permafrost. Because of permafrost erosion, the Newtok Native village is "sinking and flooding and eroding" and will be forced to relocate.[16]

At a mere 16 years of age, Nelson Kanuk, a member of the Yup'ik Eskimo Tribe in Alaska, is already suffering as a result of climate change, as his personal experiences echo those represented above.[17] He first learned about climate change in the third grade because of the pervasive changes to the Arctic environment.[18] Because of warming temperatures, the sea ice that protected his community from storms is melting and there is increased flooding.[19] He explained that "[o]ne night, ice and water flooded my village, causing my family, as well as others in my

---

[15] 43 U.S.C. § 1603 (2006).
[16] Terri Hansen, *8 Tribes That Are Way Ahead of the Climate-Adaptation Curve*, INDIAN COUNTRY TODAY (Oct. 15, 2013), http://indiancountrytodaymedianetwork.com/2013/10/15/8-tribes-are-way-ahead-climate-adaptation-curve-151763.
[17] Plaintiff Declaration of Nelson Kanuk in Support of Youth's Motion for Preliminary Injunction, Sept. 28, 2011, Appellants' Appendix A156-A159.
[18] *Id.* at A156.
[19] *Id.* at A157.

village, to need to temporarily evacuate our homes."[20]  Erosion threatens Nelson's home, as, within a matter of months, 13 feet eroded between his house and the nearby riverbank, which in 2011 was within 47 feet of the house.[21]  Climate change also threatens the health of Nelson' village as the village relies on a holding pond for sewage disposal and increased incidents of flooding cause the pond to overflow.[22]

Climate change does not, however, only impact Arctic and Alaskan Natives. For example, in 1998, Native Nations in the Pacific Coast and Rocky Mountain regions reported the following impacts from climactic changes: violent weather changes where storms wiped out intertidal shellfish; declining salmon runs; deformed fish; significant decreases in the life spans of individual Natives due to the unavailability of traditional foods; minimum river flows, as a result of reduced water, necessary for native fish species; and erosion due to rising sea levels.[23]

---

[20] *Id.*

[21] *Id.* at A158.

[22] *Id.*

[23] Native Peoples – Native Homelands Climate Change Workshop: Final Report (Nancy G. Maynard ed., 1998) [hereinafter *Native Peoples*].  The Final Report details the results of a workshop held between Native people and representatives of the federal government.  The purpose of the workshop was to understand consequences of climate change on Native Nations.  The Report explains that "[t]hese contemporary observations of the shifts in the normal historic range of physical phenomena and bio-behaviors support the conclusions of western scientific observations associated with climatic warming and variability, and should be included on their own merits as well as a basis for additional investigation."  *Id.* at ii.

More recently, in 2009, the National Tribal Air Association released a report detailing the impacts of climate change on Indian country.[24]  The report found that Native Nations were facing climate change impacts from: 1) ocean acidification threatening shellfish; 2) shorter growing seasons; 3) changes in forest composition; 4) threats to fresh water fish; 5) decreased lake levels; 6) extreme weather events; 7) decreased availability of drinking water; 8) drought; 9) invasive species, and, relatedly a loss of traditional plants and animals; 10) increased water temperatures which negatively impact fisheries; 11) increased air quality problems; and 12) increased incidents of wildfires.[25]

Many Native Nations of the Southwest, such as the Navajo Nation, have been particularly hard hit by climate change-induced droughts.  At only 10 years old, Jamie Lynn Butler, a citizen of the Navajo Nation, has already endured the harsh realities of drought.  Her family had to leave their home in Cameron, Arizona and move to Flagstaff, Arizona because of the lack of potable water.  As Ms. Butler explained, "I left my home in Cameron and Dzil Lebei Elementary School in Cameron because there's no water at my home and we need water to survive.  There's also a problem with the water at the school.  We can't drink out of the fountains, because the water is polluted and ruins the pipes.  It also tastes

---

[24] National Tribal Air Association, *supra* note 13.
[25] *Id.*

13

sour."[26]  In addition to forcing her to leave to home, the drought is also negatively

affecting Navajo and Hopi farmers, who traditionally relied upon rainfall for water

for their crops and livestock.  Today, Ms. Butler explains that "[i]nstead of

depending on the rainfall, farmers have to haul water in trucks to make sure they

have enough for their crops and animals. . . . This is especially difficult because

most Navajo don't have credit, so to buy the truck, tank, water and fuel can be

impossible in the first place.  So without water, life is just getting harder." [27]

Climate change has not only fundamentally altered the life of 10 year old Jamie

Lynn Butler by forcing her family to leave their home, but it also threatens the

agrarian lifestyle of her Native Nation, the Navajo Nation.

        Moreover, Native Nations may also face increased adverse health effects

related to climate change, including emerging mental health problems resulting

from food insecurity and the loss of homes and cultural resources.[28]  Several

Nations have reported health concerns associated with increased air pollution, both

indoor and outdoor air pollution.  For example, because climate change causes

colder winters in the Southwest, Native Nations in this region fear growing

incidents of asthma because many Natives will increasingly use wood burning

stoves to combat the cold, which, in turn, subjects Natives to increased particulate

---

[26] Plaintiff Declaration of Jaime Lynn Butler in Support of Youth's Motion for
Preliminary Injunction, Sept. 28, 2011, Appellants' Appendix A147.
[27] *Id.* at A148-149.
[28] *See generally*, National Tribal Air Association, *supra* note 13.

14

matter.[29]  The Pyramid Lake Paiute Nation already reports increased cases of

asthma and respiratory problems due to the significant reduction of water in the

area, which was caused by climate change.[30]  More broadly, the Union of

Concerned Scientists concluded that climate change could have profound health

impacts, as "[r]ising temperatures will likely lead to more frequent and severe heat

waves, heavier rainstorms and flooding, and increased air pollution."[31]

Individually, any of the foregoing would negatively impact a Native Nation,

especially one relying on traditional and subsistence lifestyles, but, taken together,

these impacts are disastrous for Native Nations.

     Because of the unique character of Native Nations and their virtual inability

to relocate without risking the loss of legal rights, these Native Nations have been

among the first to feel the profound impacts of climate change.[32]  This is because

---

[29] *Id.* at 6-7.

[30] *Id. at 8.*

[31] Union of Concerned Scientists, *Climate Change and Your Health*,
http://www.ucsusa.org/global_warming/science_and_impacts/impacts/climate-change-and-your-health.html (last visited Oct. 20, 2013).  The Union of Concerned
Scientists has released three detailed reports examining the health impacts of rising
temperatures, flooding and ozone pollution, which all result from climate change.
*Id.*

[32] Cordalis & Suagee, *supra* note 6, at 45 ("*The Fourth Assessment Report of the
UN Intergovernmental Panel on Climate Change Working Group II* recognizes
that American indigenous communities are among the most sensitive to climate
change in North America and that 'indigenous communities in northern Canada
and Alaska are already experiencing constraints on lifestyles and economic activity
from less reliable sea and lake ice (for travelling, hunting, fishing and whaling),
loss of forest resources from insect damage, stress on caribou, and more exposed

Native communities are some of the most vulnerable in the United States, given in part to their unique relationship to the environment and land.  Land "is the source or spiritual origin and sustaining myth which in turn provides a landscape of cultural and emotional means.  The land often determines the values of the human landscape."[33]

Relatedly, many Natives also possess a spiritual connection with land and the environment.[34]  Native people "continue to have a deep relationship with ancestral homelands for sustenance, religious communion and comfort, and to maintain the strength of personal and interfamiliar identities.  Through language, songs, and ceremonies, tribal people continue to honor sacred springs, ancestral burial places, and other places where ancestral communities remain alive."[35]  The spiritual connection between many Native Nations and their surrounding

---

coastal infrastructure from diminishing sea ice.'") (citing 14.2.6 Human settlements, Intergovernmental Panel on Climate Change (2007), www.ipcc.ch/ipccreports/ar4-wg2.htm).

[33] Frank Pommersheim, *The Reservation as Place: A South Dakota Essay*, 34 S.D. L. REV. 246, 250 (1989); *see also* National Congress of American Indians, Resolution #EWS-06-2004 – Supporting a National Mandatory Program to Reduce Climate Change Pollution and Promote Renewable Energy (2006), http://tribalclimate.org/PDFs/NCAI%20Resolution%20on%20Climate%20Change.pdf.

[34] *Id.*  "American Indian tribal religions … are located "spatially," often around the natural features of a sacred universe.  Thus, while indigenous people often do not care when the particular event of significance in their religious tradition occurred, they care very much about where it occurred."  *Id.* at 282-283.

[35] Mary Christina Wood & Zachary Welcker, *Tribes as Trustees Again (Part I): The Emerging Tribal Role in the Conservation Trust Movement*, 32 HARV. ENVTL. L. REV. 373, 381 (2008).

16

environment is crucial to the sovereignty of these nations and the personhood of individual Natives.[36]  Therefore, as the land and environment change due to climate change, many Native communities may be faced with devastating impacts on their culture, spirituality and traditions, especially as land is literally lost to the elements.

In addition to their cultural and spiritual connection to the land, Native Nations are also particularly vulnerable to climate change given the extreme geographical locations of many of these communities.[37]  Moreover, their legal connections to land exacerbate existing vulnerabilities.  These communities contribute little, if at all, to the problem of climate change, and, yet, bear a disproportionately large adverse impact from climate change given their unique vulnerability.[38]  This fact is a fundamental injustice, which is compounded by defendants-appellees' failure to reduce greenhouse gas emissions.

---

[36] *Id.* at 424.

[37] Peggy M. Shepard & Cecil Corbin-Mark, *Climate Justice*, 2 ENVTL. JUST. 163 (2009) ("Climate researchers report that vulnerable communities, even in the most prosperous nations, will be the first and worst hit [by climate change].  In this country, the most impacted areas will be communities-of-color, Indigenous Peoples, and low-income communities that are socio-economically disadvantaged, disproportionately burdened by poor environmental quality, and least able to adapt.").

[38] Tsosie, *supra* note 10, at 1628; National Tribal Air Association, *supra* note 13, at 12-13 ("Any impact to tribal resources due to climate change is largely the result of decades of emissions from sources outside of Indian Country (even the most developed and industrialized tribal carbon footprint is miniscule)….Although

17

## II.     Unique Legal and Cultural Status of Native Nations Must be Considered by the Federal Government in Relation to Climate Change

When considering the impacts of climate change on Native Nations, it is important to also consider the unique laws applicable to Native Nations, laws implicating federal defendants-appellees in this case, which include the Environmental Protection Agency, Department of Defense, Department of Energy, Department of Interior, Department of Agriculture, and Department of Commerce [collectively "federal appellees"].  Specifically, unlike other communities within the United States, Native Nations are sovereign, and, as a result of this sovereignty, these federal appellees owe a unique federal responsibility to tribes.[39]  Moreover, Native Nations' unique connections to land and their surrounding environments must be taken into consideration when examining the rights of Native Nations.

### A.     Tribal Sovereignty Must be Considered

Any examination of the rights of Native Nations would be incomplete without consideration of tribal sovereignty.  By virtue of their sovereign status, Native Nations, and more specifically federally recognized tribes, possess certain legal rights not possessed by other communities impacted by climate change.

Tribal sources are not a significant cause of climate change, they are the ones most keenly feeling the effects.").

[39] Although the impacts of climate change are profoundly experienced by all Native people, this portion of the brief focuses on American Indians, as Native Hawaiians have yet to be federally recognized and the Alaska Native Claims Settlement Act of 1971, 43 U.S.C. §§ 1601, *et seq*, extinguished federal superintendence for most Native Nations in Alaska.

18

Moreover, federal appellees are obligated to work with federally recognized tribes on a government-to-government basis.  As President Obama's Executive Order explained, "[t]he United States recognizes a government-to-government relationship, as well as a unique legal and political relationship, with federally recognized tribes. This relationship is set forth in the Constitution of the United States, treaties, statutes, Executive Orders, administrative rules and regulations, and judicial decisions."[40]  Moreover, because federal appellees are all members of the President's Council on Native American Affairs, they are required to "work across executive departments, agencies, and offices to coordinate development of policy recommendations to support tribal self-governance and improve the quality of life for Native Americans, and shall coordinate the United States Government's engagement with tribal governments and their communities."[41]  By failing to reduce greenhouse gases to alleviate the impacts of climate on Native Nations, federal appellees are not complying with the President's Executive Order.

Beyond the President's Executive Order, tribal sovereignty is a key legal concept that must be included in any consideration of the impacts of climate change on Native Nations.  Prior to colonization by foreign sovereigns, most

---

[40] 78 Fed. Reg. 39539 (2013).
[41] 78 Fed. Reg. 39539, 39541 (2013).

Native Nations existed as independent, self-governing communities.[42]  Even after

contact with foreign governments, federally recognized tribes continue to be

acknowledged as independent, sovereign governments.  Tribes maintain those

aspects of sovereignty that have not been removed by virtue of treaty, statute or

"by implication as a necessary result of their dependent status."[43]  As the United

States Supreme Court acknowledged in *Worcester v. Georgia*, tribes are "distinct,

independent political communities."[44]  Today, inherent tribal sovereignty persists.

"Indian tribes are neither states, nor part of the federal government, nor

subdivisions of either. Rather, they are sovereign political entities possessed of

sovereign authority not derived from the United States, which they predate."[45]

"Tribal powers of self-government are recognized by the Constitution, legislation,

---

[42] COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 4.01[1][a] (Nell Jessup
Newton, et al. eds. LexisNexis 2012 ed.).

[43] *United States v. Wheeler*, 435 U.S. 313, 323 (1978).  Use of the term
"dependent" in the quotation here is a reference to tribal governments being termed
"domestic dependent nations" in *Cherokee Nation v. Georgia*, 30 U.S. 1, 17
(1831).  In *Cherokee Nation*, Chief Justice Marshall used the term "dependent" to
suggest that tribes are under the protection of the federal government.  *Id.*

[44] 31 U.S. 515, 559 (1832).

[45] *Nanomantube v. Kickapoo Tribe in Kan.*, 631 F.3d 1150, 1151-52 (10th Cir.
2011) (quoting *NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1192 (10th Cir. 2002)
(en banc)).

treaties, judicial decisions, and administrative practice."[46]   Tribal sovereignty

remains as a core principle of federal Indian law.[47]

## B.   Federal Trust Responsibility Must be Considered

In addition to the consideration of tribal sovereignty, the federal government

is required to consider the unique trust relationship between the federal

government and federally recognized tribes in the context of climate change and

the resulting adverse impacts occurring within Indian country.  Application of the

federal trust responsibility is necessary to protect federally recognized tribes from

environmental assaults, such as climate change.  The federal trust relationship can

be traced back to promises that tribal lifestyles, governments and economies would

be protected by the federal government.  Native Nations reasonably relied on these

promises, giving rise to a sovereign trust relationship.

As an initial starting point, the United States "has charged itself with moral

obligations of the highest responsibility and trust" as fiduciary to federally

---

[46] COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 4.01[1][a] (Nell Jessup Newton, et al. eds. Lexis Nexis 2012 ed.).

[47] *United States v. Wheeler*, 435 U.S. 313, 322-323 (1978).  Although this assertion is generally true, it is worth noting that some tribes were "terminated" during the Termination Era of the mid-twentieth century.  COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.06 (Nell Jessup Newton, et al. eds. Lexis Nexis 2005 ed.) (citing Charles F. Wilkinson & Eric R. Biggs, *The Evolution of the Termination Policy*, 5 AM. INDIAN L. REV. 139, 151-154 (1977)).  "Although the termination acts did not expressly extinguish the governmental authority of such [terminated] tribes, most were unable to exercise their governmental powers after losing their land base.  Termination thus weakened the sovereignty of terminated tribes."  *Id.* at § 1.06.

recognized tribes.[48]   Several cases have invoked the federal trust responsibility to

protect Indian lands and resources.[49]   Under federal law, the United States is also

potentially liable for failure to manage designated trust assets for the benefit of

federally recognized tribes.  Because the United States has charged itself "with

moral obligations of the highest responsibility and trust", the federal government

has been found to be responsible to tribes because of federal assurances to tribes

and because of statutory requirements.   Under a line of cases involving the Indian

Tucker Act, the federal government is financially liable to federally recognized

tribes when it breaches its trust responsibility as reflected in statutes.  Moreover,

the trust responsibility can be viewed as a property law concept, as "[i]t is a

principle that arises from the native relinquishment of land in reliance on federal

assurances that retained lands and resources would be protected for future

generations.  It bears rough analogy to nuisance and trespass law."[50]

The modern trust responsibility cases involving damages begin in 1983 with

*United States v. Mitchell*.[51]  In *Mitchell*, the tribe argued that several timber and

right-of-way statutes at issue created an affirmative duty for the Secretary of the

Interior to manage the tribal lands in question.  The United States Supreme Court

---

[48] *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942).
[49] *See* cases described in Mary Christina Wood, *The Indian Trust Responsibility: Protecting Tribal Lands and Resources through Claims of Injunctive Relief Against Federal Agencies,* 39 TULSA L. REV. 355, 358 (2003).
[50] *Id.*
[51] 463 U.S. 206 (1983).

agreed, finding that the statutes in question "clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians."[52]   Similarly, in 2003, the Court also found an enforceable trust relationship where the federal government failed to adequately manage Fort Apache, which was held in trust for the White Mountain Apache Nation.  As a result of this mismanagement, the Nation was entitled to compensation for the upkeep of Fort Apache.[53]  The statute at issue required that the federal government hold Fort Apache in trust for the Nation and, importantly, gave the federal government "authority to make direct use of portions of the trust corpus."[54] Accordingly, where there is statutory language establishing a fiduciary relationship and the federal government has comprehensive control over the property in question, the United States Supreme Court has generally found an enforceable trust relationship exists.  Notably, the above mentioned cases all sprung from litigation based on specific statutory requirements and the Indian Tucker Act, an Act which requires express law supporting claims for damages against the United States.[55]

In addition to trust claims based on the Tucker Act, federal courts have also recognized claims generally based on the Administrative Procedures Act and common law principles.  Furthermore, "[c]ourt decisions make clear that the entire

---

[52] *Id.* at 224.
[53] *United States v. White Mountain Apache*, 537 U.S. 465 (2003)
[54] *Id.* at 474.
[55] 28 U.S.C. § 1505 (1949).

federal government is blanketed by the trust responsibility, and that every federal agency, not just the Bureau of Indian Affairs, must fulfill the trust responsibility in implementing statutes."[56]   Accordingly the general trust responsibility applies to federal appellees in this case.  Several federal court cases have utilized the federal trust responsibility in the form of a common law duty to protect tribal resources. For example, in *Washington v. Washington Passenger Fishing Vessel Association*,[57] the United States Supreme Court upheld a fifty percent share of harvestable fish for treaty tribes.  Also, in *Winters v. United States*,[58] the Court recognized an implied water right associated with reservation lands for tribes. Accordingly, in cases not relying on the Indian Tucker Act and damages remedies, courts have looked beyond statutory language to apply the federal trust responsibility to protect unique tribal resources.

The federal government's trust responsibility is not limited to tribes.  In some instances, this responsibility may expand to individual Indians as well.  For example, on December 8, 2009, the federal government reached a settlement with

---

[56] Mary Christina Wood, *The Indian Trust Responsibility:  Protecting Tribal Lands and Resources through Claims of Injunctive Relief Against Federal Agencies,* 39 TULSA L. REV. 355, 360 (2003).
[57] 443 U.S. 658 (1979).
[58] 207 U.S. 564 (1908).

individual Indians claiming the federal government had mismanaged their individual trust accounts.[59]

In the context of climate change, the federal government plays a management role in many of the resources being negatively impacted by climate change.  For example, the federal government maintains a comprehensive role in the regulation of fisheries within the exclusive economic zone of Alaska.[60]  As detailed above, many Alaskan Native subsistence communities rely on Alaskan fisheries for their survival.  The federal government therefore manages a resource at risk because of climate change that is crucial to the survival of Natives.

Notably, even where a compensable claim does not exist, a moral obligation remains.[61]  This is because the trust relationship emerged from federal promises of enduring protection that secured the vast cessions of both land and external sovereignty made by Native Nations to the federal government.[62]

---

[59] Patrick Reis, *Obama Admin Strikes $3.4B Deal in Indian Trust Lawsuit*, N.Y. TIMES (Dec. 8, 2009), http://www.nytimes.com/gwire/2009/12/08/08 greenwire-obama-admin-strikes-34b-deal-in-indian-trust-l-92369.html.

[60] *See generally*, 50 C.F.R. Part 679.

[61] *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942).

[62] Mary Christina Wood, *The Indian Trust Responsibility:  Protecting Tribal Lands and Resources through Claims of Injunctive Relief Against Federal Agencies,* 39 Tulsa L. Rev. 355, 358 ("[The trust] is a principle that arises from the native relinquishment of land in reliance on federal assurances that retained lands and resources would be protected for future generations."); *see also* Nell Jessup Newton, *Federal Power Over Indians: Its Sources, Scope, and Limitations*, 132 U. PA L. REV. 195, 207 (1984).

25

Recognition of the federal trust responsibility has not been limited to the courts or Congress.  President Nixon recognized the federal trust responsibility in his 1968 Special Message to Congress:

> The special relationship between Indians and the Federal government is the result of solemn obligations which have been entered into by the United States Government.  Down through the years, through written treaties and through formal and informal agreements, our government has made specific commitments to the Indian people.  For their part, the Indians have often surrendered claims to vast tracts of land and have accepted life on government reservations.[63]

Subsequent administrations have reaffirmed and even expanded upon Nixon's recognition of the federal trust responsibility doctrine.[64]

In sum, the federal trust responsibility owed by the federal government to federally recognized tribes should inform consideration of the impacts of climate change threatening Indian country.

---

[63] Special Message to Congress on the Problems of the American Indian: "The Forgotten American," 113 Pub. Papers (March 6, 1968).

[64] "For example, President Reagan's Message to Congress on January 24, 1983 continued the commitment of the Nation to strong government to government relations with tribes and to support [sic] tribal self-government and economic self-sufficiency.  President Clinton's Executive Order 13175 recognized 'the right of Indian tribes to self-government' and supported 'tribal sovereignty and self-determination.'  President George W. Bush issued a Presidential Proclamation 7500 November 12, 2001 stating 'we will protect and honor tribal sovereignty and help to stimulate economic development in reservation communities.'"  Reid Peyton Chambers, *Compatibility of the Federal Trust Responsibility with Self-Determination of Indian Tribes:  Reflections on Development of the Federal Trust Responsibility in the Twenty-First Century*, 2005 ROCKY MTN. L. INST. 13A-2, 13 A-4 (citations omitted).

Under numerous treaties, statutes, executive orders and policies, the United States has direct and express legal obligations through its trust responsibility to Native Peoples for the protection of our Native Homelands, sacred sites, and natural and cultural resources. To meet fully its obligations for the protection of cultural resources and the maintenance of habitat integrity and biodiversity, the United States must engage in meaningful consultation and participation in public processes, must be responsive to tribal concerns, and must establish appropriate protocols with American Indian Tribal nations on a government to government basis.[65]

By refusing to reduce greenhouse gas emissions, federal appellees have imperiled Native Nations, including federally recognized tribes, which is inconsistent with the federal government's general obligation to act in the best interests of these Nations.  As a branch of the federal government, these obligations should be upheld by the federal judiciary.[66]  As such, it is critical that federal courts be mindful of, and uphold, the federal government's trust responsibility to Native Nations.

---

[65] *Native Peoples*, *supra* note 23.

[66] In fact, federal courts should apply a more "searching scrutiny" in evaluating these types of claims as they go to the very "personhood" of individual Natives. Territorial integrity is key to sovereignty.  Without such integrity it is difficult to maintain the separateness that is fundamental to sovereignty.  It is through their membership in such tribal nations that many Natives define themselves, their "personhood".  Therefore, because climate change threatens the territorial integrity of many Native nations, it also threatens the very "personhood" of affected Natives.  Such a threat certainly deserves a heightened level of review by federal courts.  Nell Jessup Newton, *Federal Power Over Indians: Its Sources, Scope, and Limitations*, 132 U. PA L. REV. 195, 244 (1984).

27

C.     **Unique Relationship with Land and the Environment Must be Considered**

In addition to the legal requirements related to Native sovereignty and the federal responsibility to these same Nations, Professor Rebecca Tsosie explains how the unique cultural rights of indigenous peoples must also be considered.

> [B]ecause climate change is often thought to be the inevitable byproduct of industrialization, rather than an international policy of national governments, and because the triggering events generally do not take place on or near the reservation and are not within the control of Native peoples as governments, the discussion in this area must go beyond tribal sovereignty and evaluate the rights of indigenous peoples as unique cultural and political groups.[67]

In evaluating the cultural rights of Native Nations, Native Nations' connection to land and the environment must be considered, as explained above. In addition to the unique legal status of Native Nations, they also differ from most other American communities by virtue of their cultural and spiritual connection to the land and environment.

## CONCLUSION

For the foregoing reasons, *amici curiae* urge the Court to reverse the district court's order dismissing the youth appellants' case.

---

[67] Tsosie, *supra* note 10, at 1628.

28

Respectfully submitted,

*/s/ F. Michael Willis*
F. Michael Willis
*Counsel for Amici Curiae*

Dated: November 12, 2013

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because it contains 6,972 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

I further certify that the attached *Amicus Curiae* Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 14-point Times New Roman font.

Executed this 12th day of November, 2013.

*/s/ F. Michael Willis*
F. Michael Willis
*Counsel for Amici Curiae*

Dated: November 12, 2013

30

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of November, 2013, I have served the

foregoing *Amicus Curiae* Brief on all registered counsel through the Court's Case

Management/Electronic Filing System (CM/ECF).

*/s/ F. Michael Willis*
F. Michael Willis
*Counsel for Amici Curiae*

Dated: November 12, 2013