ORAL ARGUMENT NOT YET SCHEDULED
No. 13-5192

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

ALEC L., *et al*.,

*Plaintiffs – Appellants*,

v.

GINA McCARTHY, *et al*.,

*Defendants – Appellees*,

THE NATIONAL ASSOCIATION OF MANUFACTURERS, *et al*.,

*Intervenors for Defendants  – Appellees*

———————————————

**On Appeal from the Unites States District Court
for the District of Columbia (No. 11-cv-02235 (RLW))**

———————————————

**BRIEF OF LAW PROFESSORS AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS-APPELLANTS SEEKING REVERSAL**

———————————————

*Counsel for Amici Curiae*
William H. Rodgers, Jr.
Stimson Bullitt Professor of Envt Law.
University of Washington
3026 NW Esplanade
Seattle, WA 98117
Phone: (206) 783-9497
whr@u.washington.edu

*On the brief:*
John Davidson, J.D.
Department of Political Science
936 Prince Lucien Campbell Hall
University of Oregon
Eugene, Oregon 97403
Phone: (541) 346-4540
davidson@uoregon.edu

## STATEMENT REGARDING CONSENT TO FILE, SEPARATE BRIEFING, AUTHORSHIP AND MONETARY CONTRIBUTIONS

Counsel for *Amici* has conferred with counsel for the parties in this case, and Youth Appellants and Government Appellees consented to the filing of this *amicus curiae* brief.  Intervenor Appellees did not respond to counsel's request for consent in advance of the filing of this brief.  In accordance with Rule 29(c)(5), a party's counsel did not author the brief in whole or in part, did not contribute money that was intended to fund preparing the brief; and no person other than the *amicus curiae*, its members or its counsel, contributed money that was intended to fund preparing or submitting the brief.

Pursuant to D.C. Circuit Rule 29(d), *Amici* state that they are aware there are other *amicus curiae* briefs being filed that address issues such as climate change science, but to their knowledge Amici certify that no other brief addresses the constitutional legal questions presented in this case. Because *Amici* only submit information to the court in their area of expertise, *Amici* certify that it would not be feasible to coordinate with experts on other issues, or people with other interests, and that submitting separate briefs is necessary.

i

## CERTIFICATE OF INTERESTED PARTIES, RULINGS, AND RELATED CASES

**A. Parties and *Amici*.** Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Plaintiffs-Appellants: Law Professors and Scholars William H. Rodgers, Jr.; Joseph Sax; Erwin Chemerinsky; Michael Blumm; John Davidson; Gerald Torres; Mary Christina Wood; Burns Weston; Kevin J. Lynch; Maxine Burkett; Erin Ryan; Timothy P. Duane; Deepa Badrinarayana; Stuart Chinn; Ryke Longest; Jacqueline P. Hand; Zygmunt Plater; James Gustave Speth; Charles Wilkinson; Patrick C. McGinley; Eric T. Freyfogle; Craig Anthony Arnold; Patrick Parenteau; Federico Cheever; Mark S. Davis; James R. May; Denise Antolini; Edith Brown Weiss; Alyson C. Flournoy; David Takacs; Michael Robinson-Dorn; Karl Coplan; Oliver Houck; and Douglas L. Grant.

**B. Rulings under Review.** References to the rulings at issue appear in the Brief for Plaintiffs-Appellants.

**C. Related Cases.** References to related cases appear in the Brief for Plaintiffs-Appellants.

Respectfully submitted this 11th day of December, 2013,

*/s/ William H. Rodgers, Jr.*
William H. Rodgers Jr.
*Counsel for Amici Curiae*

## TABLE OF CONTENTS

I.     IDENTITY AND INTERESTS OF *AMICI CURIAE*....................................1

II.    SUMMARY OF ARGUMENT....................................................1

III.   ARGUMENT....................................................................3

       A.    Terminology and *PPL Montana, LLC v. Montana*..............................3

       B.    Origins of the Reserved Powers and Public Trust Doctrines...............5

       C.    Application of the Reserved Powers and Public Trust Doctrines
             to the Federal Government.................................................9

       D.    Constitutional Textual Analysis.........................................12

             1.    The Vesting Clause................................................13

             2.    Equal Protection.................................................15

             3.    Due Process.....................................................17

       E.    The Atmosphere as a Public Trust Resource.....................................20

       F.    Affirmative Constitutional Duties and the State Action Doctrine......23

       G.    The Role of the Federal Judiciary in the Public Trust Context..........26

IV.    CONCLUSION................................................................28

# TABLE OF AUTHORITIES

## CASES

*Adarand Constructors, Inc. v. Pena*,
  515 U.S. 200 (1995)........................................................................ 17

*Alabama v. Texas*,
  347 U.S. 272 (1954)........................................................................ 11

*Am. Elec. Power Co. v. Connecticut*,
  131 S. Ct. 2527 (2011).................................................................24, 26

*Ariz. Ctr. For Law in Pub. Interest v. Hassell*,
  837 P.2d 158 (Ariz. App. 1991).........................................................26

*Arnold v. Mundy*,
  6  N.J.L. 1 (N.J. 1821) .................................................................. 18

*Bolling v. Sharpe*,
  347 U.S. 497 (1954).................................................................15, 17

*Butchers' Union v. Crescent City*
  111 U.S. 746 (1884)...........................................................................3

*Comer v. Murphy Oil USA, Inc.*,
  839 F. Supp. 2d 849 (S.D. Miss. 2012).............................................24

*Ctr. for Biological Diversity v. FPL Grp.*,
  166 Cal.App.4th 1349 (Cal. App. 2008).......................................23-24

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
  489 S. 189 (1989).............................................................................24

*Fletcher v. Peck*,
  10 U.S. 87 (1810)............................................................... .........6-7, 17

*Geer v. Connecticut*,
  161 U.S. 519 (1896) ................................................... 10, 12, 18, 21, 23

   * Authorities upon which we chiefly rely are marked with asterisks.

iv

*Georgia v. Tenn. Copper Co.,
   206 U.S. 230 (1907) ...................................................................21-22

Harris v. McRae,
   448 U.S. 297 (1980)........................................................................17

Her Majesty v. City of Detroit,
   874 F.2d 332 (6th Cir. 1989)......................................................22

Hughes v. Oklahoma,
   441U.S. 322 (1979)........................................................................ 10

*Ill. Cent. R.R. v. Illinois,
   146 U.S. 387 (1892)........................................... 7-9, 12, 13-14, 15, 18, 20, 22-23

*In re water Use Permit Applications, Waihole Ditch Combined Contested Case
   Hearing, 9 P.3d 409 (Haw. 2000)  .................................................... 23-24, 27-28

*Just v. Marinette Cnty.,
   201 N.W.2d 761 (Wis. 1972).......................................................21, 23

Light v. United States,
   220 U.S. 523 (1911) .........................................................................5

*MacDonald v. Chicago,
   130 S. Ct. 3020 (2010)....................................................................17

Marbury v. Madison,
   5 U.S. 137 (1803) ........................................................................ 26

Marks v. Whitney,
   491 P.2d 374 (1971)........................................................................21

Martin v. Waddell,
   41 U.S. 367 (1842).........................................................................18

Matthews v. Bay Head Improvement Ass'n,
   471 A.2d 355 (N.J. 1984).................................................................21

*Missouri v. Holland,
  252 U.S. 416 (1920).................................................................10, 11

Native Village of Kivalina v. ExxonMobil Corp.,
  663 F. Supp. 2d 863 (N.D. Cal. 2009)................................................26

Nat'l Audubon Soc'y v. Superior Ct. of Alpine Cnty.,
  658 P.2d 709 (Cal. 1983) .............................................................21, 22

*Newton v. Comm'rs of Mahoning Cnty.,
  100 U.S. 548 (1879) .................................................................7, 8, 14

N. Carolina, ex rel. Cooper v. Tenn. Valley Author.,
  615 F.3d 291 (4th Cir. 2010)..........................................................24

*Office of Commc'n of United Church of Christ v. F.C.C.,
  707 F.2d 1413 (D.C. Cir. 1983)........................................................22

Ophir v. City of Boston,
  647 F. Supp.2d 86 (D. Mass. 2009)....................................................24

*PPL Montana, LLC v. Montana,
  132 S. Ct. 1215 (2012) .................................................................4

*Reichelderfer v. Quinn,
  287 U.S. 315 (1932) .....................................................................9

Robinson v. Ariyoshi,
  658 P.2d 287 (Haw. 1982)...............................................................21

Romer v. Evans,
  517 U.S. 620 (1996) .....................................................................16

Schechter Poultry Corp. v. United States,
  295 U.S. 495 (1935).....................................................................13

Snyder v. Massachusetts,
  291 U.S. 97 (1934)......................................................................20

*State v. City of Bowling Green,
313 N.E.2d 409 (Ohio 1974) ............................................................. 23

*Stone v. Mississippi,
101 U.S. 814 (1879) ..................................................................... 3, 5-6

Terminiello v. City of Chicago,
337 U.S. 1 (1949) .............................................................................. 25

*United States v. 1.58 Acres of Land,
523 F. Supp. 120 (D. Mass. 1981) ................................................. 9-10

United States v. Carolene Products, Co.,
304 U.S. 144 (1938) ......................................................................... 16

*United States v. Causby,
328 U.S. 256 (1946) ......................................................................... 11

*United States v. Rands,
389 U.S. 121 (1967) .......................................................................... 10

United States v. Trinidad Coal & Coking Co., 137 U.S. 160 (1890) ....................... 5

## CONSTITUTIONAL PROVISIONS

Haw. Const. art. IX, § 1 ..................................................................... 20

Haw. Const. art. XI, § 1 ..................................................................... 22

Ill. Const. art XI, § 1 .......................................................................... 20

Mont. Const. art. IX, § 1 ..................................................................... 20

Pa. Const. art. I, § 27 ......................................................................... 20

R.I. Const. art. I, § 17 ......................................................................... 22

*U.S. Const. amend. V ................................................................... 15, 17

U.S. Const. amend. XIV, §1 .............................................................. 17

\*U.S. Const. art 1, § 1..............................................................13

\*U.S. Const. pmbl..................................................................12

## STATUTES

\*42 U.S.C. § 4331(b)(1) (1970)..............................................20

\*42 U.S.C. § 9601 (2006).......................................................22

49 U.S.C.A. §176(a)..............................................................22

## OTHER AUTHORITIES

\*William Blackstone, *Commentaries on the Laws of England* (1769)..............18, 19

Michael C. Blumm & Aurora Paulsen, *The Public Trust in Wildlife,* 2013 Utah L. Rev. (2013), *available at* http://ssrn.com/abstract=2189134..............................10

Michael C. Blumm & Mary Christina Wood, *The Public Trust Doctrine in Environmental and Natural Resources Law* (Carolina Academic Press 2013)........................................................................8, 12

Michael C. Blumm, *The Public Trust Doctrine – A Twenty-First Century Concept*, 16 Hastings W.-N.W. J. Envtl. L. & Policy 105 (2010) *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1468601.............................21

\*George G. Bogert, et al., *Bogert's Trusts and Trustees*, § 582 (2011).................23

\*Karl S. Coplan, *Public Trust Limits on Greenhouse Gas Trading Schemes: A Sustainable Middle Ground?* 35 Colum. J. Envt'l L. 287 (2010).........................9

David Dana & Susan Koniak, *Bargaining in the Shadow of Democracy*, 148 U. Pa. L. Rev. 473 (1999)........................................................6

John Edward Davidson, *Draft Atmospheric Trust Litigation Amicus Brief* (Nov. 30, 2013), *available at* SSRN: http://ssrn.com/abstract=2361780……...6, 12

*Julian Eule, *Temporal Limits on the Legislative Mandate: Entrenchment and Retroactivity*, 1987 Am. B. Found. Res. J. 379 (1987)...........................................6

*The Federalist No. 10 at 78 (James Madison) (Clinton Rossiter ed., 1961)....15-16

*Jim Gardner, *Discrimination Against Future Generations: The Possibility of Constitutional Limitation*, 9 Envtl. L. 29 (1978)..................................................13

*Douglas Grant, *Underpinnings of the Public Trust Doctrine: Lessons from Illinois Central Railroad*, 33 Ariz. St. L.J. 849 (2001)...............................8, 9, 15

*Institutes of Justinian*, J. INST., 2.1.1-2.1.6 at 55 (P. Birks & G. McLeod trans. 1987)..............................................................................................................18

*Jefferson to James Madison, September 6, 1789, *Papers of Thomas Jefferson*, Ed. Julian Boyd XV, 392-98 (1950)................................................................6, 19

Michael J. Klarman, *Majoritarian Judicial Review: The Entrenchment Problem*, 85 Geo. L.J. 491 (1997).......................................................................................6

Patrick Parenteau, *Come Hell and High Water Coping with the Unavoidable Consequences of Climate Disruption*, 34 Vt. L. Rev. 957 (2010).......................23

*Roberts and Chemerinsky, *Entrenchment of Ordinary Legislation* at 1795 – 1801..................................................................................................................9, 14

Herbert Sloan, *Principles and Interest Thomas Jefferson and the Problem of Public Debt* (1995)..............................................................................................19

*1 J Story, *Commentaries on the Constitution of the United States* § 462 (2d ed. 1885)..................................................................................................................13

*Gerald Torres, *Who Owns the Sky?*, 19 Pace Envtl. L. Rev. 515 (2002)........21, 23

Charles F. Wilkinson, *The Headwaters of the Public Trust: Some of the Traditional Doctrine*, 19 Envtl. L. 425 (1989)......................................................................21

*Mary Christina Wood, *Nature's Trust: Environmental Law for a New Ecological Age* (Cambridge University Press 2013)....................................8-9, 23

# GLOSSARY

CAA          Clean Air Act

EPA          Environmental Protection Agency

GHG          Greenhouse Gas

PTD          Public Trust Doctrine

## I.      IDENTITY AND INTERESTS OF *AMICI CURIAE*

*Amici curiae* are the law professors and scholars listed on the signature page below.[1]  These individuals have dedicated their careers to teaching, researching and writing about environmental law, climate law, property law, constitutional law, and the Public Trust Doctrine, including three who teach courses devoted solely or primarily to the Public Trust Doctrine.   These law professors and scholars are among the Nation's leading experts on the complex legal history and evolution of the Public Trust Doctrine.   They have a strong interest in informing the Court about the role of the Public Trust Doctrine in defining sovereign legal obligations to protect the atmosphere from harmful greenhouse gas emissions. The expertise and scholarship of these law professors and scholars are described in more detail in Appendix 1.  *Amici* file this brief in support of the Appellants in this case.

## II.      SUMMARY OF ARGUMENT

This case involves the duties of federal officials under the Public Trust Doctrine (PTD), and how those duties apply to the air we breathe.  The PTD concerns the fundamental relationship between government and its citizens: the basic expectation, central to the purpose of organized government, that natural resources essential to survival remain abundant, justly distributed, and bequeathed to future generations.

---

[1] *Amici* file this brief solely as individuals and not on behalf of the institutions with which they are affiliated.

1

The foundational U.S. Supreme Court public trust cases held that government has no authority to substantially impair or alienate resources crucial to public welfare. The Nation's public trust over these resources remains an attribute of sovereignty that government cannot shed. The constitutional reserved powers doctrine in conjunction with the public trust prevents any one legislature from depriving a future legislature of the natural resources necessary to provide for the well-being and survival of its citizens. This requirement of sovereign restraint and intergenerational stewardship is implicit in the Vesting Clause and the due process and equal protection guarantees of the Constitution. Through the PTD, the Constitution governs for the perpetual preservation of the Nation.

The PTD imposes sovereign duties on the federal government to protect the atmosphere necessary for human survival. Government agencies allowing massive amounts of carbon dioxide to imperil the climate system jeopardize the future life, liberty, and property of the youth plaintiffs in this case and future generations. Supported by the world's leading climate scientists, Youth Appellants submit that they will face "the collapse of natural resource systems and a largely uninhabitable Nation" if courts do not intervene to hold government accountable for protection of the atmosphere before climate tipping points are passed. Appellants' Opening Brief at 3, 7. Government's failure to address impending catastrophic harm violates the basic constitutional public trust duty, applicable to the federal

government through the reserved powers doctrine and other constitutional provisions, to protect resources crucial for future human survival and welfare.

## III.    ARGUMENT

### A.    Terminology and *PPL Montana, LLC v. Montana*

The terms "public trust" and "Public Trust Doctrine" carry a range of meanings.  In the broadest sense, the term "public trust" refers to a fundamental understanding that no legislature can legitimately abdicate its core sovereign powers.  In *Stone v. Mississippi*, the Supreme Court held:

> No legislature can bargain away the public health or the public morals. . . . The supervision of both these subjects of governmental power is continuing in its nature. . . . [T]he power of governing is a trust committed by the people to the government, no part of which can be granted away.

101 U.S. 814, 819-20 (1879).  *See also Butchers' Union v. Crescent City*, 111 U.S. 746, 766 (1884) (Justice Field, concurring).   This broad trust principle is commonly referred to as the "reserved powers doctrine."

In a second sense, the terms "public trust" and "Public Trust Doctrine" refer to the application of the reserved powers doctrine to sovereign natural resources critical to public welfare.[2]  As explained below, the reserved powers doctrine and the PTD prohibit complete privatization of sovereign resources because

---

[2] Appellants' pleadings and this brief employ the term "Public Trust Doctrine" in this second sense, referring to the reserved powers doctrine as applied to critical natural resources generally.

privatization would constitute an impermissible transfer of governmental power into private hands, wrongfully impinging upon the powers of later legislatures and the rights of the public to safeguard crucial societal interests. Frequently recognized sovereign trust resources include air, water, and wildlife.

A third common usage of the PTD concerns the narrow, carefully defined body of law governing state ownership of navigable waters and the submerged lands under such waters. While the federal equal footing doctrine determines state trust ownership of such submerged lands, states apply the PTD to determine the appropriate contours of how these lands are managed. As Justice Kennedy summarized in *PPL Montana, LLC v. Montana*:

> Unlike the equal-footing doctrine . . . which is the constitutional foundation for the navigability rule of riverbed title, the public trust doctrine remains a matter of state law . . . While equal-footing cases have noted that the State takes title to the navigable waters and their beds in trust for the public, . . . the contours of *that* public trust do not depend upon the Constitution.

132 S.Ct. 1215, 1235 (2012) (emphasis added). Use of the modifier "that" underscores the existence of public trust applications beyond the narrow context of state-owned streambeds.

The court below erroneously relied on *PPL Montana*'s reference to state law in support of its dismissal of Appellants' complaint. The trial judge assumed that the PTD did not apply to federal officials since the *PPL Montana* Court referred to the doctrine as a matter of state law. However, as discussed later in this brief, the

4

PTD operates at both the state and federal levels. The *PPL Montana* Court's brief reference to the state-law PTD as it applies to state management of streambeds—the only trust resources at issue in that case—bears no reflection on the federal PTD. The Court addressed the PTD only to contrast it with the equal footing rule concerning ownership of submerged lands at statehood. The Court was not asked to consider the application of public trust principles to natural resources of critical interest to the federal government. In fact, the Court has frequently announced a federal public trust in national resources. *See Light v. United States*, 220 U.S. 523, 537 (1911); *United States v. Trinidad Coal & Coking Co.*, 137 U.S. 160, 170 (1890). In short, the *PPL Montana dicta* does not apply to this case.

## B.    Origins of the Reserved Powers and Public Trust Doctrines

The PTD, as employed in this case, represents an application of the reserved powers doctrine to the federal government. The reserved powers doctrine recognizes that one legislature may not legitimately infringe upon the equal sovereignty of later legislatures. The principle prevents one legislature from binding a later legislature by enacting an irrepealable law, for example. As the Court stated in *Stone v. Mississippi* when it upheld a state legislature's criminalization of lotteries in the face of an earlier legislature's grant of private lottery franchises:

> [T]he legislature cannot bargain away the police power of a State. . . .
> [N]o legislature can curtail the power of its successors to make such

laws as they may deem proper in matters of police. . . . No legislature can bargain away the public health or the public morals. . . . The supervision of both these subjects of governmental power is continuing in its nature . . . . [T]he power of governing is a trust committed by the people to the government, no part of which can be granted away.

101 U.S. 814, 817-20 (1879).

This rule is an ancient, axiomatic principle of government.[3]  The principle vindicates basic notions of generational sovereignty.  Each sitting legislature derives its legitimate authority from the particular public that elects it. Recognizing the rights and powers of later legislatures secures the rights and powers of the later citizens who will elect those later legislatures.[4]  As Thomas Jefferson once famously reminded James Madison, "between society and society, or generation and generation, there is . . . no umpire but the law of nature, . . . [and] one generation is to another as one independent nation to another."[5]

The Supreme Court has recognized reserved powers principles almost from the Nation's inception.  As early as 1810, in *Fletcher v. Peck*, the Supreme Court recognized, as a general principle, that "one legislature cannot abridge the powers

---

[3] *See* John Edward Davidson, *Draft Atmospheric Trust Litigation Amicus Brief*, 8 (Nov. 30, 2013), *available at* SSRN: http://ssrn.com/abstract=2361780.

[4] *See* Julian Eule, *Temporal Limits on the Legislative Mandate: Entrenchment and Retroactivity*, 1987 Am. B. Found. Res. J. 379, 195 (1987); Michael J. Klarman, *Majoritarian Judicial Review: The Entrenchment Problem*, 85 Geo. L.J. 491, 503 (1997); David Dana & Susan Koniak, *Bargaining in the Shadow of Democracy*, 148 U. Pa. L. Rev. 473, 533 (1999).

[5] Jefferson to James Madison, September 6, 1789, *Papers of Thomas Jefferson*, Ed. Julian Boyd XV, 392-98 (1950).

6

of a succeeding legislature." 10 U.S. 87, 135 (1810).  In *Newton v. Commissioners of Mahoning County*, 100 U.S. 548 (1879), the Court sustained the relocation of a county seat over claims that the former assignment was perpetual, proclaiming:

> Every succeeding legislature possesses the same jurisdiction and power with respect to them as its predecessors.  The latter have the same power of repeal and modification which the former had of enactment, neither more nor less. All occupy, in this respect, a footing of perfect equality.  This must necessarily be so in the nature of things.  It is vital to the public welfare that each one should be able at all times to do whatever the varying circumstances and present exigencies touching the subject involved may require.

*Id*. at 559.

In *Illinois Central R.R. Co. v. Illinois,* 146 U.S. 387 (1892), a landmark case expressing the PTD, the Supreme Court applied this constitutional reserved powers principle to crucial natural resources.  Relinquishing sovereign control over such resources would impair the ability of future legislatures to provide for public needs, thereby violating the reserved powers doctrine.  The Court therefore held that such resources were in trust and could not be fully privatized.

At issue was control of Chicago Harbor, which the Illinois legislature had granted to a private railroad company.  The Court explained the rationale of the PTD, and its explanation extends beyond submerged lands:

> The state can no more abdicate its trust over property in which the whole people are interested, *like* navigable waters and soils under them, so as to leave them entirely under the use and control of private parties. . . than it can abdicate its police powers in the administration of government and the preservation of the peace. . . . Any grant of the

7

kind is necessarily revocable, and the exercise of the trust by which the property was held by the state can be resumed at any time. . . . The trust with which they are held, therefore, is *governmental*, and cannot be alienated . . . .

*Id*. at 453-55 (emphases added).

Directly grounding the PTD in the reserved powers analysis of *Newton v. Commissioners* the Court stated:

In Newton v. Commissioners, . . . [the Court held] that every succeeding legislature possesses the same jurisdiction and power as its predecessor; . . . that it is vital to the public welfare that each one should be able at all times to do whatever the varying circumstances and present exigencies attending the subject may require . . . . The legislature could not give away nor sell the discretion of its successors in respect to matters, the government of which, from the very nature of things, must vary with varying circumstances. . . . *Every legislature must, at the time of its existence, exercise the power of the state in the execution of the trust devolved upon it.*

*Id*. at 459-460 (emphasis added).

In short, a sovereign's public trust obligations follow from the legislature's incapacity to legitimately bind future legislatures in matters of crucial public concern.[6] *Illinois Central* made clear that alienating or destroying essential resources would amount to relinquishing sovereign powers in violation of the Constitution's reserved powers doctrine.[7] As that Court admonished, allowing the

---

[6] *See* Douglas Grant, *Underpinnings of the Public Trust Doctrine: Lessons from Illinois Central Railroad*, 33 Ariz. St. L.J. 849, 874-79 (2001).

[7] *See* Michael C. Blumm & Mary Christina Wood, *The Public Trust Doctrine in Environmental and Natural Resources Law* 72, 234 (Carolina Academic Press, 2013); Mary Christina Wood, *Nature's Trust: Environmental Law for a New*

legislature to convey submerged lands "would place every harbor in the country at the mercy of a majority of the legislature of the state in which the harbor is situated." *Ill. Cent. R.R.*, 146 U.S. at 460-61.

## C.  Application of the Reserved Powers and Public Trust Doctrines to the Federal Government

The reserved powers doctrine applies to the federal government for the same reasons that it applies to the state governments.[8]  Its application at the federal level was confirmed in *Reichelderfer v. Quinn*, in which the Court recognized that "[t]he will of a particular Congress . . . does not impose itself upon those to follow in succeeding years."  287 U.S. 315, 318 (1932).

The most extensive judicial discussion of parallel state and federal trust obligations is in *United States v. 1.58 Acres of Land*, 523 F. Supp. 120 (D. Mass. 1981).  Drawing on the reserved powers reasoning in *Illinois Central*, that court found an inherent federal public trust obligation parallel to the state trust duty in the context of submerged lands:

> [T]he state's administration of the public trust is subject to the paramount rights of the federal government to administer its trust with respect to matters within the federal power.  The trust is of such a nature that it can be held only by the sovereign, and can only be

---

*Ecological Age* 131 (Cambridge University Press, 2013); *see also* Karl S. Coplan, *Public Trust Limits on Greenhouse Gas Trading Schemes: A Sustainable Middle Ground?* 35 Colum. J. Envt'l L. 287, 311 (2010).

[8] *See* Grant, *supra* note 6, at 877; John C. Roberts & Erwin Chemerinsky, *Entrenchment of Ordinary Legislation,* 91 Cal. L. Rev. 1773, 1795–1801 (2003). Coplan, *supra* note 7, at 311.

> destroyed by the destruction of the sovereign. . . .   Since the trust
> impressed upon this property is governmental and administered jointly
> by the state and federal governments by virtue of their sovereignty,
> neither sovereign may alienate this land free and clear of the public
> trust.

*Id.* at 124.   *See also United States v. Rands*, 389 U.S. 121 (1967) (recognizing

allnavigable waters as the public property of the Nation).

In addition to submerged lands, other crucial resources implicate joint

federal and state interests.   For instance, wild game is a recognized as a trust

resource in virtually all of the states.[9]   In *Geer v. Connecticut*, 161 U.S. 519, 534

(1896), the Court stated, "[T]he ownership of the sovereign authority [over wild

game] is in trust for all the people of the state, and hence by implication it is the

duty of the legislature to enact such laws as will best preserve the subject of the

trust and secure its beneficial use in the future to the people of the state."   *Id*. at

533-34.[10]   The Court recognized a parallel federal interest associated with

migratory birds in *Missouri v. Holland*:

> Here a national interest of very nearly the first magnitude is involved.
> It can be protected only by national action in concert with that of
> another power.   The subject matter is only transitorily within the
> State, and has no permanent habitat therein.   But for the treaty and the
> statute there soon might be no birds for any powers to deal with.

252 U.S. 416, 435 (1920).

---

[9] *See* Michael C. Blumm & Aurora Paulsen, *The Public Trust in Wildlife,* 2013
Utah L. Rev. (2013), *available at* http://ssrn.com/abstract=2189134.

[10] *But see Hughes v. Oklahoma*, 441 U.S. 322, 335-39 (1979) (applying dormant
commerce clause restrictions to state wildlife).

Similarly, the ocean and coastline present federal trust interests.  In *Alabama v. Texas*, Justice Douglas explained:

> [W]e are dealing here with incidents of national sovereignty.  The marginal sea is . . . more than a mass of water; it is a protective belt for the entire Nation over which the United States must exercise exclusive and paramount authority.  The authority over it can no more be abdicated than any of the other great powers of the Federal Government.  It is to be exercised for the benefit of the whole . . . .

347 U.S. 272, 282 (1954) (Douglas, J., dissenting).

The federal trust protects national interests in resources that transcend state borders.  To entrust the management and preservation of such resources solely to the states would invite ineffective, piecemeal management on the part of the various state legislatures and judiciaries.  As the Court explained in *Missouri v. Holland*, "It is not sufficient to rely upon the States. The reliance is vain. . . ."  252 U.S. at 435.

The same reasoning applies to the atmosphere.  In *United States v. Causby*, 328 U.S. 256 (1946), for example, the Court held that the traditional common law doctrine recognizing private rights to airspace had "no place in the modern world," explaining, "To recognize such private claims to the airspace would . . . transfer into private ownership that to which only the public has a just claim."  328 U.S. 256, 261 (1946).  Implicitly designating the atmosphere as a sovereign trust resource, the Court declared: "The airspace, apart from the immediate reaches above the land, is part of the public domain."  *Id*. at 261, 266.  Like the trust arising

11

as to navigable waters and migratory wildlife, the atmospheric trust is inherently federal, as it requires management at the national level.

## D.  Constitutional Textual Analysis

The principle that legislatures throughout time "all occupy . . . a footing of perfect equality," *Ill. Cent. R.R.*, 146 U.S. at 459-60, forms a basic pillar of American jurisprudence, an attribute of sovereignty itself.[11]  The public trust, inherent in sovereignty, functions to limit the power of all sovereigns to ensure they do not betray the natural resource interests of current and future generations of the public for short-term gains.

These principles are embedded in the sovereign compact between the government and its citizens. Although a more thorough constitutional analysis is available elsewhere,[12] this discussion highlights three constitutional clauses that incorporate trust principles: the Vesting Clause, the Equal Protection Clause, and the Due Process Clause.

All of these clauses must be interpreted in light of the Constitution's Preamble, which explicitly manifests intergenerational concern by stating the intention to "secure the Blessings of Liberty *to ourselves and our Posterity* . . . ." U.S. Const. pmbl. (emphasis added).  Although the Posterity Clause does not itself

---

[11] *See, e.g., Geer*, 161 U.S. at 525–528; *see also* Blumm & Wood, *supra* note 7, at 4.

[12] *See* Davidson, *supra* note 3, at 16-32.

confer substantive powers upon government, it does indicate who the beneficiaries of the powers and rights enumerated elsewhere in the Constitution should be[13]—namely, "ourselves and our Posterity."[14]  A conscientiously stewarded trust corpus of crucial natural resources, including a functioning atmosphere and stable climate, is an indispensable precondition if the "Blessings of Liberty" are to be maintained for Posterity.

    1.   *The Vesting Clause*

Article I, section 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States . . . ." Accordingly, Congress may not re-delegate its legislative powers to private parties or administrative agencies, although limited grants of rulemaking authority are allowed.  *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529-530 (1935). The PTD effectuates this non-delegation aspect of the vesting clause to the extent that it prohibits the delegation of control over crucial resources to private parties. As the *Illinois Central* Court explained:

> It is hardly conceivable that the legislature can divest the state of the control and management of this harbor, and vest it absolutely in a private corporation. . . .  It would not be listened to that the control and management of the harbor of that great city-a subject of concern

---

[13] 1 J STORY, *Commentaries on the Constitution of the United States* § 462 (2d ed. 1885).

[14] *See* Jim Gardner, *Discrimination Against Future Generations: The Possibility of Constitutional Limitation*, 9 Envtl. L. 29, 35, 33 (1978).

to the whole people of the state-should thus be placed elsewhere than in the state itself.

146 U.S. at 454-55.

The Vesting Clause also has a temporal aspect in that it requires legislative powers to be vested equally in all legislative bodies succeeding one another through time, so that one session of Congress may not infringe on the sovereignty of *later* sessions and the publics that they represent.[15]  The Founders did not intend the Vesting Clause to be in name only, allowing one legislature to strip its successors of control of the natural wealth necessary to exert sovereignty on behalf of the people.  To continue to secure the blessings of liberty for future generations, every legislature must possess the necessary power "at all times to do whatever the varying circumstances and present exigencies attending the subject may require . . . ." *Illinois Central R.R.,* 146 U.S. at 459 (citing *Newton v. Commissioners*).  The most serious possible constraint of future legislatures involves the loss of resources that sustain citizen survival.  Atmospheric harm and climate disruption, with the serial disasters and ultimate chaos they entail, would cripple the ability of government to meet citizen needs.  *See* Appellants' Opening Brief at 23-24.  Courts must prevent "imminent, substantial and irreparable environmental harm . . . [because] [u]nless the court acts, there might be no public values left in the future

---

[15] *See* Roberts and Chemerinsky, *supra* note 8, at 1784.

for succeeding legislatures to manage."[16]

2.    *Equal Protection*

The federal government is made subject to equal protection standards

through the due process requirement of the Fifth Amendment. *See Bolling v.*

*Sharpe*, 347 U.S. 497 (1954). While most equal protection jurisprudence pertains

to immediate discrimination against individuals, equal protection principles also

require that each legislature respect the sovereignty of later legislatures (and the

later publics whom those legislatures represent). The equal protection guarantee

must be interpreted in light of the Framers' concern for Posterity. The

fundamental rights and liberties of citizens cannot be achieved where successive

legislatures do not enjoy a "footing of perfect equality." *Illinois Central R.R.,* 146

U.S. at 459-60. Perhaps in no other instance is equal protection between citizens

of different ages (or respective generations) more acutely deprived than when

government allows actions that irrevocably damage the natural resources necessary

for citizens to survive and prosper in the future—the very circumstance that forms

Youth Appellants' grievance before this Court.

In *Federalist* 10, James Madison sagely decried the threat of "factionalism."

Madison defined a faction as "a number of citizens . . . who are united and actuated

by some common impulse of passion, or of interest, adverse to the rights of other

---

[16] Grant, *supra* note 6, at 885.

citizens *or to the permanent and aggregate interests of the community*."[17]   The present generation constitutes such a faction to the extent that it materially benefits from actions producing an energy imbalance in the atmosphere at the expense of today's youth and later citizens.

In the face of a grave climate threat, youth and Posterity represent a quintessential, politically powerless "discrete and insular minority."  *See United States v. Carolene Products, Co.*, 304 U.S. 144, 152 n. 4 (1938).  Minors and future citizens are unable to employ the voting franchise to halt adverse government action.  "Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance."  *Romer v. Evans*, 517 U.S. 620, 633 (1996).

Throughout the Nation's history, courts have insured equal protection for Posterity by imposing a public trust on natural capital that is critical to societal function (and by enforcing the reserved powers doctrine as to all matters of crucial sovereign concern).  Treating present and future generations equally as beneficiaries, the PTD entitles all to inherit the life-sustaining resources of the Nation.  If the constitutional guarantee of equal protection is to have any meaning

---

[17] The Federalist No. 10, at 78 (Clinton Rossiter ed., 1961) (emphasis added).

16

for young citizens threatened by future climate change, the courts must continue to recognize and give present effect to this trust.

   3.   *Due Process*

The due process clause of the Fifth Amendment incorporates unenumerated rights applicable against the federal government in much the same way that the Fourteenth Amendment due process clause incorporates such rights to apply against state governments.[18]   In determining whether a constitutionally unenumerated right or limitation arises as a matter of substantive due process, the Court asks "whether the right . . . is fundamental to our scheme of ordered liberty . . . or whether this right is 'deeply rooted in this nation's history and tradition.'" *MacDonald v. Chicago*, 130 S. Ct. 3020, 3036 (2010), bench opinion 19 (internal citations omitted).  The reserved powers doctrine and the Public Trust Doctrine meet both of these standards.

The reserved powers doctrine and its component rule against legislative entrenchment are implicit in the concept of ordered, democratic liberty.  As the Court recognized in *Fletcher v. Peck*, "The correctness of this principle, so far as respects general legislation, can never be controverted." 10 U.S. 87, 135 (1810).

Requiring the preservation of critical natural resources and public control thereof is likewise fundamental to ordered liberty.  The resources subject to

---

[18] *See Bolling v. Sharpe*, 347 U.S. 497; *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995); *Harris v. McRae*, 448 U.S. 297, 317-18 (1980).

17

continuing governmental oversight are those essential to the economic and physical health of society.  They form the natural infrastructure prerequisite to any stable political structure.  Because of these qualities, their destruction cannot be allowed, and their management cannot be surrendered to politically unaccountable agents.  As the *Illinois Central* Court explained:  "The sovereign power . . . cannot, consistently with the principles of the law of nature and the constitution of a well-ordered society, make a direct and absolute grant of the waters of the state, divesting all the citizens of their common right.  It would be a grievance which never could be long borne by a free people." 146 U.S. at 456 (citations omitted).

In addition to being "implicit in the concept of ordered liberty," the PTD is also "deeply rooted in this nation's history and tradition."  Ancient Roman law held that "[b]y the law of nature, the following are common to all mankind – the air, running water, the sea, and consequently the shores of the sea."[19]  That understanding carried over into English law.[20]  Blackstone confirmed that within the English legal system, certain categories of things must remain in common ownership, unsusceptible to full privatization:  "Such are the elements of light, air and water . . . also animals *ferae naturae*, or of untamable nature . . . ."[21]

---

[19] *Institutes of Justinian*, J. Inst., 2.1.1-2.1.6 at 55 (P. Birks & G. McLeod trans. 1987); *see also Geer*, 161 U.S. at 522-23.

[20] *See Arnold v. Mundy*, 6 N.J.L. 1, 50 (1821); *Martin v. Waddell*, 41 U.S. 367, 412-13 (1842).

[21] William Blackstone, II *Commentaries on the Laws of England* ch 1, 222 (1769).

The framers recognized each generation's fundamental obligation to *preserve* the value and integrity of natural resources for later generations. The most succinct, systematic treatment of intergenerational principles is that provided by Thomas Jefferson to James Madison:[22]

> The question [w]hether one generation of men has a right to bind another. . . is a question of such consequences as not only to merit decision, but place also among the fundamental principles of every government. . . . I set out on this ground, which I suppose to be self-evident, '*that the earth belongs in usufruct to the living*'. . . .

Strikingly, Jefferson based his theory of intergenerational political sovereignty on a prior "self-evident" concept of intergenerational rights and obligations in the Earth. In Jefferson's time, as now, "usufruct" referenced the rights and responsibilities of tenants, trustees, or other parties temporarily entrusted with an asset—usually land. Usufructuary rights-holders were prohibited from committing waste (lasting damage) to the property.[23] These dual concepts of usufruct and waste, applied to entailed estates over the course of centuries, eventually fostered a principle of intergenerational stewardship that had become ethical bedrock by the late 1700's. This sense of intergenerational responsibility was widely shared,[24] shaping the early "traditions and conscience of our people."[25]

---

[22]Jefferson to James Madison, *supra* note 5, at 392-98.

[23]*See* Blackstone*, supra* note 21*,* at 281.

[24] *See* Herbert Sloan, *Principles and Interest Thomas Jefferson and the Problem of Public Debt* 5 (1995) ("What makes Jefferson's views important . . . is not so much that he held them, but that they were widely shared.").

19

The same public trust principles continue to find expression in state constitutions[26] and federal statutes,[27] today, supporting their recognition as a matter of federal substantive due process.

### E.      The Atmosphere as a Public Trust Resource

The underlying rationale of the PTD requires protection of air and atmosphere as a subject of public concern "in which the whole people are interested." Describing its application of trust principles to submerged lands, the *Illinois Central* Court declared:

> The state can no more abdicate its trust over property in which the whole people are interested, *like* navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, . . . than it can abdicate its police powers. . . . So with trusts connected with public property*, or property of a special character*, . . . they cannot be placed entirely beyond the direction and control of the state.

*Ill. Cent.*, 146 U.S. at 453-54 (emphasis added). The atmosphere supports the entire climate system that makes possible human survival and all societal endeavors. Allowing carbon emissions that disrupt earth's energy balance represents the ultimate abdication of government control over a resource of public concern.

---

[25] *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934).

[26] *See, e.g.,* Pa. Const. art. I, § 27; Mont. Const. art. IX, § 1; Haw. Const. art. IX, § 1; Ill. Const. art XI, § 1.

[27] *See, e.g.,* National Environmental Policy Act of 1969, § 101(b)(1), 42 U.S.C. § 4331(b)(1) (1970).

Courts emphasize that the PTD is not "'fixed or static,' but is to be 'molded and extended to meet changing conditions and needs of the public it was created to benefit.'" *Matthews v. Bay Head Improvement Ass'n*, 471 A.2d 355, 365 (N.J. 1984) (citation omitted); *see also Marks v. Whitney*, 491 P.2d 374, 380 (1971). Courts have expanded the reach of the PTD to embrace other categories of public resources, such as non-navigable tributaries, groundwater, wetlands, dry sand areas, and wildlife,[28] and to protect modern concerns, including ecological and recreational interests. *See Nat'l Audubon Soc'y v. Superior Ct. of Alpine Cnty.*, 658 P.2d 709, 724 (Cal. 1983).

The notion of air as a public trust resource is as old as our legal system.[29] The Roman classification of "res communes," or "things which remain common," included air – along with water, wildlife, and the sea. *Geer*, 161 U.S. at 525. The *Geer* Court relied on this "res communes" classification to confirm the public trust over wildlife. 161 U.S. at 523-25. In *Georgia v. Tennessee Copper*, the Court recognized the states' sovereign property interests in air, declaring that "the state

---

[28] *See Nat'l Audubon Soc'y*, 658 P.2d at 719; *Matthews*, 471 A.2d at 358; *Robinson v. Ariyoshi*, 658 P.2d 287, 311 (Haw. 1982); *Just v. Marinette Cnty.*, 201 N.W.2d 761, 769 (Wis. 1972) (wetlands); *see also* Charles F. Wilkinson, *The Headwaters of the Public Trust: Some of the Traditional Doctrine*, 19 Envtl. L. 425 (1989) (describing expansion of the PTD); Michael C. Blumm, *The Public Trust Doctrine – A Twenty-First Century Concept*, 16 Hastings W.N.W. J. Envtl. L. & Policy 105 (2010), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1468601 (same).
[29] *See* Gerald Torres, *Who Owns the Sky?*, 19 Pace Envtl. L. Rev. 515 (2002).

21

has an interest independent of and behind the titles of its citizens, in all the earth *and air* within its domain." 206 U.S. 230, 237 (1907) (emphasis added). Numerous state constitutions and codes recognize air as a public trust resource.[30] Congress confirmed the public nature of the air resource in the Air Commerce Act of 1926, recognizing that the United States "has complete and exclusive national sovereignty in [its] air space." 49 U.S.C.A. §176(a).  Federal law also recognizes air as a trust asset for which the federal government, states, and tribes may obtain recovery in the event of natural resource damages.[31]  Congress has treated the airwaves (electromagnetic broadcasting frequencies) as a federal public trust asset.[32]

Granted, never before has the Nation's climate system been threatened.  But the essential rationale of the public trust applies as forcefully to protect today's citizens as it did long ago to protect the people's right in navigable waters.  As the *Illinois Central* Court said then in face of unprecedented circumstances:

> We cannot, it is true, cite any authority where a grant of this kind has been held invalid, for we believe that no instance exists where the harbor of a great city and its commerce have been allowed to pass into the control of any private corporation.  But the decisions are numerous

---

[30] *See, e.g.*, *Her Majesty v. City of Detroit*, 874 F.2d 332, 337 (6th Cir. 1989); Haw. Const. art. XI, § 1; R.I. Const., art. I, § 17; *Nat'l Audubon Soc'y,* 658 P.2d at 718-20.

[31] *See* 42 U.S.C. § 9601 (2006) (CERCLA).

[32] *See Office of Comm'n of United Church of Christ v. F.C.C.*, 707 F.2d 1413, 1427-28 (D.C. Cir. 1983).

22

which declare that such property is held by the state, by virtue of its
sovereignty, in trust for the public.

*Ill. Cent. R.R.*, 146 U.S. at 455. The critical difference between then and now—
making this case of pivotal importance—is that degradation of the atmosphere and
the resulting disruption of the earth's energy balance pose an existential threat to
human society of a magnitude unimaginable in the day when Justice Field invoked
the doctrine to protect Chicago Harbor.[33]

## F.     Affirmative Constitutional Duties and the State Action Doctrine

The PTD subjects government to fiduciary standards of performance in
managing common trust property.  The most basic trust duty is to protect crucial
assets from irrevocable damage.  Private trustees may not sit idle.  "The trustee has
a duty to protect the trust property against damage or destruction."  George G.
Bogert, et al., *Bogert's Trusts and Trustees*, § 582 (2011).

The same applies to public trustees.  As trustee of sovereign resources,
government has a fiduciary obligation to protect the trust resources for the
continuing generations of citizen beneficiaries.  *See Geer*, 161 U.S. at 533-34;
*State v. City of Bowling Green*, 313 N.E. 2d 409, 411 (Ohio 1974); *Just v.
Marinette Cnty.*, 201 N.W.2d at 768-70.  The legislature is the primary trustee; the

---

[33] Commentators increasingly point to the logic and necessity of applying the
public trust doctrine to the climate crisis.  *See, e.g.*, Torres, *supra* note 29, at, 533;
Wood, *supra* note 7, at ch. 7 & 10; Patrick Parenteau, *Come Hell and High Water
Coping with the Unavoidable Consequences of Climate Disruption*, 34 Vt. L. Rev.
957, 963-64 (2010).

executive, as an agent of the trustee, has the same public trust obligation.  *See Ctr. for Biological Diversity v. FPL Grp.*, 166 Cal.App.4th 1349, 1365-66 (Cal. App. 2008); *In re water Use Permit Applications, Waihole Ditch Combined Contested Case Hearing,* 9 P.3d 409 (Haw. 2000).

Respondents in this case, however, argue that the Constitution imposes no affirmative obligations on the federal government to act.  But courts have recognized an affirmative duty to act when government has placed limits on the ability of citizens to act on their own behalf.  *DeShaney v. Winnebago Cnty. Dep't of Soc Servs.*, 489 U.S. 189, 195, 200 (1989).  Government has done just that in the face of climate harm.  The public has been deprived of legal recourse against greenhouse gas polluters under federal common law nuisance theories due to judicial findings of displacement from the Clean Air Act.  *See Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527, 2537-38 (2011); *see also Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849, 865 (S.D. Miss. 2012) *aff'd*, 718 F.3d 460 (5th Cir. 2013).  Courts have similarly denied states relief in suits premised on state common law claims.  *See*, *e.g.*, *N. Carolina, ex rel. Cooper v. Tenn. Valley Author.*, 615 F.3d 291, 303 (4th Cir. 2010).  Federal courts have rejected local and state legislative attempts to curtail emissions.  *See*, *e.g.*, *Ophir v. City of Boston*, 647 F. Supp.2d 86 (D. Mass. 2009).

Depriving citizens of a judicial remedy in the context of climate crisis holds nearly unfathomable consequences.   The preeminent climatologist, Dr. James Hansen, has warned, "[F]ailure to act with all deliberate speed in the face of the clear scientific evidence of the danger functionally becomes a decision to eliminate the option of preserving a habitable climate system."[34]  As Justice Jackson once said, the Constitution is not "a suicide pact." *Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949).   Because the federal government, through a combination of weak legislation, weak regulatory enforcement and vigorous judicial application of displacement and preemption doctrines, has effectively curtailed the ability of citizens to act on their own behalf, the normal presumption against imposing affirmative constitutional duties does not apply.

Further, this presumption would be relevant only if the federal government has been a passive actor with regard to carbon emissions and climate change.   To the contrary, as the Complaint alleges, the federal government has been and remains directly involved in climate destruction, actively promoting the extraction and consumption of fossil fuels and resulting greenhouse gas (GHG) emissions. *See* Amended Complaint, ¶¶ 53-65, 145-150.

---

[34] Appellants' Appendix, Brief for *Amicus Curiae* Dr. James Hansen in Support of Youth, Nov. 14, 2011, at A373.

**G.      The Role of the Federal Judiciary in the Public Trust Context**

For any trust to function effectively, judicial enforcement is essential.  This principle applies to sovereign resource trusts just as it does to private trusts.  *See Ariz. Ctr. For Law in Pub. Interest v. Hassell*, 837 P.2d 158, 169 (Ariz. App. 1991).  Courts are being called upon here as they have always been in public trust cases—not to exercise direct management over the *res* of the trust, but to ensure that the political branches fulfill their trust obligation to avoid destruction or irreparable harm to an asset that must sustain future generations.

In other climate cases, courts have cited "political question" concerns when declining to provide relief from the federal government's current energy policy (and largely non-existent climate policy).  *See*, *e.g.*, *Am. Elec. Power*, 131 S. Ct. 2527; *Native Village of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 871 (N.D. Cal. 2009).  In none of these cases was a court called upon to determine whether the government had a fundamental constitutional obligation to oversee the atmosphere as a sovereign trust resource.  "It is a proposition too plain to be contested, that the Constitution controls any legislative act repugnant to it . . . . It is emphatically the province and duty of the judicial department to say what the law is . . . ."  *Marbury v. Madison*, 5 U.S. at 137, 177 (1803).  In this case, judicial relief is essential to protect youth's life, liberty, and property interests.

Because the reserved powers and public trust doctrines are designed to protect the rights and sovereign powers of later generations ("Posterity") from infringement by earlier generations, the political question doctrine does not apply in the same way to public trust cases as to other cases. Most parties protesting a broadly shared harm may be instructed to seek their remedy in the electoral arena. However, minors and future generations have no effective voting option; they cannot pursue their goals through the normal, majoritarian political process as the political question doctrine assumes. It is for this reason that the PTD treats these citizens as trust beneficiaries and requires government, as trustee, to protect their interests. Such a trust, to be effective, requires judicial oversight and enforcement.

The relief requested in this case is narrowly tailored to respect the appropriate prerogatives of the political branches. Appellants ask the court only to order Respondents to produce and implement a climate recovery plan establishing measures to reduce carbon dioxide emissions as required by the best available science, followed by regular carbon accountings to ensure that this plan is carried out. Judicial oversight would allow the other branches full latitude in deciding which measures are appropriate to accomplish the necessary emission reductions. Requiring the other branches of government to fulfill their fiduciary duty to protect inalienable public rights in sovereign trust property has never been declared a "political question" inappropriate for a judicial remedy. "The check and balance of

27

judicial review provides a level of protection against improvident disposition of an irreplaceable res." *Waihole Ditch*, 9 P.3d at 455.

## IV.    CONCLUSION

The Constitution reflects a clear intention to govern for the endurance of the Nation.   Lodged in the constitutional framework and reflected in specific provisions of the Constitution, the PTD imposes a fiduciary obligation on Respondents to take immediate action to abate dangerous GHG emissions that threaten the air, atmosphere, and climate system necessary for the continued survival and welfare of the Nation's citizens.


DATED this 11th day of December, 2013.

Respectfully submitted,

*On the Brief:*

*/s/ William H. Rodgers Jr.*         */s/ John Davidson*
William H. Rodgers, Jr.              John Davidson
Stimson Bullitt Professor of        Professor of Constitutional Law
Environmental Law                   University of Oregon
University of Washington            Dep't of Political Science
School of Law                       936 Prince Lucien Campbell Hal
3026 NW Esplanade                   University of Oregon
Seattle, WA 98117                   Eugene, OR 97403
T: (206) 783-9497                   T: (541) 346-4540
E-mail: whr@u.washington.edu        E-mail: davidson@uoregon.edu
Counsel for Applicants
*Amici Curiae Law Professors*

28

On Behalf Of:

Joseph Sax
James H. House and Hiram H. Hurd Professor of
Environmental Regulation (Emeritus)
University of California Berkeley Law School

Erwin Chemerinsky
Dean of the School of Law
Distinguished Professor of Law
Raymond Pryke Professor of First Amendment Law
University of California, Irvine School of Law

Michael Blumm
Jeffrey Bain Faculty Scholar and Professor of Law
Lewis and Clark Law School

John Davidson
Professor of Constitutional Law
University of Oregon Department of Political Science

Gerald Torres
Marc and Beth Goldberg Distinguished Visiting Professor of Law
Cornell Law School
Professor and Bryant Smith Chair in Law
University of Texas School of Law

Mary Christina Wood
Philip H. Knight Professor
Faculty Director, Environmental and
Natural Resources Law Program
University of Oregon School of Law

Burns Weston
Bessie Dutton Murray Distinguished Professor of Law and Emeritus Senior
Scholar, UI Center for Human Rights; Co-Director, Commons Law Project,
The University of Iowa College of Law

Kevin J. Lynch
Assistant Professor of Law
University of Denver Sturm College of Law

Maxine Burkett
Associate Professor of Law
William S. Richardson School of Law
University of Hawai'i

Erin Ryan
Associate Professor of Law
Lewis & Clark Law School

Timothy P. Duane
Visiting Professor of Law
University of San Diego
Professor of Environmental Studies
University of California, Santa Cruz

Deepa Badrinarayana
Associate Professor
Dale E. Fowler School of Law
Chapman University

Stuart Chinn
Assistant Professor
Faculty Director, Public Law and Policy Program
University of Oregon School of Law

Ryke Longest
Clinical Professor of Law
Duke University School of Law

Jacqueline P. Hand
Professor of Law
University of Detroit Mercy Law School.

Zygmunt Plater
Professor of Law
Boston College Law School

James Gustave Speth
Professor of Law
Vermont Law School

Charles Wilkinson
Distinguished Professor
Moses Lasky Professor of Law
University of Colorado Law School

Patrick C. McGinley
Charles H. Haden II Professor of Law
West Virginia University College of Law

Eric T. Freyfogle
Swanlund Chair and Professor of Law
University of Illinois at Urbana-Champaign

Craig Anthony Arnold
Boehl Chair in Property and Land Use Professor of Law
Affiliated Professor of Urban Planning
Brandeis School of Law
Chair of the Center for Land Use and Environmental Responsibility, University of
Louisville

Patrick Parenteau
Professor of Law
Senior Counsel, Environmental and Natural Resources Law Clinic
Vermont Law School

Federico Cheever
Professor of Law and
Senior Associate Dean for Academic Affairs
Sturm College of Law
University of Denver

Mark S. Davis

Senior Research Fellow and Director
Tulane Institute on Water Resources Law and Policy
Tulane Law School

James R. May, B.S.M.E., CEIT, J.D., LL.M, Esq.
Professor of Law
Co-Director, Environmental Law Center
Professor of Graduate Engineering (Adjunct)
Widener University

Denise Antolini
Professor & Associate Dean
William S. Richardson School of Law
University of Hawaii at Manoa

Professor Edith Brown Weiss
Francis Cabell Brown Professor of International Law
Georgetown University Law School

Alyson C. Flournoy
Professor & Alumni Research Scholar
University of Florida Levin College of Law

David Takacs
Associate Professor of Law
University of California, Hastings School of Law

Michael Robinson-Dorn
Clinical Professor of Law
University of California, Irvine School of Law

Karl Coplan
Professor of Law
Co-Director, Environmental Litigation Clinic
Pace Law School

Oliver Houck
Professor of Law
Tulane University Law School

Douglas L. Grant
Professor Emeritus
William S. Boyd School of Law
University of Nevada – Las Vegas

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because it contains 6,941 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

I certify that the attached *Amicus Curiae* Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 14-point Times New Roman font.

Executed this 11th day of December, 2013.

*/s/ William H. Rodgers, Jr.*
Counsel for *Amici Curiae* Law Professors

34

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of December, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to all registered parties.

*/s/ William H. Rodgers, Jr.*
William H. Rodgers, Jr.
Counsel for *Amici Curiae* Law Professors

# APPENDIX 1

The *Amicus* professors include some of the most respected and accomplished constitutional and environmental law scholars in the Nation and have written profusely on the function of the public trust doctrine in environmental law and the role of the constitution in American law and democracy. Many have authored books and other writings on climate change.

Dean Erwin Chemerinsky is one of the Nation's most accomplished and esteemed constitutional law scholars. He has authored seven books and textbooks on constitutional law and federal jurisdiction, as well as nearly 200 law review articles on constitutional law and other subjects. Professor Joseph L. Sax is widely recognized as the grandfather of public trust scholarship. His prolific writings on the public trust are cited widely in American courts and in the courts of other nations. Professor William H. Rodgers, Jr. has authored the Nation's leading hornbook and treatise on environmental law, textbooks on environmental law, climate change, and energy, and over 45 articles and book chapters on environmental law. Professors Michael C. Blumm and Mary Christina Wood are co-authors of a textbook on public trust law, and both have written law review articles, book chapters, textbooks, and general-audience books on a broad range of natural resource law issues.

36

Professor Gerald Torres, a former president of the Association of American Law Schools (AALS), served as deputy assistant attorney general for the Environment and Natural Resources Division of the U.S. Department of Justice and as counsel to former U.S. attorney general Janet Reno. He has produced a profuse body of scholarship on constitutional law, federal Indian law, and the public trust. Professor Charles F. Wilkinson is an award-winning author of many books on natural resources law and federal Indian law, has produced two leading textbooks in the area, and has served as co-editor of the Handbook of federal Indian law. Professor Burns H. Weston is a widely acclaimed grandfather of the field of human rights law, having founded human rights programs and produced scholarship and books in the area, most recently focusing on environmental law and intergenerational justice and human rights.

The collective scholarship authored by the amicus professors throughout their respective careers represents a vast and far-reaching body of work. Over a third of the *amicus* professors have produced textbooks on environmental law, constitutional law, or natural resources law subjects. Over a third have produced books for the general audience probing the field of environmental law or constitutional law. All have produced leading law review articles or book chapters on specific environmental or constitutional law issues, including a vast body of work focusing on the public trust doctrine.

37

The *amicus* professors bring a combined experience of hundreds of years of teaching, many in the leading environmental law programs in the country.  Over a third are chaired professors, and several are program directors or deans in their law schools.   Representing a wealth of experience and scholarship in the fields of environmental and constitutional law, these *amicus* professors have joined in this brief out of concern over the failure of environmental statutes to force an urgent climate response.   Their shared conviction, lodged in sustained study and scholarship over the years, is that the public trust doctrine constitutionally obliges the federal government, as a sovereign trustee of the atmosphere, to immediately reduce greenhouse gas emissions that threaten the future habitability, security, and welfare of this nation.