No. 13-5192

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ALEC L., *et al.*,

*Plaintiff-Appellants,*

v.

ENVIRONMENTAL PROTECTION AGENCY
AND GINA MCCARTHY, ADMINISTRATOR,
U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Defendant-Appellees,*

THE NATIONAL ASSOCIATION OF MANUFACTURERS, DELTA CONSTRUCTION
COMPANY, INC., DALTON TRUCKING, INC., SOUTHERN CALIFORNIA CONTRACTORS
ASSOCIATION, INC.; CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION, AND
ENGINEERING & UTILITY CONTRACTORS ASSOCIATION,

*Intervenor-Appellees,*

On Appeal from the United States District Court
for the District of Columbia (No. 11-cv-02235 (RLW))

## OPENING BRIEF FOR INTERVENOR-APPELLEES

Theodore Hadzi-Antich
PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916)419-7111

*Counsel for Intervenor-Appellees Delta
Construction Company, Inc., Dalton
Trucking, Inc., Southern California
Contractors, Association, Inc.,
California Construction Trucking
Association, Inc. (formerly California
Dump Truck Owners Association), and
United Contractors (formerly
Engineering & Utility Contractors
Association)*

David T. Buente Jr.
Joseph R. Guerra
Roger R. Martella, Jr.
Quin M. Sorenson
Erika L. Myers
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
Telephone: (202) 736-8000

*Counsel for Intervenor-Appellee the
National Association of
Manufacturers*

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Intervenor-Appellees certify as follows:

**A.     Parties and Amici.**  Plaintiffs below, Appellants here, include Alec L., by and through his Guardian Ad Litem Victoria Loorz; Victoria Loorz; Madeline W., by and through her Guardian Ad Litem Janet Wallace; Janet Wallace; Garrett S., by and through his Guardian Ad Litem Valerie Serrels; Grant S., by and through his Guardian Ad Litem Valerie Serrels; Valerie Serrels; Zoe J., by and through her Guardian Ad Litem Nina Grove; Nina Grove; Kids vs. Global Warming, a nonprofit; and Wildearth Guardians, a nonprofit.

Defendants below, Appellees here, include Regina McCarthy, in her official capacity as Administrator of the United States Environmental Protection Agency; Sally Jewell, in her official capacity as Secretary of the United States Department of the Interior; Thomas J. Vilsack, in his official capacity as Secretary of the United States Department of Agriculture; Penny Sue Pritzker, in her official capacity as Secretary of the United States Department of Commerce; Ernest Moniz, in his official capacity as Secretary of the United States Department of Energy; and Chuck Hagel, in his official capacity as Secretary of the United States Department of Defense.

Defendant-Intervenors below, Appellees here, include The National Association of Manufacturers; Delta Construction Company, Inc.; Dalton Trucking, Inc.; Southern California Contractors Association, Inc.; California Construction

i

Trucking Association (formerly California Dump Truck Owners Association); and Utility Contractors (formerly Engineering & Utility Contractors Association).

Amici that moved to participate in the district court were Dr. James E. Hansen; Professor Ronald A. Cass, Professor Robert A. Destro, Professor James L. Huffman, and Professor Jason Scott Johnston. Amici seeking to participate in this Court include James Hansen; David Beerling; Paul J. Hearty; Ove Hoegh-Guldberg; Pushker Kharecha; Valerie Masson-Delmotte; Camille Parmesan; Eelco J. Rohling; Makiko Sato; Pete Smith; Lise Van Susteren; WITNESS; Michael MacCraken; Global Kids, Inc.; Earth Guardians; Boston Latin Youth Climate Action Network; Kids Against Fracking; Labor Network for Sustainability; Granny Peace Brigade; International Council of Thirteen Indigenous Grandmothers; HelpAge International; HelpAge USA; Protect Our Winters; Kent Environment and Community Network; 350.org; Interfaith Moral Action on Climate; Interfaith Power and Light; Green Zionist Alliance; Sisters of Mercy of the Americas; Institute Leadership Team of the Sisters of Mercy of the Americas; Sisters of Mercy of the Americas Northeast Community Leadership Team; Sisters of Mercy Northeast Justice Council; National Congress of American Indians; Alaska Inter-Tribal Council; Forgotten People, Inc.; Indigenous Peoples Climate Change Working Group; National Native American Law Student Association; Akiak Native Community; Randall Abate; Lorie Graham; Diane Kaplan; Sarah Krakoff; Colette Routel; Elizabeth Kronk Warner; Steven M. Anderson, Brigadier General; Lee F. Gunn, Vice Admiral; David W. Titley, Rear Admiral; Lon

Burnam; Marc Elrich; John Engen; Kitty Piercy; William H. Rodgers, Jr.; Mary
Christina Wood; Erwin Chemerinsky; Michael Blumm; John Davidson; Gerald
Torres; Burns H. Weston; Stuart Chinn; Kevin J. Lynch; Maxine Burkett; Erin Ryan;
Timothy P. Duane; Deepa Badrinarayana; Ryke Longest; Jacqueline P. Hand;
Zygmunt J.B. Plater; James Gustave Speth, Jr.; Charles Wilkinson; Patrick C.
McGinley; Eric T. Freyfogle; Craig Anthony Arnold; Patrick A. Parenteau; Federico
Cheever; Mark S. Davis; James R. May; Denise Antolini; Edith Brown Weiss; Alyson
C. Flournoy; David Takacs; Michael Robinson-Dorn; Karl S. Coplan; Oliver A.
Houck; Joseph Sax; Douglas L. Grant.

   **B.**  **Ruling Under Review.** References to the rulings at issue appear in the
Brief for Appellants.

   **C.**  **Related Cases.**  This case has not been before this or any other
appellate court previously.  There are no related proceedings pending before this or
any other court, as defined by Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Intervenor-Appellees make the following disclosures:

The National Association of Manufacturers ("NAM") is the nation's largest industrial trade association, representing small and large manufacturers in every industrial sector and in all 50 states. The NAM has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

Delta Construction Company, Inc., is a California corporation that provides road construction services. Delta Construction Company, Inc., has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

Dalton Trucking, Inc., is a California corporation that provides specialized transportation and off-loading services. Dalton Trucking, Inc., has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

The Southern California Contractors Association, Inc., is a non-profit trade organization that represents and promotes the interest of union contractors and their suppliers. The Southern California Contractors Association, Inc., has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

The California Construction Trucking Association (formerly California Dump Truck Owners Association) is a trade association representing the interests of small and large trucking companies in California. The California Construction Trucking

Association has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

United Contractors (formerly Engineering & Utility Contractors Association) is a trade association representing union-affiliated contractor businesses and associate firms throughout the western United States.   United Contractors has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES,  RULINGS, AND RELATED CASES .............i

CORPORATE DISCLOSURE STATEMENT .......................................................iv

TABLE OF AUTHORITIES ........................................................................... vii

TABLE OF ABBREVIATIONS .......................................................................... xii

INTRODUCTION..............................................................................................1

JURISDICTIONAL STATEMENT..........................................................................3

STATEMENT OF THE CASE.................................................................................3

SUMMARY OF ARGUMENT ...............................................................................7

ARGUMENT ...................................................................................................10

    I.    THE PUBLIC TRUST DOCTRINE IS A STATE LAW DOCTRINE AND DOES NOT IMPLICATE A FEDERAL QUESTION SUBJECT TO FEDERAL JURISDICTION. .....................10

    II.    THIS CASE PRESENTS NON-JUSTICIABLE POLITICAL QUESTIONS..........................................................................19

    III.    THE PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIM. ................................................................................25

CONCLUSION.................................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Page**

C<small>ASES</small>

\*_Am. Elec. Power Co. v. Connecticut,_
     131 S. Ct. 2527 (2011) ................................................................1, 2, 15, 16, 22, 23, 29

_Appleby v. City of N.Y.,_
     271 U.S. 364 (1926) .................................................................................... 12

\*_Baker v. Carr,_
     369 U.S. 186 (1962) ................................................................ 3, 8, 19, 21, 23

_Brigham Oil & Gas, L.P. v. N.D. Bd. of Univ. & Sch. Lands,_
     866 F. Supp. 2d 1082 (D.N.D. 2012) ......................................................... 13

_Brown v. Plata,_
     131 S. Ct. 1910 (2011) ................................................................................ 21

_Bush v. Lucas,_
     462 U.S. 367 (1983) ...............................................................................15, 16

_Carlson v. Green,_
     446 U.S. 14 (1980) ...................................................................................... 15

_City of Alameda v. Todd Shipyards Corp.,_
     635 F. Supp. 1447 (N.D. Cal. 1986) ........................................................... 13

_Comer v. Murphy Oil USA, Inc.,_
     839 F. Supp. 2d 849 (S.D. Miss. 2012), _aff'd on other grounds_, 718 F.3d 460
     (5th Cir. 2013) .........................................................................................25, 29

_Ctr. for Biological Diversity v. Dept' of Interior,_
     563 F.3d 466 (D.C. Cir. 2009) .................................................................... 29

_DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,_
     489 U.S. 189 (1989) .................................................................................... 18

_Dist. of Columbia v. Air Fla., Inc.,_
     750 F.2d 1077 (D.C. Cir. 1984).............................................................12, 14

\* Authorities upon which we chiefly rely are marked with asterisks.

*El-Shifa Pharm. Indus. Co. v. United States,*
  607 F.3d 836 (D.C. Cir. 2010) ................................................................. 19

*Fletcher v. Peck,*
  10 U.S. (6 Cranch.) 87 (1810) ................................................................. 17

*Geer v. Connecticut,*
  161 U.S. 519 (1896), *overruled by Hughes v. Oklahoma,* 441 U.S. 322 (1979) ............... 14

*Gilligan v. Morgan,*
  413 U.S. 1 (1973) ..................................................................... 8, 20, 24

*Gladstone Realtors v. Vill. of Bellwood,*
  441 U.S. 91 (1979) ....................................................................... 27

*Gonzales v. Raich,*
  545 U.S. 1 (2005) ........................................................................ 18

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ...................................................................... 20

*Helvering v. Gowran,*
  302 U.S. 238 (1937) ...................................................................... 10

*Hughes v. Oklahoma,*
  441 U.S. 322 (1979) ...................................................................... 14

*Hui v. Castaneda,*
  559 U.S. 799 (2010) ...................................................................... 16

*Ill. Cent. R.R. v. Illinois,*
  146 U.S. 387 (1892) .................................................................. 14, 17

*James Madison Ltd. v. Ludwig,*
  82 F.3d 1085 (D.C. Cir. 1996) .......................................................... 9, 18

*\*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................... 3, 9, 26, 28

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ...................................................................... 20

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ................................................................ 22, 27, 29

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ................................................................... 27

*Native Vill. of Kivalina v. ExxonMobil Corp.,*
    663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd on other grounds*, 696 F.3d 849 (9th
    Cir. 2012), *cert, denied*, 133 S. Ct. 2390 (2013) ....................................... 25, 29

*North Carolina ex rel. Cooper v. TVA,*
    615 F.3d 291 (4th Cir. 2010) ........................................................ 28, 29

*Overby v. Nat'l Ass'n of Letter Carriers,*
    595 F.3d 1290 (D.C. Cir. 2010) ...................................................... 12

*Phillips Petroleum v. Mississippi,*
    484 U.S. 469 (1988) ............................................................7, 11, 12

*\*PPL Montana, LLC v. Montana,*
    132 S. Ct. 1215 (2012) ...............................................2, 3, 7, 11, 12, 17, 18

*Sansotta v. Town of Nags Head,*
    724 F.3d 533 (4th Cir. 2013) ........................................................ 13

*Seminole Tribe v. Florida,*
    517 U.S. 44 (1996) .................................................................. 12

*Shively v. Bowlby,*
    152 U.S. 1 (1894)................................................................... 12

*Sierra Club v. Morton,*
    405 U.S. 727 (1972) ................................................................. 26

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) .................................................................. 27

*In re Steuart Transp. Co.,*
    495 F. Supp. 38 (E.D. Va. 1980)...................................................... 13

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................................. 25

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
    402 U.S. 1 (1971).................................................................... 21

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981) ................................................................ 23

*United States v. 1.58 Acres of Land*,
    523 F. Supp. 120 (D. Mass. 1981)........................................ 13

*United States v. 32.42 Acres of Land*,
    683 F.3d 1030 (9th Cir. 2012) ........................................ 13, 14

*United States v. Mass. Maritime Acad.*,
    762 F.2d 142 (1st Cir. 1985) ................................................ 21

*United States v. Oakar*,
    111 F.3d 146 (D.C. Cir. 1997) ............................................ 12

*United States v. Standard Oil Co. of Cal.*,
    332 U.S. 301 (1947) .......................................................... 8, 15

*Washington v. Davis*,
    426 U.S. 229 (1976) .............................................................. 18

*Webster v. Doe*,
    486 U.S. 592 (1988) .............................................................. 20

## CONSTITUTION, STATUTES AND REGULATION

U.S. Const. art. I, § 1 ................................................................ 20

U.S. Const. art. I, § 8 ................................................................ 20

U.S. Const. art. II, § 1 .............................................................. 20

National Climate Program Act of 1978, Pub. L. No. 95-367, 92 Stat. 601 .................. 23

Energy Security Act of 1980, Pub. L. No. 96-294, 94 Stat. 611 .................................... 23

Global Climate Protection Act of 1987, Pub. L. No. 100-204, 101 Stat. 1331............. 23

Global Change Research Act of 1990, Pub. L. No. 101-606, 104 Stat. 3096 .............. 23

Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776 ................................. 23

Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat.
    1492 ...................................................................................... 23

Consolidated Appropriations Act of 2008, Pub. L. No. 110-161, 121 Stat. 1844 (2007)............................................................................................. 23

28 U.S.C. § 1331 ................................................................................. 18

74 Fed. Reg. 56,260 (Oct. 30, 2009).................................................... 23

**LEGISLATIVE HISTORY**

S. Res. 98, 105th Cong. (1997)........................................................... 25

**INTERNATIONAL AUTHORITY**

United Nations Framework Convention on Climate Change, *adopted* May 9, 1992, 1771 U.N.T.S. 107, S. Treaty Doc. No. 102-38...........................24, 25

**OTHER AUTHORITY**

Douglas L. Grant, *Underpinnings of the Public Trust Doctrine: Lessons from* Illinois Central Railroad, 33 Ariz. St. L.J. 849 (2001) ............................................. 13

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| App. | Appellant's Appendix, No. 13-5192 (D.C. Cir., filed Oct. 23, 2013) |
| *AEP* | *Am. Elec. Power Co. v. Connecticut* (131 S. Ct. 2527 (2011)) |
| EPA | U.S. Environmental Protection Agency |
| Pls. Br. | Opening Brief for Appellants, No. 13-5192 (D.C. Cir., filed Oct. 22, 2013) |
| ppm | parts per million |
| UNFCCC | United Nations Framework Convention on Climate Change, *adopted* May 9, 1992, 1771 U.N.T.S. 107, S. Treaty Doc. No. 102-38 |

# INTRODUCTION

In this extraordinary lawsuit, a group of private citizens and organizations asked a district court to commandeer six federal agencies and direct them to take whatever actions are "necessary" to drastically reduce greenhouse gas emissions in the United States in order to lower global atmospheric greenhouse gas concentrations to levels these plaintiffs deem acceptable.  App. 72-73.[1]  Those agencies share regulatory responsibilities over millions of enterprises, across every sector of the economy, such that restrictions of the type the plaintiffs seek, would have profound consequences for the Nation's economic development and productivity, social policies, security interests, and international standing.  And it would have put the district court in the position of monitoring these agencies, possibly for many decades, and attempting to determine on an ongoing basis whether their efforts are "satisfactory" and, if not, what measures they should or should not take to meet whatever emissions targets are deemed "appropriate" in light of changing environmental conditions and economic development in this and other countries.  *Id.* at 34, 39.

This unprecedented claim, presented under the guise of the "public trust doctrine," a little known and rarely used *state* common law doctrine generally

---

[1] The phrase "greenhouse gases" refers to a broad group of substances present in the atmosphere, including both man-made chemicals like chloro-fluorocarbons and many naturally occurring substances. *Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527, 2532-33 & n.1 (2011) ("*AEP*").  The most pervasive greenhouse gas emitted by anthropogenic activities is carbon dioxide. *Id.*

governing *state* property rights in lands submerged beneath tidal and navigable waterways, was properly dismissed by the district court for a number of reasons. While the plaintiffs maintain that the public trust doctrine arises as a matter of federal law, binds federal officials, and is indeed "constitutionally enshrined," Pls. Br. 15, the Supreme Court—along with every other court to consider the issue—has said precisely the opposite, recognizing that the doctrine "do[es] not depend upon the Constitution" but rather "remains a matter of state law," with no application to the federal government. *PPL Montana, LLC v. Montana*, 132 S. Ct. 1215, 1235 (2012). Never before has the doctrine been employed to compel a government agency to adopt a particular regulatory regime, much less one (like that demanded by these plaintiffs) that would directly contravene express legislative mandates, including those of the Clean Air Act "designat[ing] an expert agency, … [the U.S. Environmental Protection Agency ("EPA")], as primary regulator of greenhouse gas emissions." *AEP*, 131 S. Ct. at 2539-40.

      Indeed, even if the public trust doctrine might somehow be deemed applicable to the federal government, the claim in this case would still fall outside of the federal courts' jurisdiction under Article III. That claim, if allowed to proceed, would allow a group of private citizens to compel through judicial fiat the exercise of legislative and executive authority conferred by our Constitution exclusively to the political branches, in violation of standing and separation-of-powers principles. For all of these reasons, the judgment of dismissal should be affirmed.

## JURISDICTIONAL STATEMENT

Whether the district court could exercise jurisdiction over this case under 28 U.S.C. § 1331 and under Article III of the U.S. Constitution is at issue. The "public trust" doctrine is a matter governed solely by state law, as the Supreme Court held in *PPL Montana*, 132 S. Ct. at 1235, and therefore the "public trust" claim presented by the plaintiffs does not implicate a "federal question" under 28 U.S.C. § 1331, as the district court held. App. 74-84. In addition, the claim does not present a cognizable "case or controversy" under Article III because it implicates non-justiciable political questions, *Baker v. Carr*, 369 U.S. 186, 217 (1962), and because the plaintiffs lack standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). This Court otherwise has jurisdiction to review the final judgment of the district court, dismissing the claims for lack of jurisdiction, pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE CASE

The complaint in this case alleges that the federal government has violated its obligation to protect the global atmosphere under the "Public Trust Doctrine." App. 34, 69-70. It asserts that "[t]he United States, as a sovereign nation, has a duty as trustee to protect natural resources," including "the atmosphere," and it claims that the six federal agencies named as defendants in this case—the Department of Agriculture, Department of Commerce, Department of Defense, Department of Energy, Department of Interior, and Environmental Protection Agency—have "failed to preserve and protect ... the atmosphere[ ] by allowing it to become polluted with

3

high levels of human-caused [carbon dioxide]." *Id.* As relief, the complaint demands that the district court direct these agencies to develop and submit a "climate recovery plan" under which they would commit to "[t]aking all necessary actions to reduce [carbon dioxide] emissions in the United States by at least six percent per year beginning in 2013," with the goal of "phas[ing] out fossil fuels by about 2050" and reducing atmospheric carbon dioxide levels from 390 parts per million ("ppm"), as they currently stand according to the plaintiffs, to 350 ppm by December 1, 2099. *Id.* at 36, 40-41, 67-68. This plan would be subject to review and approval by the district court, with input from the plaintiffs (but no other members of the public), and the complaint requests that the district court retain jurisdiction over the case until the defendants satisfy their alleged obligations to the plaintiffs, potentially until 2099. *Id.*[2]

Motions to dismiss were filed by the named defendants and by two groups granted leave to intervene as of right in the district court, The National Association of Manufacturers and a coalition of California companies and trade associations. *See id.* at 15, 23; *see also id.* at 75 & n.3. The motions argued, *inter alia*, that the claim was not within the jurisdiction of the federal judiciary because the "public trust" doctrine is a matter of state law, and thus does not present a "federal question" under 28 U.S.C.

---

[2] This case was originally filed in the Northern District of California, on May 4, 2011, but was transferred to the District of Columbia on December 15, 2011, on motion of the defendants pursuant to 28 U.S.C. § 1404(a). App. 9, 18, 22. All orders and judgments relevant to this appeal were issued by the District Court for the District of Columbia. *Id.* at 27-28.

§ 1331, and additionally because the claim raised non-justiciable political questions and plaintiffs lacked standing under Article III of the U.S. Constitution.  *See id.* at 15, 23.[3]

The district court granted the motions and dismissed the claim by order dated May 31, 2012.  *Id.* at 74-75.  Quoting the Supreme Court's recent holding in *PPL Montana, LLC v. Montana* that "the public trust doctrine remains a matter of state law," whose "contours ... do not depend upon the Constitution," the district court concluded that the "public trust" claim in this case did not implicate a "federal question" within the court's jurisdiction under 28 U.S.C. § 1331.  App. 79-81 (quoting 132 S. Ct. at 1235).  It held in the alternative that, "even if the public trust doctrine had been a federal common law claim at one time, it has subsequently been displaced by federal regulation, specifically the Clean Air Act."  *Id.*  In light of these holdings, the court dismissed the claim for lack of jurisdiction, without addressing whether the claim would otherwise be justiciable or the plaintiffs had standing to proceed under Article III.  *See id.*

The plaintiffs thereafter filed a motion for reconsideration, arguing that the district court had failed "to provide [them] with a sufficient opportunity to address the Supreme Court's decision in *PPL Montana*" and had failed to address whether the

---

[3] The motions also argued that the claim should be dismissed based on the sovereign immunity doctrine and for failure to state a claim upon which relief could be granted.  *See* App. 15, 23

"public trust doctrine" may arise under specific constitutional provisions, including the Commerce, Due Process, and Equal Protection Clauses. *Id.* at 88. The district court rejected both arguments. *Id.* It explained that the plaintiffs "could and should have" presented their arguments concerning *PPL Montana* in their final brief in opposition to the motions to dismiss—since that brief was filed a full two months after the decision issued—and that in all events counsel for the plaintiffs was allowed to, and did, address the case at length during a hearing on the motions in May 2012. *Id.* at 89-92. The court noted further that, during that hearing, plaintiffs' counsel had expressly affirmed that they "were *not* alleging any specific constitutional violations." *Id.* at 94-95 (emphasis added). It concluded that plaintiffs were therefore themselves to blame for failing to address *PPL Montana* in full or to set forth all of the asserted constitutional bases for their claim. *Id.* at 90, 94. The court characterized the plaintiffs' contrary suggestion as "disingenuous" and "completely counter to their ... prior representations to the Court." *Id.*[4]

---

[4] The plaintiffs' assertion that "[the defendants] did not move to dismiss [the] complaint on grounds that [it] failed to state constitutional claims," Pls. Br. 8, is false. The intervening defendants' motion to dismiss expressly argued—in the text, and not merely "in a footnote," *id.* at 15—that the public trust doctrine is not and cannot be grounded in any of the constitutional provisions cited by the plaintiffs, including "the Commerce Clause, the Fourteenth Amendment Equal Protection and Due Process Clauses, and the Fifth Amendment Due Process Clause," as well as the "reserved powers" principle. Intervenor's Mot. To Dismiss 15-17 & nn.8-9, Doc. 67, No. 1:11-cv-2235 (D.D.C., filed Oct. 31, 2011). The plaintiffs, however, declined to present any counter-argument on these points, as the district court noted. App. 93.

The court denied the motion for reconsideration by order on May 22, 2013. *Id.* at 95-96. This appeal followed.

## SUMMARY OF ARGUMENT

The plaintiffs in this case openly seek to circumvent the legislative and regulatory processes established by statute and our Constitution and to use the federal judiciary to compel the massive technological and economic changes that they believe are necessary to drastically reduce greenhouse gas emissions in this country to address climate change. *See* Pls. Br. 3-4. They predicate these unprecedented, as well as undemocratic and judicially unmanageable, demands on the "public trust doctrine," an archaic state law principle traditionally applied for the modest purpose of determining state-law property rights in lands submerged beneath tidal and navigable waterways. *E.g.*, *Phillips Petroleum v. Mississippi,* 484 U.S. 469, 473-74 (1988). In no case has any court ever invoked the doctrine to compel regulatory action by the federal government, much less adoption of a sweeping new regulatory agenda of the type sought by these plaintiffs.

A number of well-settled legal principles mandated dismissal of this extraordinary lawsuit. *First*, as the Supreme Court held in *PPL Montana*, the public trust doctrine does not arise under federal law but instead "remains a matter of state law," 132 S. Ct. at 1235, and therefore it provides no cause of action against the federal government and presents no "federal question" within the jurisdiction of the federal judiciary under 28 U.S.C. § 1331. *PPL Montana* flatly precludes recognition of

7

the novel federal version of the public trust doctrine that the plaintiffs assert. To go further, as plaintiffs request, and recognize an independent federal cause of action to enforce that doctrine would violate virtually every constitutional precept limiting the judiciary's authority to engage in common lawmaking. *See, e.g.*, *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 302, 314-16 (1947) (federal courts should not "create a new substantive legal liability without legislative aid").

*Second*, even if a federal public trust doctrine existed, adjudication of the plaintiffs' claim would be barred by the political question doctrine. That claim would require each of the named agencies to promulgate specific regulations to meet drastic emissions reductions and to submit to continued monitoring by the district court. App. 36, 40-41, 68. The court would in effect become engaged in administrative rulemaking, directing the adoption of standards of general applicability and future effect despite the absence of any legislative authorization or indeed any "judicially discoverable and manageable standards" that might guide its determinations. *Baker*, 369 U.S. at 217. Those agencies would, moreover, remain under the court's exclusive control for purposes of enforcing those standards for the foreseeable future. Such relief would clearly "embrace critical areas of responsibility vested by the Constitution in the Legislative and Executive Branches of the Government," *Gilligan v. Morgan*, 413 U.S. 1, 5-7 (1973), rendering this case non-justiciable.

*Third*, the plaintiffs lack standing under Article III. The complaint attributes a host of current and future environmental impacts to climate change, but it never links

8

those effects to the failure of these agencies to regulate in the manner the plaintiffs demand, as would be required to show standing. *See Lujan*, 504 U.S. at 560-61 & n.2, 574. To the contrary, according to the complaint itself, climate change has already commenced and is attributable to greenhouse gas emissions from innumerable third party sources over the course of centuries—and thus would not be redressed by the relief sought in the complaint. App. 37-38, 52-53, 66-67. Nor are the asserted injuries "particularized" to these plaintiffs: the impacts of climate change, as described by the plaintiffs, are shared in some form by each and every person on the planet, and their claim thus constitutes precisely the type of "generalized grievance" that the Supreme Court has held inadequate to support standing under Article III. *Lujan*, 504 U.S. at 573-74.

There is, quite simply, no way to adjudicate the claim in this case consistent with the jurisdictional limitations of 28 U.S.C. § 1331 and Article III of the Constitution. This is not a mere pleading problem, which might be cured through amendment (as the plaintiffs suggest, Pls. Br. 35-38), but represents a fundamental and irremediable defect in the theory underlying their claim. *See, e.g.*, *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (leave to amend should be denied when futile). The claim was properly dismissed by the district court, and that judgment should be affirmed.

## ARGUMENT

The unprecedented claim asserted by the plaintiffs in this case, based on the "public trust doctrine," was subject to dismissal for lack of jurisdiction on several independent grounds.  That claim does not present a "federal question" for purposes of 28 U.S.C. § 1331, *infra* Part I; it implicates a series of "political questions" that are non-justiciable under Article III, *infra* Part II; and the plaintiffs lack standing under Article III, *infra* Part III.  Although the district court relied on the first point, correctly holding that jurisdiction does not exist under 28 U.S.C. § 1331, App. 79-81, this Court can affirm on any of these grounds.  *E.g.*, *Helvering v. Gowran*, 302 U.S. 238, 245 (1937).

## I.   THE PUBLIC TRUST DOCTRINE IS A STATE LAW DOCTRINE AND DOES NOT IMPLICATE A FEDERAL QUESTION SUBJECT TO FEDERAL JURISDICTION.

All parties apparently agree that the dispositive question for purposes of assessing if jurisdiction could be exercised under 28 U.S.C. § 1331 is whether the "public trust doctrine" is a matter of state or federal law.  *See* App. 79-81.  Only if the plaintiffs are correct in their premise that the doctrine arises under federal law, and is binding in some way on Congress and federal officials, *see* Pls. Br. 8-10, would the claim in this case arguably present a "federal question" within the scope of 28 U.S.C. § 1331.

a.    That premise has, however, been decisively rejected by the Supreme Court.  The Court recently declared in *PPL Montana* that "the public trust doctrine remains a matter of state law" and its "contours ... do not depend upon the

10

Constitution." 132 S. Ct. at 1234-35. The doctrine limits the rights of *States*, but has no application to the federal government. *Id.* Indeed, because the doctrine is one of state law, it is always subject to supreme federal legislative authority, including "the federal power to regulate vessels and navigation under the Commerce Clause and admiralty power." *Id. PPL Montana* confirms, as the district court held, that the public trust doctrine is not one of federal law—either constitutional, statutory, or common—but is instead exclusively a "matter of state law." *Id.*

This discussion in *PPL Montana* cannot be viewed as mere "dicta," or somehow not binding on federal courts, as the plaintiffs suggest (Pls. Br. 38-45). In that case Montana argued, in support of its claim to title over certain riverbeds in dispute, that "denying the State title to the riverbeds … w[ould] undermine the public trust doctrine" by interfering with its rights over navigable waters within its borders. 132 S. Ct. at 1234. The State asserted that the public trust doctrine is grounded in the U.S. Constitution, as part of the "equal footing doctrine," Br. for Resp. 53, 132 S. Ct. 1215 (No. 10-218), and is therefore binding as a matter of federal law, *id.* at 25 & n.11. The equal footing doctrine has indeed long been recognized as principle derived from the Constitution, providing that each State, upon its admission to the Union, "gains title within its borders to the beds of waters then navigable … or tidally influenced." 132 S. Ct. at 1228. By contrast, however, any obligation to maintain those lands for the "public trust" arises only *after* the lands have passed to the State, and then solely as a matter of state law. *Id.* at 1234-35; *see also Phillips Petroleum v. Mississippi,* 484 U.S. 469,

473-74 (1988).  The Supreme Court in *PPL Montana* recognized precisely this point, rejecting Montana's position and explaining that, "[w]hile equal-footing cases have noted that the State takes title to the navigable waters and their beds in trust for the public, the contours of that public trust do not depend upon the Constitution" but "remains a matter of state law."  132 S. Ct. at 1234-35.  That conclusion—that the public trust doctrine does not apply as a matter of federal law and therefore could not support Montana's claim to title—was plainly necessary to the result in *PPL Montana* and must be deemed part of the Court's "holding," binding in future cases.[5]  *E.g.*, *Seminole Tribe v. Florida*, 517 U.S. 44, 66-67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").

This holding did not, contrary to the plaintiffs' suggestion (Pls. Br. 45-47), depart from long-settled law.  The Supreme Court and other courts have, in decisions stretching back for more than a century, consistently interpreted and applied the public trust doctrine as an exclusively state-law principle that governs only state actors.  *E.g.*, *Phillips Petroleum*, 484 U.S. at 473; *Appleby v. City of N.Y.*, 271 U.S. 364, 395 (1926); *Shively v. Bowlby*, 152 U.S. 1 (1894); *Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d

---

[5] Even if the Court's discussion of the public trust doctrine might somehow be deemed unnecessary to the result, it is precisely of the sort—"[c]arefully considered language of the Supreme Court ... [of] unmistakable import"—that this Court has recognized must be treated as binding "even if technically dict[a]."  *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997); *see also Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290, 1295 (D.C. Cir. 2010) (same).

1077 (D.C. Cir. 1984); *see also* Douglas L. Grant, *Underpinnings of the Public Trust Doctrine: Lessons from Illinois Central Railroad*, 33 Ariz. St. L.J. 849, 870 (2001) ("[T]he Supreme Court has steadfastly treated the public trust doctrine as a matter of state law not federal law."). Recent cases have recognized that this conclusion is now unambiguously mandated by *PPL Montana*. *Brigham Oil & Gas, L.P. v. N.D. Bd. of Univ. & Sch. Lands*, 866 F. Supp. 2d 1082, 1088 (D.N.D. 2012) ("The United States Supreme Court recently made clear that the public trust doctrine is a matter of state law."); *see also Sansotta v. Town of Nags Head*, 724 F.3d 533, 537 n.3 (4th Cir. 2013) (same); *United States v. 32.42 Acres of Land*, 683 F.3d 1030, 1038 (9th Cir. 2012) (same).

In no prior case, including the three district court decisions cited by the plaintiffs (Pls. Br. 45), has a federal court held that the public trust doctrine arises as a matter of federal law or applies directly to the federal government. Two of those cases, *City of Alameda v. Todd Shipyards Corp.*, 635 F. Supp. 1447 (N.D. Cal. 1986), and *United States v. 1.58 Acres of Land*, 523 F. Supp. 120 (D. Mass. 1981), concluded that a land conveyance from a State to the federal government does not extinguish public trust restrictions burdening the *State's* title, but neither case recognized a free-standing federal public trust doctrine of the type advanced here. The third, *In re Steuart Transportation Co.*, 495 F. Supp. 38 (E.D. Va. 1980), referred to the "public trust" doctrine as supporting the federal government's "right" to commence a lawsuit to protect public resources, but it did not hold, or even suggest, that the doctrine imposes any affirmative obligation on the federal government to act when it chooses

not to act.[6]  These decisions, which had previously been criticized by this Court as contrary to governing law, *Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d at 1083-84, cannot be interpreted—particularly post-*PPL Montana*—to establish a federal public trust doctrine binding on federal officials.[7]

      b.    It would be doubly inappropriate to go further and hold that federal law not only embodies the public trust doctrine but also creates an implied cause of action to enforce it.  The Supreme Court has for decades admonished that federal courts

---

[6] An additional case the plaintiffs describe (Pl. Br. 45) as "affirming the federal Public Trust Doctrine," *United States v. 32.42 Acres of Land*, 683 F.3d 1030 (9th Cir. 2012), actually holds to the contrary—quoting *PPL Montana*—that "the public trust doctrine remains a matter of state law" and "the federal government's [regulatory] power [cannot be subjugated to] state law public trust doctrine." *Id.* at 1038.

[7] That is particularly true since the version of the public trust doctrine asserted here reflects a vast expansion of the doctrine's traditional application to lands submerged beneath tidal and navigable waterways, and its traditional function of restricting transfers of title or alienation of those lands. *See, e.g.*, *Ill. Cent. R.R. v. Illinois*, 146 U.S. 387 (1892).  Although state courts have sometimes relied on specific state constitutional or statutory provisions to extend the state doctrine to other natural resources within a State's jurisdiction, the atmosphere is not a resource that can be owned, in any cognizable form of ownership, and by its very nature it is not within the jurisdiction of any single government.  Nor has a court ever applied the traditional doctrine to impose an affirmative duty upon governments to adopt a particular regulatory regime for trust resources.  The principle case the plaintiffs cite for a contrary proposition, *Geer v. Connecticut*, 161 U.S. 519 (1896), was "expressly overrule[d]" decades ago.  *Hughes v. Oklahoma*, 441 U.S. 322, 335 (1979).  And, even when *Geer* was good law, it stood only for the limited holding that a State *could* regulate natural resources in its borders—not that private plaintiffs could require the State to do so.  *See* 161 U.S. at 522.  For this reason, even if the public trust doctrine could be deemed a part of federal law (contrary to *PPL Montana* and other decisions), the claim in this case does not set forth a valid cause of action pursuant to that doctrine, and would be subject to dismissal for failure to state a claim for which relief might be granted.  *See supra* n.3.

14

should not imply new causes of action or expand existing ones in the absence of express statutory authorization, *Carlson v. Green*, 446 U.S. 14 (1980), even where the claim would vindicate "fundamental" constitutional rights, *Bush v. Lucas*, 462 U.S. 367 (1983). To do so, the Court has explained, would "intrud[e] within a field properly within Congress' control," *Standard Oil*, 332 U.S. at 316, because Congress "is in a better position to decide whether or not the public interest would be served by creating [the cause of action]," *Bush*, 462 U.S. at 388-90. Recognizing the claim in this case would undoubtedly—and impermissibly—"intrud[e] within a field properly within Congress' control," *Standard Oil*, 332 U.S. at 316—the regulation of greenhouse gas emissions across the Nation.

This conclusion is further confirmed by the fact that Congress has already legislated on these issues, directing in the Clean Air Act that EPA consider (as appropriate under statutory requirements) nationwide standards for greenhouse gas emissions. *See AEP*, 131 S. Ct. at 2537-38. It is well-settled that, when Congress enacts a federal statute that "speak[s] directly to [the] question" previously addressed by a non-statutory cause of action, the cause of action is displaced and can no longer be recognized. *Id.* at 2537. Indeed, in *AEP*, the Supreme Court addressed the specific issue presented here—whether the Clean Air Act precludes non-statutory claims seeking restrictions on greenhouse gas emissions—and held unambiguously "that the Clean Air Act and the EPA actions it authorizes" displace any such claims. *Id.*

The plaintiffs argue that *AEP* is distinguishable because it addressed claims for emissions restrictions against "fossil-fuel fired power plants," whereas in this case the plaintiffs seek a broader form of relief—a "comprehensive climate recovery plan" administered under the continuing supervision of the district court—against a different group of defendants. Pls. Br. 47-52. This reflects a fundamental misapprehension of displacement. Claims are displaced whenever a statute "speaks" to the relevant issues, even if it does not offer "precisely" (Pls. Br. 49) the relief the plaintiffs seek and regardless of the parties against which the claims might be brought. For example, the Court held in *AEP* that the claims there were displaced even though the statute did not provide the plaintiffs with an equivalent form of relief against the named defendants. *See* 131 S. Ct. at 2537-40. That holding squarely applies here, and forecloses the plaintiffs' claim.

The plaintiffs also make the bold assertion that their claim is not subject to displacement because it is "constitutional" in nature. Pls. Br. 48. That argument is not only unprecedented (as suggested by the lack of supporting citation), but plainly wrong. Whatever the basis of the public trust doctrine, and even if one assumes (contrary to authority) that it is grounded in some way in the U.S. Constitution, a cause of action to enforce that doctrine would represent an exercise of federal common-lawmaking and—as the Supreme Court has said in numerous prior cases, including those addressing "constitutional" claims—would be subject to displacement. *See, e.g.*, *Hui v. Castaneda*, 559 U.S. 799, 808 (2010); *Bush*, 462 U.S. at

16

385-86.   The Supreme Court has indeed stated that the public trust doctrine in particular is "subject always to the paramount right of congress." *Ill. Cent.*, 146 U.S. at 435.[8]   The claim in this case, even if it might otherwise have been recognized, has been displaced by the Clean Air Act.

c.     The plaintiffs devote a substantial part of their opening brief to arguing that several provisions of the Constitution provide them with a "public trust" cause of action.   Pls. Br. 14-35.   These arguments are, as discussed above, flatly inconsistent with *PPL Montana* and numerous other decisions of the Supreme Court characterizing the public trust doctrine as "not depend[ent] upon the Constitution," and admonishing against creation of new causes of action, even for the purpose of vindicating constitutional rights.   *Supra* pp. 10-14.   But, even ignoring those fundamental defects, the arguments fail on their own terms.

None of the constitutional provisions or principles cited by the plaintiffs could potentially apply in this case.   The "reserved powers" doctrine serves only to prohibit one legislature from adopting legislation that would bind a future one; it imposes no affirmative obligation on Congress to act.   *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810).   The Due Process Clause likewise does not "confer [any] affirmative right to

---

[8] The plaintiffs appear to have largely, and properly, abandoned their contention—pressed extensively in the district court, but only alluded to in their brief on appeal, *e.g.*, Pls. Br. 35-36—that the Supreme Court's discussion of the public trust doctrine in *Illinois Central* represented a statement of federal law.   *See PPL Montana*, 132 S. Ct. at 1235 (stating that *Illinois Central* "was necessarily a statement of Illinois law")  (quoting *Appleby*, 271 U.S. at 395).

governmental aid, even where such aid may be necessary to secure life, liberty, or property interests," except in those very limited circumstances—clearly not present here—"when the State takes a person into its custody and holds him there against his will." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196-200 (1989). The Equal Protection Clause prohibits only those positive laws that, as enacted or applied, impermissibly discriminate against members of a protected class; it does not require government to act, and does not apply where (as here) there are no allegations of intentional discrimination but only of "disproportionate[] impact[]." *Washington v. Davis*, 426 U.S. 229, 245-47 (1976). And the Commerce Clause is a *grant* of power authorizing Congress to regulate, not a requirement that Congress enact particular regulations. *Gonzales v. Raich*, 545 U.S. 1, 17 (2005).

In short, there is no basis in federal law—whether the Constitution, statute, or common law—for recognition of a public trust claim. This is not a mere pleading problem that might be cured by an amended complaint, as the plaintiffs suggest (Pls. Br. 35-38), but reflects a fundamental, jurisdictional defect in the legal theory underlying the claim. *See, e.g.*, *James Madison*, 82 F.3d at 1099 (leave to amend should be denied when futile). Because the public trust doctrine "remains a matter of state law," *PPL Montana*, 132 S. Ct. at 1235, the plaintiffs' claim does not "aris[e] under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and was properly dismissed by the district court.

18

## II.  THIS CASE PRESENTS NON-JUSTICIABLE POLITICAL QUESTIONS.

The claim was independently subject to dismissal under the political question doctrine.  That doctrine bars adjudication of issues that: (i) are "textually ... commit[ted]" to another branch by the Constitution; (ii) are not subject to "judicially discoverable and manageable standards"; or (iii) could not be resolved without "expressing lack of the respect due coordinate branches of government."  *Baker*, 369 U.S. at 217.  The claim in this case implicates all of these concerns.[9]

a.    Adjudication of the plaintiffs' claim would, without doubt, involve the judiciary in issues that are committed by the text of the Constitution to the coordinate branches of Government.  The complaint asks the district court to direct agencies of the Executive Branch to promulgate specific regulations to achieve a particular goal, without regard to the agencies' own expert determinations regarding the need for or suitability of those regulations and without regard to statutory prerequisites and directives enacted by Congress.  App. 72-73.  The district court would, in essence, be commandeering these agencies and placing them under its exclusive control for these

---

[9] The justiciability limitations imposed by the political question doctrine flow from Article III of the Constitution and therefore apply to *all* causes of action presented in the federal judiciary, however titled and whether styled as arising under the Constitution, statute, or common law.  *Baker*, 369 U.S. at 214, 216; *see also El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842-43 (D.C. Cir. 2010) (en banc) ("The political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters ... constitutionally committed to their discretion.").

purposes—issuing an order directing each of them to develop and implement a "climate recovery plan," requiring them to "take all necessary actions to reduce [carbon dioxide] emissions in the United States by at least six percent per year beginning in 2013," and "[r]etain[ing] jurisdiction over [them] for purposes of enforcing and effectuating [that] order." *Id.*

There could hardly be a clearer violation of the constitutional principle of separation of powers. The Constitution by its terms commits legislative power—in particular, authority "To regulate Commerce"—to Congress, U.S. Const. art. I, §§ 1, 8, and executive power to the President, *see* U.S. Const. art. II, § 1. The political branches, which are ultimately responsible to the public, determine the need for and set regulatory standards. There is simply no basis and no allowance in the Constitution for a court to control or supervise the internal operations of agencies or direct their regulatory discretion in the absence of any statute authorizing such judicial intervention. *See, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *Webster v. Doe*, 486 U.S. 592, 601 (1988); *Heckler v. Chaney*, 470 U.S. 821, 829 (1985); *see also Gilligan*, 413 U.S. at 5-7 (rejecting as non-justiciable claims that would require the judiciary to craft particular "standards" for governmental operations and monitor compliance thereafter). Providing the relief sought by the plaintiffs would require a

court to exercise legislative and executive power denied to the judiciary by the Constitution.[10]

b.    This claim is also non-justiciable because there are no "judicially discoverable and manageable standards" for resolving it.  *Baker*, 369 U.S. at 217.  The complaint asks the Court to issue "appropriate equitable relief" directing the agencies to develop a "satisfactory remedial plan" to address the risks of climate change.  App. 34, 39, 71.  But there are no discoverable or manageable standards by which this Court could assess what relief would be "satisfactory" or "appropriate" in light of the myriad interests implicated by regulation of greenhouse gas emissions and climate change.

To determine the level of emissions reductions, if any, that may be warranted in light of the alleged future risks of climate change, a court would need not only to resolve the scientific likelihood of those risks, and their likely impact on the Nation, but also to weigh those risks against the possible benefits of emissions-producing activities and associated reduction measures and then make a comparative judgment to determine which industries and sectors should be required to reduce their

---

[10] The requested relief in this case bears no resemblance to that granted in cases in which courts ordered parties to create a "plan" with continuing judicial oversight.  In those cases, courts entered the relevant remedial orders pursuant to express statutory authority and to address violations of express federal statutory and constitutional mandates.  *E.g.*, *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011) (Prison Litigation Reform Act); *United States v. Mass. Maritime Acad.*, 762 F.2d 142, 147 (1st Cir. 1985) (Civil Rights Act); *see also Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 17 (1971) (citing Civil Rights Act of 1964).

emissions and by how much. *AEP*, 131 S. Ct. at 2539-40 (stating that greenhouse gas emissions regulations "cannot be prescribed in a vacuum" but must take account of "competing interests" relating to "national or international policy"). Thus, even if one accepts (as the plaintiffs allege) that reducing carbon dioxide emissions by six percent starting in 2013 would abate some of the future risks of climate change, App. 38-40, those reductions would nevertheless not be "appropriate" if the future potential benefits would be outweighed by, for instance, enormous losses in productivity and economic development.

A court simply could not make these determinations without relying on "ad hoc" policy judgments of the type prohibited by the political question doctrine. In *Massachusetts v. EPA*, for example, after holding that the Clean Air Act authorized EPA to consider whether to regulate greenhouse gas emissions under certain circumstances, the Supreme Court refused to address whether the agency should actually exercise that discretion on grounds that it would implicate "policy judgments" that the federal judiciary has "neither the expertise nor the authority to evaluate." 549 U.S. 497, 533-34 (2007). Likewise, in *AEP*, the Court refused to address the "appropriate amount of regulation in any particular greenhouse gas-producing sector" because that inquiry, "as with other questions of national or international policy," would require balancing a number of "competing interests," including among other things "the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption." 131 S. Ct. at 2539-40. Only the

legislative and executive branches have the capacity and authority under our Constitution to assess and weigh these questions of "high policy" and decide whether regulations such as those the plaintiffs seek are appropriate. *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 647 (1981).

  c.  This claim is non-justiciable for the additional reason that it cannot be adjudicated without "expressing lack of the respect due" other branches of government. *Baker*, 369 U.S. at 217. Congress has taken a series of steps over decades to assess the potential impacts and risks of climate change,[11] and in the Clean Air Act, the Supreme Court has said, it "designated an expert agency, ... EPA, as best suited to serve as primary regulator of greenhouse gas emissions." *AEP*, 131 S. Ct. at

---

  [11] As early as 1978, Congress established a "national climate program," with the purpose of improving understanding of global climate change through research and international cooperation. National Climate Program Act of 1978, Pub. L. No. 95-367, 92 Stat. 601. Through the 1980s and 1990s, Congress enacted a series of statutes mandating further study of the impact of greenhouse gases and trends in climate change, Energy Policy Act of 1992, Pub. L. No. 102-486, tit. XVI, § 1601, 106 Stat. 2776, 2999; Global Change Research Act of 1990, Pub. L. No. 101-606, 104 Stat. 3096; Energy Security Act of 1980, Pub. L. No. 96-294, tit. VII, § 711, 94 Stat. 611, 774-75, and directing executive officials to coordinate international negotiations concerning global climate change, Global Climate Protection Act of 1987, Pub. L. No. 100-204, tit. XI, § 1002, 101 Stat. 1331, 1408. In the Energy Independence and Security Act of 2007, Congress established nationwide greenhouse gas reduction targets to be satisfied through modified biofuel production methods and increased fuel efficiency standards on cars and certain trucks, as implemented by EPA and the Department of Transportation. Pub. L. No. 110-140, 121 Stat. 1492. In 2008, Congress formally directed EPA to "develop and publish a … rule … to require mandatory reporting of greenhouse gas emissions above appropriate thresholds in all sectors of the economy of the United States," Consolidated Appropriations Act of 2008, Pub. L. No. 110-161, tit. II, 121 Stat. 1844, 2128 (2007), which EPA did in 2009, 74 Fed. Reg. 56,260 (Oct. 30, 2009).

2539-40.   Similarly, in international negotiations, the President and Congress have adopted an incremental approach, joining with other nations in pursuing a multilateral response to climate change issues.  *See* United Nations Framework Convention on Climate Change (UNFCCC), *adopted* May 9, 1992, 1771 U.N.T.S. 107, S. Treaty Doc. No. 102-38 (1992).

The plaintiffs would ask a district court to substitute its judgment for that of the Legislative and Executive Branches.  They would, in essence, have the court tell those branches how to legislate and how to regulate.  The complaint is, indeed, remarkably candid in its purpose:  to secure a declaration instructing the "federal government to do its job," as the plaintiffs would define it.  App. 34.  The complaint, moreover, specifically requests that the court "[r]etain jurisdiction over this action" (potentially until 2099) in order to ensure that the named agencies follow their obligations under the approved recovery plan.  *Id.* at 40-41.  It is hard to imagine how the judiciary could show a greater "lack of respect" for the political branches than by issuing an order that supersedes their considered judgment concerning matters within their constitutional authority, and further subjects them to potentially decades of continuing supervision by a federal judge.  *See Gilligan*, 413 U.S. at 5-8 (claims calling upon court "to assume continuing regulatory jurisdiction" over governmental department constitute non-justiciable political questions).

"[A]llowing courts to oversee legislative or executive action," as the plaintiffs in this case request, "would significantly alter the allocation of power ... away from a

24

democratic form of government." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal quotation marks omitted).[12] "Climate change" claims like the one asserted by these plaintiffs implicate a host of political questions that are non-justiciable under Article III and, as other courts have recognized, must be dismissed for lack of jurisdiction. *E.g.*, *Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849, 862-63 (S.D. Miss. 2012), *aff'd on other grounds*, 718 F.3d 460 (5th Cir. 2013); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 874-77 (N.D. Cal. 2009), *aff'd on other grounds*, 696 F.3d 849 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2390 (2013).

## III.   THE PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIM.

In addition to the jurisdictional and justiciability problems discussed above, this case also cannot proceed because the plaintiffs lack standing under Article III. To satisfy the "irreducible constitutional minimum of standing," a plaintiff must plead facts showing an "injury in fact" that is "imminent" and "particularized," "fairly traceable to the challenged action of the defendant," and "likely … redress[able] by a

---

[12] The justiciability problems associated with this claim are all the more pronounced because many of the agency operations at issue here relate to foreign relations or national defense, fields that the Constitution plainly commits to the political branches. Indeed, in this case, the interference with the conduct of foreign affairs could not be plainer. The complaint requests, for example, that the Court declare that "the United States government has an obligation ... under the UNFCCC to take action" to reduce greenhouse gas emissions. App. 72. But the emissions targets in the UNFCCC are by their terms non-binding. S. Treaty Doc. No. 102-38, art. 2; *see* S. Res. 98, 105th Cong. (1997). The complaint thus asks the judiciary to transform agreements that were negotiated by the President and approved by the Senate as non-binding into non-discretionary mandates.

favorable decision." *Lujan*, 504 U.S. at 560-61 (alterations and internal quotation marks omitted).  The plaintiffs in this case cannot meet that standard.

a.     The allegations in the complaint fail to satisfy the "core" constitutional requirement of an injury that is "imminent" and "particularized."  Most of the adverse impacts alleged in the complaint are to the environment or the public generally, rather than the plaintiffs personally, *e.g.*, App. 42, 45, 54 (to forests and glaciers, "infrastructure" and "ecosystem," and "human civilization"), or concern events in the past, *e.g.*, *id.* at 42, 62 (discussing the plaintiffs' "previous[ ]" experiences), which could not support claims for prospective injunctive relief.  *See Lujan*, 504 U.S. at 504 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ....").  Other alleged harms are to the *interests* for which the plaintiffs advocate, not actual injuries to the plaintiffs themselves, *e.g.*, App. 43, and are likewise inadequate.  *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972).   Indeed, rather than seeking to redress "imminent" or "actual" harms, the complaint acknowledges that its purpose is "to *investigate* the effectiveness of federal authorities in planning and managing our nation's response to human-induced global energy imbalance."  App. 38 (emphasis added).

This fundamental deficiency is reflected in the fact that, if these allegations could support standing for these plaintiffs, they could support standing for *anyone*. The complaint asserts that the plaintiffs have standing to sue because they will in the future experience effects of climate change, and it identifies as those effects nearly

every climatological, meteorological, and epidemiological occurrence on the planet, including "rising sea levels," "biodiversity loss," increased "frequency of forest fires" and "severe storms, flooding, and droughts," as well as "lost timber and tourism revenue," "an increase in asthma[,] allergies[, and other] diseases and disorders," and even "failed states" and "radicalization." *Id.* at 36-37, 56-57, 62-64. Under the plaintiffs' view, anyone who may in the future suffer from any of those effects—in other words, anyone on the planet—could bring suit to force adoption of regulations that, in that person's view, are reasonably warranted to address those risks.

This is plainly not valid. It is not enough for a plaintiff to allege that the defendant's conduct may generally contribute to a risk to "society" or humanity in general. *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 111-14 (1979); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106-07 (1998). Indeed, these claims are precisely the type of "generalized grievance" that the Supreme Court has held in numerous cases, *see Lujan*, 504 U.S. at 573-74 (citing cases), to be inadequate to support standing. Those cases, like this one, involved claims by citizen-plaintiffs to prevent alleged waste or misuse of an asset held in trust for the public at large, and they were deemed non-justiciable because the claims addressed "essentially a matter of public and not of individual concern." *Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923) ("If one [citizen] may champion and litigate such a cause, then every other [citizen] may do the same."). Whatever differences might exist in the way these and other parties may in the future experience any alleged effects of climate change, the essential legal injury asserted

here—that is, damages to a natural resource, the atmosphere, allegedly held in trust for the public, App. 70—is shared equally by each and every other citizen. It is the archetypal example of an "abstract" and "generalized grievance" that cannot support standing. *See Lujan*, 504 U.S. at 573-74.

b.       Nor can the plaintiffs show that their injuries are "fairly traceable" to these defendants, or "likely redressable" by the requested relief. That is because the chain of causation the plaintiffs allege depends "on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id.* at 562. The complaint asserts that the six named federal agencies should be directed to "take all necessary actions to reduce emissions in the United States by at least six percent beginning in 2013." App. 40. A majority of greenhouse gas emissions are from sources that are outside the United States, which would not and could not be reached by a decree in this case. *See, e.g., North Carolina ex rel. Cooper v. TVA*, 615 F.3d 291, 302 (4th Cir. 2010). Indeed, the complaint acknowledges that the reductions sought by the plaintiffs would constitute only the United States's "share" of necessary global reductions. App. 70-71.

There is indeed no basis to believe that reductions ordered here would lead to *any* overall reduction, much less the reduction allegedly needed to achieve the plaintiffs' goal of 350 ppm carbon dioxide globally, or prevent or even slow the ongoing global warming effect that the plaintiffs allege. To the contrary, it is just as

28

possible that greenhouse gas emissions in other nations would *increase* if severe limits were imposed in the United States, thereby negating the purported benefit achieved by the emissions reductions sought in this case. *See, e.g.*, *North Carolina*, 615 F.3d at 302. Other decisions have, notably, dismissed similar "climate change" claims for precisely this reason. *E.g.*, *Comer*, 839 F. Supp. 2d at 857-62; *Kivalina*, 663 F. Supp. 2d at 879-80; *see Ctr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 478-79 (D.C. Cir. 2009) (rejecting similar causation theory).

That these plaintiffs lack standing is confirmed by *Massachusetts v. EPA*, 549 U.S. 497 (2007). In upholding a State's standing to sue to compel EPA to consider greenhouse gas emissions limits for motor vehicles pursuant to the Clean Air Act, the Supreme Court explicitly relied on the fact that "[i]t is of considerable relevance that the party seeking review here is a sovereign State and not … a private individual." *Id.* at 518-20. In light of their distinctive position in the federal union, the Court said, States are entitled to "special solicitude in [the] standing analysis." *Id.* This factor, described by the Court in *Massachusetts* as "of *critical* importance to the standing inquiry," *id.* at 516 (emphasis added), is not present here, and the private plaintiffs in this case therefore lack standing to bring their claim.[13]

---

[13] It may be noted that in *AEP* the Supreme Court raised, but did not resolve, the issue of whether the plaintiffs had standing to bring their claims. 131 S. Ct. at 2535 (noting four-to-four split; affirming exercise of jurisdiction "by an equally divided Court"). To the extent the opinion discusses this issue, however, it strongly implies that standing could not be found in a climate change case—like this one—brought solely by *private* parties. *See id.* (noting four Justices would have approved standing for

## CONCLUSION

For these reasons, the Court should affirm the judgment of the district court.

Respectfully submitted,

/s/ Joseph R. Guerra

| | |
|---|---|
| Theodore Hadzi-Antich | David T. Buente Jr. |
| PACIFIC LEGAL FOUNDATION | Joseph R. Guerra |
| 930 G Street | Roger R. Martella, Jr. |
| Sacramento, CA 95814 | Quin M. Sorenson |
| (916)419-7111 | Erika L. Myers |
| | SIDLEY AUSTIN LLP |
| *Counsel for Intervenor-Appellees Delta* | 1501 K Street, N.W. |
| *Construction Company, Inc., Dalton* | Washington, D.C. 20005 |
| *Trucking, Inc., Southern California* | Telephone: (202) 736-8000 |
| *Contractors, Association, Inc.,* | |
| *California Construction Trucking* | *Counsel for Intervenor-Appellee the* |
| *Association, Inc. (formerly California* | *National Association of* |
| *Dump Truck Owners Association),* | *Manufacturers* |
| *and United Contractors (formerly* | |
| *Engineering & Utility Contractors* | |
| *Association)* | |

---

"some" of the plaintiffs in light of holding in *Massachusetts* "permitt[ing] a *State* to challenge EPA's refusal to regulate greenhouse gas emissions") (emphasis added).

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 28(a)(11) and 32(a)(7)(C)(i), and D.C. Circuit Rules 28(d) and 32(a)(2), the undersigned certifies that this brief complies with those provisions because it was prepared in 14-point font and contains 8,173 words (according to the word count of the word-processing system used to prepare the brief.), excluding those sections exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1).

/s/ Joseph R. Guerra
Joseph R. Guerra
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
Telephone: (202) 736-8000

*Counsel for Intervenor-Appellee the*
*  National Association of Manufacturers*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of December 2013, I caused the foregoing brief to be filed via the Court's CM/ECF System; all of the parties listed on the attorney service preference report have been served, via the Court's CM/ECF system or by first-class mail.

/s/ Joseph R. Guerra
Joseph R. Guerra
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000

*Counsel for Intervenor-Appellee the*
*National Association of Manufacturers*