ORAL ARGUMENT NOT YET SCHEDULED
No. 13-5192

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

ALEC L., *et al.*,
Plaintiffs – Appellants,

v.

GINA McCARTHY, *et al.*,
Defendants – Appellees,

THE NATIONAL ASSOCIATION OF MANUFACTURERS, *et al.*,
Intervenors for Defendants –
Appellees.

_____

On Appeal from the United States District Court
For the District of Columbia (No. 11-cv-02235 (RLW))

_____

## *AMICUS CURIAE* BRIEF OF THE AMERICAN TORT REFORM ASSOCIATION IN SUPPORT OF APPELLEES

_____

Victor E. Schwartz
Phil Goldberg (Counsel of Record)
Christopher E. Appel
SHOOK, HARDY & BACON L.L.P.
1155 F Street N.W., Suite 200
Washington, DC 20004
Tel: (202) 783-8400
Fax: (202) 783-4211

*Counsel for Amicus Curiae*

## STATEMENT REGARDING CONSENT TO FILE, SEPARATE BRIEFING, AUTHORSHIP, AND MONETARY CONTRIBUTIONS

Counsel for Plaintiffs-Appellants, Defendants-Appellees, and Intervenor-Appellees have consented to the submission of this brief.

Pursuant to Circuit Rule 29(d), counsel for *amicus curiae* certify that they represent a broad-based coalition of approximately 170 businesses, corporations, municipalities, associations, and professional firms that have pooled their resources to promote fairness, balance, and predictability in civil litigation. Counsel further certify that they are not aware of other organizations or individuals addressing the same or similar civil liability concerns that are submitting a brief as *amicus curiae* in support of Appellees.

Pursuant to Fed. R. App. P. 29(c)(5), counsel for *amicus curiae* state that (1) no party's counsel authored the brief in whole or in part; (2) no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and (3) no person – other than *amicus curiae*, its members, or its counsel – contributed money that was intended to fund preparing or submitting the brief.

## **CERTIFICATE OF INTERESTED PARTIES, RULINGS, AND RELATED CASES**

A.     **Parties and _Amici._** Except for the following, all parties, intervenors, and _amici_ appearing before the district court and in this Court are listed in the Brief for Plaintiffs-Appellants:

_Amici curiae_ supporting Plaintiffs-Appellants in this appeal include:

1.     Interfaith Moral Action on Climate, Interfaith Power and Light, The Green Zionist Alliance, The Sisters of Mercy of the Americas, The Sisters of Mercy of the Americas Northeast Community Leadership Team, The Sisters of Mercy Northeast Justice Council (collectively "Faith Groups");

2.     James Hansen, David Beerling, Paul J. Hearty, Ove Hoegh-Guldberg, Pushker Kharecha, Valerie Masson-Delmotte, Camille Parmesan, Eelco Rohling, Makiko Sato, Pete Smith, and Lise Van Susteren (collectively "Law Professors");

3.     National Congress of American Indians, Alaska Inter-Tribal Council, Forgotten People, Inc., Indigenous Peoples Climate Change Working Group, National Native American Law Student Association, Akiak Native Community, and Law Professors Randall Abate, Lorie Graham, Diane Kaplan, Sarah Krakoff, Colette Routel, and Elizabeth Kronk Warner;

4.     Steve Anderson, Lee Gunn, and David W. Titley (collectively "National Security Experts");

ii

5.     Lon Burnam, Marc Elrich, John Engen, and Kitty Piercy (collectively "Government Leaders");

6.     WITNESS, Michael MacCracken, Ph.D., Global Kids, Inc., Earth Guardians, Boston Latin School Youth Climate Action Network, Kids Against Fracking, 350.org, Labor Network for Sustainability, Granny Peace Brigade, International Council of Thirteen Indigenous Grandmothers, HelpAge International, HelpAge USA, Protect Our Winters, Kent Environment and Community Network; and

7.     William H. Rodgers, Jr., Joseph Sax, Erwin Chemerinsky, Michael Blumm, John Davidson, Gerald Torres, Mary Christina Wood, Burns Weston, Kevin J. Lynch; Maxine Burkett, Erin Ryan, Timothy P. Duane, Deepa Badrinarayana, Stuart Chinn, Ryke Longest, Jacqueline P. Hand, Zygmunt Plater, James Gustave Speth, Charles Wilkinson, Patrick C. McGinley, Eric T. Freyfogle, Craig Anthony Arnold, Patrick Parenteau, Federico Cheever, Mark S. Davis, James R. May, Denise Antolini, Edith Brown Weiss, Alyson C. Flournoy, David Takacs, Michael Robinson-Dorn, Karl Coplan, Oliver Houck, and Douglas L. Grant (collectively "Law Professors and Scholars").

*Amicus curiae* American Tort Reform Association is supporting Appellees in this appeal.

B.     **Rulings under Review.** The rulings under review are the District Court's May 31, 2012 order granting Defendants and Defendant-Intervenors' Motions to Dismiss (A085) (and incorporated memorandum opinion (A074-84)); and May 22, 2013 order denying Plaintiffs' Motion for Reconsideration (A097) (and incorporated memorandum opinion (A086-96)), in *Alec L., et al. v. Jackson, et al.,* No. 1:11-cv-02235 (RLW) (Hon. Robert L. Wilkins).

C.     **Related Cases.** *Amicus curiae* American Tort Reform Association is unaware of any related cases.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure, counsel for *amicus curiae* American Tort Reform Association hereby state that *amicus curiae* has no parent corporation and has issued no stock.

# <u>TABLE OF CONTENTS</u>

**PAGE**

STATEMENT REGARDING CONSENT TO FILE, SEPARATE BRIEFING, AUTHORSHIP, AND MONETARY CONTRIBUTIONS ...................................... i

CERTIFICATE OF INTERESTED PARTIES, RULINGS, AND RELATED CASES ............................................................................................... ii

CORPORATE DISCLOSURE STATEMENT ........................................................ v

TABLE OF CONTENTS ........................................................................... vi

TABLE OF AUTHORITIES ...................................................................... viii

GLOSSARY ............................................................................................ xi

INTEREST OF *AMICUS CURIAE* ............................................................. 1

SUMMARY OF ARGUMENT ..................................................................... 1

ARGUMENT .......................................................................................... 4

I.     THIS CASE REPRESENTS AN UNSOUND ATTEMPT BY PRIVATE LITIGANTS TO USE THE LITIGATION SYSTEM TO REGULATE AMERICA'S GHG EMISSIONS ........... 4

       A.     The Public Trust Doctrine Does Not Support a Claim Requiring the U.S. Government to Enact a Broad Regulatory Scheme to Give Effect to Appellants' Desired Standard for Worldwide GHG Emissions .................... 4

       B.     Related Attempts to Have the Judiciary Regulate GHG Emissions Have Been Uniformly Rejected By Courts ............... 8

II.    WHETHER AND HOW TO REGULATE CO2 EMISSIONS IS THE ROLE OF THE POLITICAL BRANCHES OF GOVERNMENT ............................... 12

A.  Congress Has Carefully Deliberated Over GHG Emissions, Setting Forth an Incremental, Balanced Approach to GHG Emissions....................................13

B.  The Supreme Court Has Unambiguously Stated that Courts Are to Reinforce, Not Undermine the Regulatory Process...........................................16

III.  APPELLANTS' PUBLIC TRUST DOCTRINE THEORY WOULD CREATE A BOUNDLESS NEW LEGAL ACTION ........18

CONCLUSION .....................................................................................21

CERTIFICATE OF COMPLIANCE.......................................................22

CERTIFICATE OF SERVICE .............................................................23

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*\*AEP v. Connecticut*, 131 S. Ct. 2527 (2011) ..................................... 3, 8-10, 12, 19

*Baker v. Carr*, 369 U.S. 186 (1962)........................................................................20

*California v. Gen. Motors Corp.*, No. C06-05755 MJJ, 2007 WL 2726871
    (N.D. Cal. Sept. 17, 2007) ........................................................................8, 20

*Comer v. Murphy Oil USA, Inc.*, No. 1:05-CV-436-LG-RHW, 2007 WL
    6942285 (S.D. Miss. Aug. 30, 2007) ("*Comer I*"), *rev'd*, 585 F.3d
    855 (5th Cir. 2009), *appeal dismissed*, 607 F.3d 1049 (5th Cir. 2010) ....8, 20

*Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849 (S.D. Miss. 2012)
    ("*Comer II*"), *aff'd*, 718 F.3d 460 (5th Cir. 2013)................................3, 8, 11

*Connecticut v. Am. Elec. Power Co.*, 406 F. Supp. 2d 265 (S.D.N.Y. 2005),
    *vacated*, 582 F.3d 309 (2d Cir. 2009), *rev'd*, 131 S. Ct. 2527 (2011) ......8, 20

*Diamond v. Gen. Motors Corp.*, 97 Cal. Rptr. 639 (Cal. Ct. App. 1971)...............10

*Envtl. Prot. Info. Ctr. v. Cal. Dep't of Forestry & Fire Prot.*,
    187 P.3d 888 (Cal. 2008) ...................................................................................6

*Illinois Cent. R.R. Co. v. Illinois*, 146 U.S. 387 (1892) ............................................5

*Kelly v. 1250 Oceanside Partners*, 140 P.3d 985 (Haw. 2006)................................6

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................................19

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ......................................................2, 16

*Native Village of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863
    (N.D. Cal. 2009), *aff'd*, 696 F.3d 849 (9th Cir. 2012), *cert. denied*,
    133 S. Ct. 2390 (2013)............................................................ 3, 8, 10-11, 20

*Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469 (1988)....................................5

*PPL Montana, LLC v. Montana*, 132 S. Ct. 1215 (2012)......................................4, 7

*Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 506 U.S. 702 (2010) ................................................................ 4-5

*Summa Corp. v. California*, 466 U.S. 198 (1984) ..................................... 5

*Tioga Public Sch. Dist. v. U.S. Gypsum Co.*, 984 F.2d 915 (8th Cir. 1993) .......... 18

*U.S. v. Mission Rock Co.*, 189 U.S. 391 (1903) ....................................... 5

*Utility Air Regulatory Group v. EPA*, 134 S. Ct. 418 (Oct. 15, 2013) (granting certiorari) ........................................................... 17

## STATUTES

Cal. Fish & Game Code § 1801 ........................................................ 6

Haw. Const. art. XI, § 1 ............................................................. 6

5 U.S.C. §§ 551 et seq. .............................................................. 17

15 U.S.C. § 2901 .................................................................... 13

15 U.S.C. §§ 2931 to 2939 ........................................................... 14

42 U.S.C. § 7521 ....................................................................

42 U.S.C. § 7607 .................................................................... 17

## OTHER AUTHORITIES

*About Us*, Our Children's Trust, at http://ourchildrenstrust.org/about ................... 2

Christopher E. Appel, *Time for Climate Change Tort Litigation to Cool Off Permanently*, 12:223 Environmental Report (Bloomberg BNA) B-1, Nov. 20, 2012 ................................................................ 11

*Carbon Pollution Standards: What EPA is Doing*, EPA, at http://www2.epa.gov/carbon-pollution-standards/what-epa-doing .............. 15

*Climate Debate in Congress*, Center for Climate and Energy Solutions, at
    http://www.c2es.org/federal/congress ..........................................................13

*The Costs of Reducing Greenhouse-Gas Emissions*, Cong. Budget
    Office (2009) .................................................................................................16

Energy Security Act, Pub. L. No. 96-294, 94 Stat. 611 (1980)...............................14

Final Rule, Prevention of Significant Deterioration and Title V Greenhouse
    Gas Tailoring Rule, 75 Fed. Reg. 31,514, 31,557-67 (June 3, 2010) ...........17

Phil Goldberg, *Why Progressives Should Cool to "Global Warming"
    Lawsuits*, Progressive Pol'y Inst., Nov. 2010.................................................18

Robert Meltz, *Climate Change Litigation: A Growing Phenomenon*, Cong.
    Research Serv., RL 32764 (2008) ...................................................................12

William O'Keefe, *Cap and Trade's Sad History*, TheHill.com,
    Aug. 10, 2010, at http://thehill.com/blogs/congress-
    blog/energy-a-environment/113553-cap-and-trades-sad-history-.................15

Robert B. Reich, *Don't Democrats Believe in Democracy?*, Wall St. J.,
    Jan. 12, 2000, at A22 .....................................................................................11

S. Res. 98, 105th Cong. (1997).............................................................................14

S. Treaty Doc. No. 102-38 (1992) .........................................................................14

Victor E. Schwartz et al., *Does the Judiciary Have the Tools for Regulating
    Greenhouse Gas Emissions?*, 46 Val. U. L. Rev. 369 (2012)..........................8

Transcript of Oral Argument, Am. Elec. Power Co. v. Connecticut,
    131 S. Ct. 2527 (2011)...................................................................................19

# GLOSSARY

| | |
|---|---|
| *AEP* | *American Elec. Power Co. v. Connecticut*, 131 S.Ct. 2527 (2011) |
| App. Br. | Opening Brief of Appellants |
| ATRA | American Tort Reform Association |
| CAFE | Corporate Average Fuel Economy |
| $CO_2$ | carbon dioxide |
| EPA | Environmental Protection Agency |
| GHG | greenhouse gas |
| ppm | parts per million |
| UNFCCC | United Nations Framework Convention on Climate Change |
| U.S. | United States |

## INTEREST OF *AMICUS CURIAE*

Founded in 1986, the American Tort Reform Association (ATRA) is a broad-based coalition of approximately 170 businesses, corporations, municipalities, associations, and professional firms that have pooled their resources to promote reform of the civil justice system with the goal of ensuring fairness, balance, and predictability in civil litigation.  For over two decades, ATRA has filed *amicus curiae* briefs in cases before state and federal courts that have addressed important civil litigation issues, including those related to climate change litigation.  ATRA submits this brief to show how Appellants' novel legal theory seeks to improperly regulate GHG emissions through litigation; a theory which, if accepted by this Court, would adversely impact ATRA's members.

## SUMMARY OF THE ARGUMENT

This case is an attempt by private individuals to use civil litigation to circumvent Congress in an effort to achieve their own political agenda. Specifically, Appellants are seeking to have a federal district court set U.S. energy policy related to emission levels of $CO_2$, which is one of six types of gases that are collectively referred to as greenhouse gases (GHGs).[1]  *See* App. Br. at 3. Appellants then want to use the injunctive power of the court to require the federal

---

[1]     These gases are carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride.

government to impose a series of programs and regulations on the American people to achieve this agenda. *See id*. at 4 (stating that the goal of this litigation is to "order" the federal regulatory agencies to adopt a "comprehensive climate recovery plan").

The Supreme Court of the United States has made clear, including in the context of GHG emissions, that Congress, not individual citizens, has the sole power to authorize federal agencies to enact regulations. *See Massachusetts v. EPA*, 549 U.S. 497, 533 (2007) (stating federal agencies, in setting GHG emissions policy, can only "exercise discretion within defined statutory limits"). As discussed below, Congress in its collective judgment has consistently decided against adopting strict GHG emission limits, including the types of major reduction of GHG emissions Appellants seek in this case.

*Amicus* appreciates that Appellants may be frustrated that, in their view, there has been "failed" presidential leadership and a "deadlocked" Congress on this issue. *See About Us*, Our Children's Trust, at http://ourchildrenstrust.org/about (stating such frustrations as reasons for bringing this claim). Indeed, *amicus* has its own public policy frustrations with Congress and the Administration. But, civil litigation, including based on the public trust theory offered in this case, does not provide the ability to hijack the political process.

2

In the past few years, there have been several comparable attempts to use civil litigation to force the regulation of GHGs. *See AEP v. Connecticut*, 131 S. Ct. 2527 (2011); *Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849 (S.D. Miss. 2012) ("*Comer II*"), *aff'd*, 718 F.3d 460 (5th Cir. 2013); *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012). All of these lawsuits failed for the same reason this suit should be dismissed. *See id.* The Supreme Court, federal circuits, and district judges found that the public policy judgments required for determining whether and how the U.S. should regulate $CO_2$ emissions are not appropriately made by a self-selected group of plaintiffs or judges, and then imposed through judicial orders. *See id.* As the Supreme Court concluded in *AEP*, any decision made through such a judicial process "cannot be reconciled with the decisionmaking scheme" of Congress. 131 S. Ct. at 2540.

If Appellants' claims are allowed to proceed, neither Congress nor the President could override the Appellants' agenda. The political branches of government would be relegated to managers of Appellants' national policy directive. Members of Congress and the many other stakeholders in the climate change debate would be silenced by judicial decree. This is not the American political system. The lower court's ruling should be affirmed because only Congress, and not states, trusts, individuals, or courts, can delegate "to EPA the decision [of] whether and how to regulate carbon dioxide emissions." *Id.* at 2538.

# ARGUMENT

## I.   THIS CASE REPRESENTS AN UNSOUND ATTEMPT BY PRIVATE LITIGANTS TO USE THE LITIGATION SYSTEM TO REGULATE AMERICA'S GHG EMISSIONS

Appellants are seeking to regulate through litigation.  They are asking the District Court to place an upper limit of 350 parts per million (ppm) on the total permissible $CO_2$ emissions *worldwide* and then direct the U.S. Government to develop and implement a comprehensive regulatory regime for U.S. businesses and residents based on that standard.  App. Br. at 7 (alleging current global levels of GHGs are 390 ppm, up from 280 ppm in pre-industrial times).  As discussed below, Appellants' claims have no basis in law.

### A.   The Public Trust Doctrine Does Not Support a Claim Requiring the U.S. Government to Enact a Broad Regulatory Scheme to Give Effect to Appellants' Desired Standard for Worldwide GHG Emissions

The legal theory upon which Appellants' claims are built is called the "public trust" doctrine.  It is a limited doctrine advanced only under state common law.  It originated from the idea that a state bears a "public trust" responsibility to keep certain communal property under the state's control.

Litigation in the federal courts involving states' public trust doctrine has largely focused on ownership rights of specific types of natural resources, namely tidelands and waterways.  *See*, *e.g.*, *PPL Montana, LLC v. Montana*, 132 S.Ct. 1215 (2012) (determining ownership rights of riverbeds); *Stop the Beach*

*Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 506 U.S. 702 (2010) (stating Florida "owns in trust for the public the land permanently submerged beneath navigable waters and the foreshore (the land between the low-tide line and the mean high-water line)"); *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469 (1988) (assessing ownership of tidelands); *Summa Corp. v. California*, 466 U.S. 198 (1984) (reversing state's attempt to assert a public trust easement over tidelands); *U.S. v. Mission Rock Co.*, 189 U.S. 391 (1903) (assessing title of soils under the tide waters within a state's limits).

For example, in *Illinois Cent. R.R. Co. v. Illinois*, 146 U.S. 387 (1892), the Supreme Court of the United States found that the shoreline of Lake Michigan was held in public trust by the state and, therefore, could not be transferred out of public ownership to a private railroad. *See id.* at 436 (describing the common law theory as being founded on the necessity of preserving "navigable waters from private interruption and encroachment"). In these cases, the remedies are straight-forward; the ownership interest is decided, and the states are generally informed as to whether they can sell, lease, or license the lands. *See id.* In the modern era, the public trust doctrine has played an important role in determining land and water rights and can provide a safeguard against states seeking to sell, lease, or license valuable public property to raise short-term capital to fill fiscal gaps.

In a handful of state courts, the public trust doctrine has been expanded slightly, but not beyond ownership interest in public lands and allocation of public resources. *See, e.g., Envtl. Prot. Info. Ctr. V. Cal. Dep't of Forestry & Fire Prot.*, 187 P.3d 888 (Cal. 2008) (affirming, in case about logging rights, that the common law doctrine applies only to planning and allocation of water resources); *Kelly v. 1250 Oceanside Partners*, 140 P.3d 985, 1002 (Haw. 2006) (applying the doctrine to all water resources). Any further expansion of the public trust doctrine has been achieved through legislation or state constitutional amendment.[2]

For example, the California Legislature enacted a public trust statute to expand the state's common law doctrine. *See* Cal. Fish & Game Code § 1801 (stating "the policy of the state to encourage the preservation, conservation, and maintenance of wildlife resources under the jurisdiction and influence of the state"). Even this statute, though, is not a broad mandate that would allow a private group to order the state to engage in a broad regulatory regime; the law specifically states that it is not to be misused such that it gives any individual or court the "power to regulate natural resources or commercial or other activities connected therewith, except as specifically provided by the Legislature." *Id.*

---

[2]      Hawaii has a constitutional amendment stating its public trust doctrine: "[T]he State . . . shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources . . . All public natural resources are held in trust by the State for the benefit of the people." Haw. Const. art. XI, § 1.

As the District Court here fully appreciated, the public trust doctrine, even if it were recognized under federal law, does not provide any basis for circumventing Congress and ordering federal agencies to develop a "comprehensive climate recovery plan" for global GHG emissions.  *See Alec L. v. Perciasepe*, No. 11-cv-2235 (RLW), at 4 (D. D.C. May 31, 2012) (holding that the public trust doctrine does not "protect the atmosphere or impose duties on the federal government"). Congress has not enacted a public trust statute, and the public trust doctrine is not a constitutional doctrine, as Appellants recently changed their legal arguments to allege.[3]  *See PPL Montana, LLC v. Montana*, 132 S. Ct. 1215, 1235 (2012) (stating the public trust doctrine's contours "do not depend upon the Constitution"); Memorandum Opinion, *Alec L. v. Perciasepe*, No. 11-cv-2235 (RLW), at 10 n. 5 (D. D.C. May 22, 2013) ("Plaintiffs failed to invoke – or even reference – any particular constitutional provision or law underpinning their claims.").  Under any theory, based on the Constitution or state or federal common law, Appellants do not state a claim allowing the remedy they seek; there is no such claim recognized under American jurisprudence.  *See* Memorandum Opinion, *Alec L. v. Perciasepe*,

---

[3]     *See* Memorandum Opinion, *Alec L. v. Perciasepe*, No. 11-cv-2235 (RLW), at 7 (D. D.C. May 22, 2013) ("[T]hroughout their briefing in this case, Plaintiffs staunchly maintained that the public trust doctrine, in and of itself, provided the basis for federal jurisdiction…. Now, however, Plaintiffs appear to be arguing that… the Federal Defendants committed freestanding, independent violation of the Constitution under the Due Process Clause, Equal Protection Clause, and the Commerce Clause.").

No. 11-cv-2235 (RLW), at 11 (D. D.C. May 31, 2012) (concluding this is not a dispute "for the federal courts to resolve").

### B.   Related Attempts to Have the Judiciary Regulate GHG Emissions Have Been Uniformly Rejected By Courts

Appellants' objective of instituting a U.S.-administered cap on global $CO_2$ emissions is not the first time litigants have petitioned the judiciary to force regulation of GHGs emissions.  In the past decade, four such lawsuits have been brought by both public and private entities seeking both damages and injunctive regulatory relief related to the emissions of $CO_2$.[4]  *See* Victor E. Schwartz, Phil Goldberg, Chris Appel, *Does the Judiciary Have the Tools for Regulating Greenhouse Gas Emissions?*, 46 Val. U. L. Rev. 369, 382-86 (2012).  Each one of these cases has been dismissed, including by the Supreme Court of the United States, because setting GHG emission limits "is undoubtedly an area 'within national *legislative* power.'"  *AEP*, 131 S. Ct. at 2535 (emphasis added).  It is not an area for judicial involvement.

---

[4]   *See Connecticut v. Am. Elec. Power Co.*, 406 F. Supp. 2d 265 (S.D.N.Y. 2005), *vacated*, 582 F.3d 309 (2d Cir. 2009), *rev'd*, 131 S. Ct. 2527 (2011); *California v. Gen. Motors Corp.*, No. C06-05755 MJJ, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007); *Native Village of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2390 (2013);  *Comer v. Murphy Oil USA, Inc.*, No. 1:05-CV-436-LG-RHW, 2007 WL 6942285 (S.D. Miss. Aug. 30, 2007) ("*Comer I*"), *rev'd*, 585 F.3d 855 (5th Cir. 2009), *appeal dismissed*, 607 F.3d 1049 (5th Cir. 2010); *Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849 (S.D. Miss. 2012) ("*Comer II*"), *aff'd*, 718 F.3d 460 (5th Cir. 2013).

*AEP* is comparable to the case at bar. Several land trusts, state attorneys general, and cities sought a judicial decree to require a "cap" on $CO_2$ emissions of a specified percentage each year for ten years. *See id.* at 2534.[5] In this case, the defendants were six public utilities. The Court unanimously held that Congress displaced "any federal common law right" seeking to limit GHG emissions. *Id.* at 2537. Thus, to the extent that Appellants' public trust theory sounds in federal common law, it has been displaced.

The Court, though, did not focus its ruling solely on displacement. It appreciated that climate change claims could come in various forms and spent a considerable portion of the opinion providing a road map for this and other courts to follow in other such cases, including the one at bar. Specifically, the Court stated broadly that regulation of GHG emissions is not an area where "federal courts should create the controlling law." *Id.* at 2536. Determining whether and how to set GHG emissions, the Court continued, is a public policy decision that needs to start in Congress, and "the Court remains mindful that it does not have the creative power akin to that vested in Congress." *Id.*

In particular, the Supreme Court issued a stern warning that courts should "resist setting emissions standards by judicial decree," which would include the

---

[5]     As here, "[t]he trusts urged that climate change would destroy habitats for animals and rare species of trees and plants," among other things. *AEP*, 131 S. Ct. at  2534.

9

global emissions cap that Appellants seek here. *Id*. at 2539. The Court stated that even if Congress and EPA, acting pursuant to its congressional authority, declines to regulate GHGs, "the federal courts would have no warrant to employ the federal common law" to require otherwise. *Id.*[6] While some interest groups may strongly disagree with this result, it reflects Congress's and EPA's collective policy decision. These are complex issues that require a full balancing of interests, and unlike Congress and EPA, "judges lack the scientific, economic, and technological resources an agency can utilize in coping with issues of this order." *Id.* at 2539-40.

These Supreme Court determinations are not limited to any specific claim. They certainly include public trust claims here. After *AEP*, the Ninth Circuit followed the Supreme Court's rationale to dismiss a common law claim that, while seeking a different remedy, also would have required courts to determine what "reasonable" emission standards for GHGs would be – just as Appellants are asking of this Court. *See Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012) (seeking monetary damages). The Ninth Circuit explained that even though the "case presents the question in a slightly different

---

[6]     The California Court of Appeal, more than forty years ago, issued an instructive decision in *Diamond v. Gen. Motors Corp.*, 97 Cal. Rptr. 639 (Cal. Ct. App. 1971). In addressing the issue of judicially imposed air pollution limits for Los Angeles, the court explained that plaintiffs were "simply asking the court to do what the elected representatives of the people have not done: adopt stricter standards over the discharge of air contaminants in this country, and enforce them with the contempt power of the court." *Id.* at 645.

context . . . [i]f a federal common law cause of action has been extinguished . . . it would be incongruous to allow it to be revived in another form." *Id.* at 857; *see also Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849 (S.D. Miss. 2012), *aff'd*, 718 F.3d 460 (5th Cir. 2013) (dismissing a similar common law climate change case).

The common theme through each of these rulings is that to adjudicate these claims under any civil litigation theory, the judiciary would be taking on the role of setting emissions policy for GHGs. *See* Christopher E. Appel, *Time for Climate Change Tort Litigation to Cool Off Permanently*, 12:223 Environmental Report (Bloomberg BNA) B-1, Nov. 20, 2012. The case at bar offers slight variants on the cases above by suing the government directly, not individual companies, in seeking judicially imposed limits on GHG emissions, but the result is the same. As the Supreme Court and federal circuits explained, it does not matter whether the cases seek injunctive relief or monetary damages, are brought by state attorneys general or individuals, or are brought under state or federal law. The courts have concluded that the judiciary is not to make such policy judgments.[7]

---

[7] Prominent legal scholar Robert Reich, who served as Secretary of Labor under President Clinton, is often credited with coining the term "regulation through litigation" to describe policy-driven lawsuits. Robert B. Reich, *Don't Democrats Believe in Democracy?*, Wall St. J., Jan. 12, 2000, at A22. While initially favoring these actions for advancing a political agenda, he realized their danger, concluding they amounted to "faux legislation, which sacrifices democracy." *Id.*

## II. WHETHER AND HOW TO REGULATE CO$_2$ EMISSIONS IS THE ROLE OF THE <u>POLITICAL BRANCHES OF GOVERNMENT</u>

Whether and how to regulate GHGs remains a highly debated, contentious issue in Congress, EPA, and internationally because of the broad impact these regulations would have on modern industrialized economies, in the U.S. and abroad.  In addition to the doctrinal deficiencies with Appellants' claims discussed above, the Supreme Court has recognized that any regulation of GHG emissions must be considered along with the benefits of fossil fuel energy, "our Nation's energy needs and the possibility of economic disruption" from such regulations. *AEP*, at 131 S. Ct. at 2539.   Appellants' attempt to set the worldwide GHG emissions limit at 350 ppm here so that it can achieve its own political agenda does not incorporate such an "informed assessment of competing interests." *Id*.

For example, GHG emissions outside of the U.S. constitute about 83% of worldwide GHG emissions.  *See* Robert Meltz, *Climate Change Litigation: A Growing Phenomenon*, Cong. Research Serv., RL 32764, at 8, fig. 2 (2008) (estimating worldwide emission levels).  If this lawsuit were allowed to succeed, U.S. businesses and residents would bear the entire burden of Appellants' reduction.  Further, the U.S. would have to continually offset increases in CO$_2$ emissions in China, India, and other emerging economies.  *See* App. Br. at 6 (demanding action "to rapidly reduce carbon emissions and protect and restore the

balance of the atmosphere"). In addition, the impact on the U.S. economy and the ability of Americans to have access to affordable energy could not factor into U.S. energy policy. U.S. policymakers would have to blindly follow the court ordered GHG emission reductions.

### A. Congress Has Carefully Deliberated Over GHG Emissions, Setting Forth an Incremental, Balanced Approach to GHG Emissions

The remedy Appellants seek – an unforgiving reduction in GHG emissions – would stand in stark contrast to the long-standing tenets of congressional energy policy of weaving together progressive, cogent strategies for managing risks, benefits, and capabilities of American energy sources. While *amicus* has no position on the substantive results of Congress's deliberations on this issue, what has become clear is that Congress has steadfastly approached the issue of GHG regulations with purposeful deliberation.[8]

Starting in the 1970s, Congress began an aggressive effort to study the allegations related to global climate change. In 1978, Congress established a "national climate program" intended to increase the general knowledge about the global climate "through research, data collection, assessments, information dissemination, and international cooperation." 15 U.S.C. § 2901. In 1980, through

---

[8] Hundreds of bills have been introduced during the last few Congresses proposing climate change solutions. *See Climate Debate in Congress*, Center for Climate and Energy Solutions, at http://www.c2es.org/federal/congress.

the Energy Security Act, Congress commissioned a study by the National Academy of Sciences to analyze the "projected impact, on the level of carbon dioxide in the atmosphere, of fossil fuel combustion, coal-conversion and related synthetic fuels activities."  Energy Security Act, Pub. L. No. 96-294, tit. VII, § 711, 94 Stat. 611, 774-75 (1980).  In 1990, Congress enacted the Global Changes Research Act, which established a ten-year research program for global climate issues.  *See* 15 U.S.C. §§ 2931 to 2939.

In recognition that GHG emission is a global, not U.S. phenomenon, Presidents since George H. W. Bush have negotiated internationally for a united global approach to GHG emission.  In 1992, the first President Bush signed the United Nations Framework Convention on Climate Change (UNFCCC), a nonbinding agreement of 154 nations to reduce atmospheric concentrations of $CO_2$ and other GHGs to "prevent dangerous anthropogenic interference with the [Earth's] climate system."  S. Treaty Doc. No. 102-38, Art. 2, p.5 (1992).  In 1997, UNFCCC member nations negotiated the Kyoto Protocol that called for mandatory reductions of GHG emissions of developed nations.  *See* S. Res. 98, 105th Cong. (1997).  President Clinton signed the Kyoto Protocol, but did not present it to the Senate for ratification, which expressed concern that the economic burdens of reducing $CO_2$ emissions would substantially and unfairly fall on industrialized nations.  In 2007, the second President Bush expressed concern with the Kyoto

14

Protocol because it exempted developing nations, did not include two major types of pollutants, and would have a negative economic impact on the U.S. The current Administration worked toward the Copenhagen Climate Conference in 2009, which considered renewing the Kyoto Protocol, and encouraged all nations to reduce emissions of GHGs. The conference resulted in an agreement called the Copenhagen Accord.

Domestically, Congress has steadfastly opposed broad caps on GHG emissions that would be applied only in the U.S. *See, e.g.,* William O'Keefe, *Cap and Trade's Sad History*, TheHill.com, Aug. 10, 2010, at http://thehill.com/blogs/congress-blog/energy-a-environment/113553-cap-and-trades-sad-history- (discussing Congress's rejection of various cap and trade proposals over thirteen year period). In the past few years, EPA has begun proposing a series of regulations related to $CO_2$ emissions. *See, e.g., Carbon Pollution Standards: What EPA is Doing*, EPA, at http://www2.epa.gov/carbon-pollution-standards/what-epa-doing. These initiatives can lead to $CO_2$ regulations so long as they are done in a manner authorized by Congress.

This history shows a purposeful, incremental, and balanced approach to addressing concerns posed by aggregated global GHG emissions. It is in concert with the Supreme Court's understanding that setting national energy policy requires a broad consideration of a multitude of factors. Indeed, a major

15

consideration for Congress that would not be factored into any judicial ruling on this issue has been the higher costs GHG emission limits would impose on the American public in terms of energy consumption, product prices, and decreased economic activity. *See The Costs of Reducing Greenhouse-Gas Emissions*, Cong. Budget Office, at 11 (2009); *AEP*, 131 S. Ct. at 2539 (concluding the judiciary does not possess the institutional competence to determine "[t]he appropriate amount of regulation" for sources of GHGs given the impact such a decision would have on the "energy needs" of the American people). The lack of specific standards for $CO_2$ emissions, therefore, is not a reflection on the fact that the political branches have not adequately considered the issue, but rather a demonstration of the complexity of designing a balanced regulatory regime.

**B.    The Supreme Court Has Unambiguously Stated that Courts Are to Reinforce, Not Undermine the Regulatory Process**

The role for the courts is not to undermine the regulatory process, as Appellants' claims in the instant case would do, but rather to assure that EPA and other federal agencies adhere to their congressional charters. As indicated above, EPA has been considering certain types of regulations for GHG emissions, and as the Supreme Court stated in *Massachusetts*, the courts must assure that EPA exercises this discretion "within defined statutory limits." 549 U.S. at 533. Specifically, the Clean Air Act provides courts with the obligation to "reverse any

16

such action found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 549 U.S. at 528 (citing 42 U.S.C. § 7607(d)(9)). The Administrative Procedure Act also ensures that the regulated community will be included in the regulatory process by having the opportunity for notice and comment when substantive rights are affected by federal regulations. *See* 5 U.S.C. §§ 551 et seq.

To this end, the Supreme Court recently granted *certiorari* in a case to decide whether EPA has acted within those bounds in issuing new GHG emission permitting standards for stationary sources. *See Utility Air Regulatory Group v. EPA*, 134 S.Ct. 418 (Oct. 15, 2013) (granting *certiorari*). In that case, EPA attempted to apply GHG emissions to existing Clean Air Act programs that were not designed for GHGs. EPA conceded that doing so yielded "absurd" results. Final Rule, Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule, 75 Fed. Reg. 31,514, 31,557-67 (June 3, 2010). Rather than work with Congress on developing a new program, EPA revised the Clean Air Act's statutory regime on its own. *See id.* The Supreme Court is now considering whether EPA properly acted within its congressional authority in doing so.[9] This is the appropriate role of the courts.

---

[9]     ATRA did not file an *amicus* brief in this case and does not have an organizational position on the outcome of this case.

By contrast, Appellants' lawsuit would have the Court ignore such considerations, bypass decades of work by Congress and Administrations, and force individual policy preferences on the federal government. The entire body of law safeguarding the regulatory process would be supplanted by judicial decree. The American public, negatively impacted by the forced reduction, would not have any avenues for their voices to be heard. Further, if successful, Appellants' would force agencies to expend significant resources establishing the type of comprehensive regulatory regime that Congress has thus far eschewed, as well as wasting additional taxpayer dollars in litigation.

## III.    APPELLANTS' PUBLIC TRUST DOCTRINE THEORY WOULD CREATE A BOUNDLESS NEW LEGAL ACTION

Beyond the case at bar, allowing this case to proceed would swing the federal courthouse doors wide open to politically-based lawsuits. *See* Phil Goldberg, *Why Progressives Should Cool to "Global Warming" Lawsuits*, Progressive Pol'y Inst., Nov. 2010. Private litigants would have a new public trust cause of action to impose their own natural resource agendas whenever they believe the government is not doing enough to satisfy their subjective beliefs.[10]

This new public trust action would become the "superman" of legal theories,

---

[10]    *Cf. Tioga Public Sch. Dist. v. U.S. Gypsum Co.*, 984 F.2d 915, 921 (8th Cir. 1993) (warning that public nuisance theory "would become a monster that would devour in one gulp the entire law of tort" if not properly confined).

18

leaping all bounds, whether born in the constitution, statute, or common sense.[11] As a preliminary matter, recognizing Appellants' legal theory would significantly expand the constitutional requirements for standing that have largely abated the ability of private individuals, such as Appellants, from challenging government action or inaction, including in the area of natural resources preservation.[12]  There would be no line of demarcation for when a public trust cause of action arises, *i.e.*, when an interest group can claim the government breached the public trust.  There also would be no standards for how far reaching of a remedy claimants could seek. In the case at bar, under what principles are Appellants suggesting that 350 ppm is the appropriate global emissions standard?  Can a court implement its judgment as to what the remedy should be?  How long does the government have to implement the court imposed remedy?  If similar cases are brought in other courts, what happens when standards set in one court conflict with standards in another court?

These are the exact types of "legislative" issues that confounded each of the

---

[11]    During oral argument in *AEP*, Justice Ginsburg expressed concern that having the judiciary set GHG emissions would "set up a district judge . . . as a kind of *super* EPA."  Transcript of Oral Argument at 37–38, Am. Elec. Power Co. v. Connecticut, 131 S. Ct. 2527 (2011) (emphasis added).

[12]    *See Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) (denying private interest group standing). Appellants allege that, pursuant to a federal public trust doctrine, children are a "suspect class" in which the federal government's inaction, which by definition treats all persons the same, has nevertheless resulted in "systematic age discrimination."  App. Br. at 31-32.

district courts where climate change suits have been filed.  *See, e.g., Kivalina*, 663 F. Supp. 2d at 877 ("allocation of fault – and cost – of global warming is a matter appropriately left for determination by the executive or legislative branch"); *AEP*, 406 F. Supp. 2d at 274 (stating before GHG emissions become province of courts, "an initial policy determination of a kind clearly for non-judicial discretion is required") (internal citation omitted); *Comer*, 2007 WL 6942285, at *1 ("Plaintiffs' claims are non-justiciable pursuant to the political question doctrine."); *California*, 2007 WL 2726871, at *8 ("The political branches' actions and deliberate inactions in the area of global warming . . . highlight this case as one for nonjudicial discretion.").  As the Supreme Court has recognized, political cases such as these provide no "judicially discoverable and manageable standards." *Baker v. Carr*, 369 U.S. 186, 217 (1962).

The public trust theories sought here would actually go further than these other cases, particularly if approved under the constitutional theories Appellants now offer.  For example, even when Congress has a law on point, such as with the Clean Air Act, Endangered Species Act, or Clean Water Act, anyone could claim a constitutional public trust claim that the government is not doing enough to preserve the air, species, or water for future generations.  Therefore, in addition to providing endless opportunities for new environmental litigation, this theory could ultimately dismantle current government regulation of natural resources.

End-game oriented public policy litigation may entice those sympathetic to a particular political agenda, but they do not give rise to litigation. Article III does not provide federal courts with authority to settle this or any other suit seeking to decide the national climate change policy debate.

## <u>CONCLUSION</u>

For these reasons, this Court should affirm the decision below.

Respectfully submitted,

<u>/s/ Phil Goldberg</u>
Phil Goldberg
Victor E. Schwartz
Christopher E. Appel
SHOOK, HARDY & BACON L.L.P.
1155 F Street N.W., Suite 200
Washington, DC 20004
Tel: (202) 783-8400
Fax: (202) 783-4211

Attorneys for *Amicus Curiae*

Dated: December 30, 2013

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because it contains 4,958 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.


/s/ Phil Goldberg
Phil Goldberg


Dated:  December 30, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of December, 2013, I have served the foregoing Brief on all registered counsel through the Court's Case Management/Electronic Filing System (CM/ECF).

/s/ Phil Goldberg
Phil Goldberg

Dated:  December 30, 2013